IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
*(Electronically Filed)*

| | | |
|---|---|---|
| FRANKIE COLLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:22-cv-00076-GNS |
| | ) | |
| TYSON FOODS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

\*\*\* \*\*\* \*\*\*

Defendant, Tyson Foods, Inc. ("Tyson" or the "Company"), submits this Reply in Support of Tyson's Motion to Dismiss Plaintiff's Complaint (the "Motion") and in response to Plaintiff's Memorandum of Law in Opposition ("Plaintiff's Response").

**I.**     **The Court Should Dismiss Plaintiff's RFRA and Constitutional Claims Because Tyson is Not a Government Actor and the Claims Fail on Their Merits (Counts Five and Six).**

Tellingly, Plaintiff does not dispute he may bring constitutional or RFRA claims only against government actors.  (*See* Pl.'s Resp., pp. 17-22).  Instead, Plaintiff attempts to transform Tyson into a government actor by misconstruing settled law regarding the application of various tests under the State Action Doctrine, and misrepresenting Tyson's KCRA preemption argument. (*See* Pl.'s Resp., p. 2) (arguing Tyson claimed "it is a federal state actor that preempts any state anti-discrimination law," and "[i]f Tyson is not a federal actor for the purposes of those federal laws, then Tyson cannot claim federal preemption as if they were").

1

Contrary to Plaintiff's Response, however, Tyson never claimed to be a "federal state actor," nor does it need to be one to invoke federal preemption of Plaintiff's KCRA claims.  (*See* Tyson's Mem. in Supp., Part IV.C); *see also King v. Ford Motor Co.*, 209 F.3d 886, 896 (6th Cir. 2000) (permitting defendant to argue federal preemption despite defendant not being the federal government).  As explained in Tyson's Memorandum in Support, Tyson did not take government action and cannot be sued for violating laws that apply only against the government.  (*See* Mem. in Supp., Parts II.A, C, D, and E and III.A).

A.   **Recent Rulings Concerning Other Private Entity Vaccination Policies Demonstrate Tyson's Vaccination Policy Does Not Constitute Government Action.**

Plaintiff cites no decision supporting his argument that a private party's vaccination policy constitutes government action.  Indeed, every district court in the Sixth Circuit has held otherwise; on at least two occasions, these holdings were in the context of Tyson's vaccination policy specifically. *See, e.g.*, *See Reed v. Tyson Foods, Inc.*, No. 21-cv-01155-STA-jay, slip op. at 11 (W.D. Tenn. June 14, 2022) (dismissing Fourth and Fifth Amendment claims, and RFRA claim, against Tyson because Tyson did not engage in government action when it enacted a mandatory vaccination policy); *Johnson v. Tyson Foods, Inc.*, No. 21-cv-01161-STA-jay, slip op. at 11 (W.D. Tenn. June 15, 2022) (same); *Beckerich v. St. Elizabeth Med. Ctr.*, 2021 WL 4398027, at *3 (E.D. Ky. Sept. 24, 2021) (rejecting plaintiffs' attempt to assert constitutional claims against a private hospital that implemented a vaccine mandate); *Harsman v. Cincinnati Children's Hosp. Med. Ctr.*, 2021 WL 4504245, at *3 (S.D. Ohio Sept. 30, 2021) (same).[1]  This Court would break with other court rulings if it held that a private employer's vaccination policy constitutes government action.

---

[1] Unpublished opinions cited herein are attached at Ex. A; *Reed v. Tyson* begins on page 25, *Johnson v. Tyson* begins on page 2, *Beckerich v. St. Elizabeth* begins on page 52, and *Harsman v. Cincinnati* begins on page 66.

Tellingly, Plaintiff's Response does not even attempt to distinguish *Reed v. Tyson* and *Johnson v. Tyson* from the instant case. Instead, Plaintiff argues the logic in *Bekerich* should not apply because of an objectively meaningless distinction. (*See* Pl.'s Resp., p. 21). Specifically, Plaintiff argues the State Action argument in *Beckerich* involved an allegation that the defendant hospital received government funding, but Plaintiff makes no such allegation here about Tyson. (*See id.*). This purported distinction Plaintiff highlights bolsters Tyson's argument; even receipt of federal funding is insufficient to transform a private hospital implementing a vaccine mandate into a state actor. Plaintiff's citation to *Harsman* similarly fails to support a finding that an employer's vaccine mandate is state action. Thus, Plaintiff's attempts to distinguish *Beckerich* and *Harsman* are unconvincing.

**B.     Sixth Circuit Precedent Makes Clear That Tyson's Vaccination Policy Is Not Government Action.**

None of the allegations in the Complaint demonstrate that Tyson's vaccination policy ("Policy") satisfies any of the Sixth Circuit's tests for determining whether a private party's actions amount to government action: "(1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000); (Mem. in Supp., Parts II.A and II.C). Plaintiff argues the Court should ignore binding precedent and reject those tests. (*See* Pl.'s Resp., p. 17-18). He seeks to rebut uncontroverted precedent with a non-precedential decision in *Minges v. Butler County Agricultural Society*, 585 F. App'x 879 (6th Cir. 2014). (Pl.'s Resp., pp. 18-19) (arguing *Lansing* is "at odds" with *Minges*). But far from being "at odds" with *Lansing*, *Minges* applies the very nexus test analyzed in *Lansing*.

*See Minges*, 585 F. App'x at 880.  Simply, the *Lansing* decision controls.  The non-precedential

decision in *Minges* does not and cannot alter *Lansing's* well-established tests.[2]

The application of each test shows Plaintiff has not alleged facts suggesting Tyson took

government action in implementing its Policy.  First, Tyson's conduct does not come within the

public function doctrine because the Company did not "exercise powers which are traditionally

exclusively reserved to the state" (such as administering elections or taking property through

eminent domain).  *See* Mem. In Supp., pp. 5-6*; see also Ellison v. Garbarino*, 48 F.3d 192, 195

(6th Cir. 1995).  Indeed, private companies regularly implement vaccination policies for their

employees.  Omitting this fact, Plaintiff argues Tyson "provid[ed] a critical infrastructure to

exercise the federal government's public function of guaranteeing an adequate food supply during

the government declared COVID-19 pandemic."  (Pl.'s Resp., p. 19).  Plaintiff has not plausibly

alleged Tyson functioned *as* the government simply by working *with* the government.  *See Ellison*,

48 F.3d at 195.

Plaintiff also does not plausibly allege Tyson's implementation of its vaccination Policy

meets the state compulsion test.  (*See* Mem. in Supp., pp. 6-7).  Plaintiff argues it is disingenuous

for Tyson to say its vaccine Policy was guided, not coerced, by the federal government.  (*See* Pl.'s

---

[2] It is worth noting, the defendant in *Minges* was an Ohio county agricultural society and the Ohio Supreme Court had deemed such societies "political subdivisions" for the purposes of state immunity.  *See Minges*, No. 13-4410 at *2-3 (reasoning "the State's decision to bring such societies beneath its sovereign-immunity umbrella is powerful evidence that, at least in some circumstances, they act on its behalf.").  Moreover, the *Minges* court recognized, "agricultural societies often serve a governmental function."  *Id.*  This particular society was even required to "seat at least two state employees on [its] board[]" and had the power to "appropriate private property under the State's eminent-domain statute."  *Id.*  Therefore, the question of whether the *Minges* defendant was a state actor was less obvious than the question presented here.  Unlike Minges, Plaintiff does not need to take discovery on this issue because a private poultry processor has never been deemed a "political subdivision," does not serve a government function as contemplated by the *Minges* court, is not required to have any state employees on its board, and cannot exercise powers akin to eminent-domain.

4

Resp., p. 19).  Plaintiff fails to explain, however, how Tyson's decision to implement a vaccine mandate could be deemed a decision of the government.  (*See id.* at 19-20).  Plaintiff presumes because the DPA instructed poultry processing companies to stay open and continue operations, Tyson was coerced by the federal government to implement a vaccine mandate.  (*Id.*).  But, this is not a reasonable presumption, and cannot support a claim that the government compelled Tyson to adopt the vaccination Policy.

Finally, Plaintiff's Complaint contains no factual allegations that meet the symbiotic relationship or nexus test for government action.  He does not allege Tyson conspired with the government to violate his rights, or that Tyson acted as the government's agent in any purported violations.  (*See* Mem. in Supp., pp. 7-8).  Instead, Plaintiff argues only that, "[b]y providing critical infrastructure to guarantee national food supply at the direction of executive order, the CDC and OSHA, Tyson necessarily acted as an agent of the government . . . ."  (*See* Pl.'s Resp., pp. 20-21).  This argument is illogical, unsupported by any factual allegations, and cannot defeat a motion to dismiss.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

In *United States v. Miller*, the Sixth Circuit found Google was not a government actor when it reported potential child pornography on its site to the police, because Google "sought to rid its virtual spaces of criminal activity for the same reason that shopkeepers have sought to rid their physical spaces of criminal activity: to protect their businesses." 982 F.3d 412, 425 (6th Cir. 2020). The same applies to Tyson, which implemented its vaccination Policy in "cooperat[ion] with" the government, *id.*, but did so to protect its premises, facilities, and operations by ensuring its employees are protected from COVID-19 infection.  As *Miller* shows, this did not make Tyson a

government actor, so it is not subject to suit for violation of constitutional or statutory laws that apply only to the government.

C.    **The Court Should Dismiss all Claims Requiring Government Action (Counts Five and Six).**

Plaintiff argues this Court should defer any decision on the question of government action even though many courts resolve this issue at the motion to dismiss stage.  (*See* Pl.'s Resp., pp. 17-18).  Plaintiff's cited cases change nothing.  Where plaintiffs fail to plead facts supporting a finding of government action, the Supreme Court and Sixth Circuit have affirmed dismissal on the pleadings.  *See, e.g.*, *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 358-59 (1974) (affirming grant of motion to dismiss on finding that defendant's actions did not constitute government action); *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007) (affirming grant of defendant's motion to dismiss "because the [plaintiff's] complaint failed to allege facts showing state action"). This Court should dismiss Plaintiff's Constitutional and RFRA claims for the same reason.

D.    **Plaintiff's Federal Constitutional Claims Fail on Their Face (Count Five).**

1.    **Plaintiff's Fourth Amendment claim is meritless.**

Setting aside whether Tyson is a government actor, Plaintiff's Fourth Amendment Claim nonetheless fails on its merits because Tyson's vaccination Policy is not a search or seizure as a matter of law.  A "search" for purposes of the Fourth Amendment occurs when *the government* "trespasses on a constitutionally protected area," or invades a person's "constitutionally protected reasonable expectation of privacy."  *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019). A "seizure" occurs when a *government official* applies "physical force" or makes a "show of authority" to restrain the subject's liberty, and the subject submits. *Gardenhire v. Schubert*, 205 F.3d 303, 313 (6th Cir. 2000).

Plaintiff attempts to shoehorn Tyson's vaccination Policy into these frameworks by citing *Schmerber v. California*, 384 U.S. 757 (1966), and *Winston v. Lee*, 470 U.S. 753 (1985), but these cases are inapposite. (*See* Pl.'s Resp., pp. 22-23). In *Schmerber*, a blood sample was drawn at the express direction of a police officer and was taken into government possession for criminal prosecution. *Schmerber*, 384 U.S. at 758. In *Winston*, the state sought a warrant to allow a forced hospital surgery under general anesthetic to recover a bullet lodged deeply in the defendant's body for the government to take into possession to use as evidence in a criminal prosecution against the defendant. *Winston*, 470 U.S. at 757–58. Plaintiff alleges nothing of the sort. Nor did Tyson direct any bodily intrusion or search or seizure of its employees. Tyson's Policy involves no use of "physical force" or "show of authority" to restrain its employees. *See Gardenhire*, 205 F.3d at 313. Accordingly, Plaintiff's Fourth Amendment claim is without merit.

### 2. Plaintiff fails to state a Fifth Amendment Claim.

Plaintiff argues some broad, free-standing "rights to bodily integrity and medical free choice" bar Tyson's Policy. (*See* Pl.'s Resp., pp. 23-24). But Plaintiff misconstrues the legal standard. As the Seventh Circuit recently explained, the Supreme Court applied rational basis review to uphold an earlier vaccination requirement and lower courts "must apply the law established by the Supreme Court." *See Klaassen v. Trustees of Indiana Univ.*, 7 F.4th 592, 593 (7th Cir. 2021) (plaintiffs lacked fundamental substantive due process right against vaccination because "vaccination requirements, like other public-health measures, have been common in this nation").[3] Each court to assess such COVID-19 government vaccination requirements has done

---

[3] *See also We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 293–94 (2d Cir. 2021) (while "individuals who object to receiving the vaccines on religious grounds have a hard choice to make, they do have a choice. Vaccination is a condition of employment in the healthcare field; the [government employer] is not forcibly vaccinating healthcare workers.").

so under rational basis review.  Yet, Plaintiff does not argue he pleaded any plausible violation of rights here under rational basis review.

Instead, Plaintiff raises three immaterial cases.  (*See* Pl.'s Resp., pp. 23-24).  Plaintiff cites *Cruzan v. Dir., Mo. Dep't of Health*, even though the Supreme Court explained when a liberty interest is at stake it must be balanced against the relevant government interest, 497 U.S. 261, 278 (1990)—and Plaintiff attempts no such balancing of the significant employer interest in maintaining a healthy workforce.  He also relies on *Albright v. Oliver*, 510 U.S. 266, 272 (1994), which pertains only to criminal cases, and *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891), which compelled an individual to expose bodily injuries to a jury.  These cases stray far from the issues presented here, and Plaintiff misses the point: even a government vaccination Policy is constitutionally permissible so long as it is "rationally related to a legitimate state interest." *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  Every court to assess similar policies under the Fifth Amendment has found them permissible, and Plaintiff gives this Court no reason to hold otherwise.

### E.    Plaintiff's RFRA Claim Fails on Its Merits (Count Six).

Again, setting aside whether Tyson is a government actor, Plaintiff's RFRA claim also fails because Title VII is the exclusive remedy for employment discrimination claims against (purported) federal actors.  (*See* Mem. in Supp., Part III.A).  Meanwhile, the RFRA mandates that courts use strict scrutiny when examining federal laws and regulations that substantially affect religious freedom.  *See* 42 U.S.C. § 2000bb-1(a); *Cutter v. Wilkinson*, 423 F.3d 579, 582 (6th Cir. 2005).  Plaintiff disagrees but makes no attempt to distinguish controlling case law.  *See Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 993 (6th Cir. 2009) (Title VII "provides the exclusive remedy for [religious discrimination] claims in federal employment."); (*see also* Pl.'s Resp., pp. 24-25).

In the face of binding precedent, Plaintiff proffers two non-binding decisions, neither of which involve employment discrimination claims and both of which are a red herring. (*See* Pl.'s Resp., pp. 24-25). For example, in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), the court grappled with whether the RFRA permitted a corporation to assert a religious-based exemption to the Patient Protection and Affordable Care Act ("PPACA"); specifically, Hobby Lobby argued the RFRA prohibited the U.S. Department of Health and Human Services to demand the corporation provide health-insurance coverage for methods of contraception the corporation's owners did not agree with for religious reasons. *See Hobby Lobby*, 573 U.S. at 688-91. Not only is the U.S. Department of Health and Human Services unquestionably a federal agency, the RFRA applied because the court was analyzing whether a federal law, the PPACA, improperly affected religious freedoms. *Id*. Nothing in the case suggests a plaintiff could use the RFRA to assert an employment discrimination claim against a private entity.

Plaintiff's argument regarding *Tagore v. Unites States*, 735 F.3d 324 (5th Cir. 2013) is unconvincing for the same reasons. (*See* Pl.'s Resp., p. 24-25). Tagore asserted claims against the Internal Revenue Service alleging she was prohibited from wearing her Sikh ceremonial sword to the federal building in which she worked. *Tagore*, 735 F.3d at 325. Tagore's RFRA claim challenged a federal law which prohibited dangerous weapons inside government buildings. *Id.* (explaining 18 U.S.C. § 930(a) proscribes the knowing possession of a "dangerous weapon" in a federal facility). Unlike the PPACA and 18 U.S.C. § 930(a), Tyson's vaccine mandate is not a federal law or regulation subject to the RFRA's required scrutiny. Accordingly, *Hunter* controls here and Plaintiff's RFRA claim must be dismissed.

## II.   **Plaintiff's Employment Discrimination Claims Cannot Survive Tyson's Motion to Dismiss (Counts One through Four).**

### A.   **Plaintiff's Failure to Exhaust His Administrative Remedies Is Fatal to His ADA Claim (Count Four).**

Plaintiff characterizes his failure to assert a disability claim with the EEOC as a mere failure "to check a box on a form," and suggests this court should overlook this critical misstep. (*See* Pl.'s Resp., p. 2, 7).  But, courts routinely dismiss discrimination claims where a plaintiff: (1) fails to check the appropriate boxes on an EEOC charge; and (2) submits a charge devoid of any facts to support the new claim.  *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010); *see also Harris v. Sara Lee/Hillshire Brands Corp.*, No. 2:13-cv-00151-DLB at *6 (E.D. Ky. April 22, 2014) (dismissing genetic information and age claim because pro se plaintiff did not check either box on his charge and alleged no facts regarding those protected bases).[4]

Plaintiff also argues he should not be required to exhaust his administrative remedies to bring an ADA claim because he "did not have legal counsel at the time of his filing of his EEOC charge and he was unaware of the additional claims available to him." (Pl.'s Resp., p. 7).  Plaintiff, however, offers no authority to support his contention that one's *pro se* status or one's failure to know available claims excuse a failure to exhaust administrative remedies as to such unknown claims.  (*See id.*).

The exhaustion requirement exists to provide notice to an alleged wrongdoer of its potential liability.  *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004).  The rule also "afford[s] the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion."  *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).  By his own

---

[4] The *Harris v. Sara Lee/Hillshire Brands* case begins on page 73 of Ex. A.

FP 45202824.1

admission, Plaintiff was "unaware of the additional claims available to him" at the time he filed his religious discrimination charge.  (*See* Pl.'s Resp., p. 7).  Consequently, Plaintiff did not allege any facts which could have provided notice to Tyson it may be liable under the ADA.  *See* Pl.'s EEOC Charge, Ex. B to Mem. in Supp., attached hereto at Ex. C for the Court's convenience.  If Plaintiff himself was "unaware of the additional claims available to him" at the time he filed his Charge, it defies logic to suggest that either the EEOC or Tyson could have divined from Plaintiff's sole paragraph alleging a religious discrimination claim under Title VII that Plaintiff would one day pursue a disability discrimination claim.  *See id.*  Thus, neither the EEOC nor Tyson had a meaningful opportunity to initiate conciliation of the ADA claim Plaintiff now asserts.

Plaintiff argues Tyson should have assumed he may pursue an ADA claim because receiving or declining vaccinations is a medical decision.  (Pl.'s Resp., p. 7).  This is unconvincing, particularly where, until the filing of this lawsuit, Plaintiff's only proffered basis for declining the vaccine has been for religious reasons.  Moreover, Plaintiff has never alleged he has an underlying health condition which makes the vaccine unsafe for him.  The fact that Plaintiff is not actually disabled and Tyson never regarded him as such eviscerates his argument that Tyson should have anticipated some ADA claim resulting from Plaintiff's religious objections.[5]

Plaintiff's own cited authority supports Tyson's argument.  (*See* Pl.'s Resp., p. 7).  For example, in *Deister v. Auto Club Ins. Ass'n.*, the Sixth Circuit affirmed a district court's decision that the plaintiff's disability retaliation claim failed because he "failed to check the box in his EEOC form entitled 'retaliation'" and "the narrative section [did not] include facts that would suggest that he intended to bring an ADA retaliation claim." *Deister v. Auto Club Ins. Ass'n.*, Case

---

[5] See Part II.C, *infra* for Tyson's position regarding Plaintiff's dubious theory that Tyson's vaccine mandate was the equivalent of regarding Plaintiff as disabled by believing he lacked immunity to COVID.

No. 15-1620, at *11 (6th Cir. 2016).[6]  Plaintiff's citation to *Moore v. Hexacomb Corp.* is equally futile because *Moore* is easily distinguished from the facts of this case.  *See Moore v. Hexacomb Corp.*, 670 F. Supp. 2d 621, 632 (W.D. Mich. 2009).  In *Moore*, a court determined a plaintiff's disability discrimination claim could survive because he had alleged a failure to accommodate claim in his EEOC charge premised upon the same disability and facts.  *See id*.  In deciding the termination claim was exhausted, the Court reasoned: "Given the fact that the restrictions were permanent, it is reasonable to conclude that the EEOC investigation into the failure to accommodate claim would have disclosed the termination claim."

Contrast the holding in *Moore* with that of *Jones v. Sumser Retirement Vill.*, 209 F.3d 851, 853-54 (6th Cir. 2000).  In *Jones*, the plaintiff's EEOC charge alleged her employer failed to keep her position open while she recovered from an injury.  *Jones*, 209 F.3d at 853-54.  The plaintiff's charge alleged an ADA discrimination claim but did not specifically allege the defendant failed to accommodate her disability.  *Id*.  The Sixth Circuit ultimately held her accommodation claim did not "grow out of" the investigation of her discriminatory termination claim because the claims were sufficiently different.  *Id.* at 854.

Here, Plaintiff's EEOC charge never referenced any perceived or actual disability.  Thus, according to Sixth Circuit case law, Plaintiff's ADA claim does not "grow out of" an investigation of Plaintiff's Title VII religious discrimination claim in his EEOC charge, and must fail for failure to exhaust administrative remedies.  *See Jones*, *supra*; *Moore*, *supra*; *Deister*, *supra*.

Finally, while *pro se* plaintiffs may be held to less stringent pleading standards, "the lenient treatment of *pro se* litigants has limits."  *Farah v. Wellington*, 295 Fed. Appx. 743, 748 (6th Cir.

---

[6] The *Deister v. Auto Club* case begins on page 77 of Ex. A.

2008) (quoting *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996)).  Federal courts routinely dismiss complaints filed by *pro se* plaintiffs where, like here, the plaintiffs failed to exhaust administrative remedies and/or failed to state plausible claims upon which relief may be granted.  *See, e.g.*, *Simpson v. G4S Secure Solution (USA), Inc.*, 2013 U.S. Dist. LEXIS 67452 (W.D. Tenn. May 13, 2013) (dismissing *pro se* plaintiff's ADA complaint due to failure to exhaust his administrative remedies); *Jordan v. E & A Protective Servs.-Bravo, LLC*, 2013 U.S. Dist. LEXIS 144438 (W.D. Tenn. Oct. 4, 2013) (dismissing *pro se* plaintiff's complaint for failure to exhaust administrative remedies and on statute of limitations grounds).[7]  Plaintiff's *pro se* status at the time of filing his EEOC Charge cannot cure his failure to exhaust his administrative remedies regarding his ADA claim.  For these reasons, his ADA claim in Count Four should be dismissed.

### B.  Plaintiff Fails to State a Claim Under the ADA and KCRA Because Tyson Has No Duty to Accommodate a Perceived Disability (Counts Two and Four).

Plaintiff does not claim to have an actual disability but, rather, his ADA and KCRA claims are based entirely upon the allegation Tyson regarded him as having an impairment of "functions of the immune system."  (*See* Pl.'s Resp., pp. 4-6).  Notwithstanding, Plaintiff's Response argues he is still entitled to an accommodation under the ADAAA.  (*See id.* at p. 2, 4-6).  This is incorrect. The legislature expressly foreclosed any such theories of recovery when it amended the ADA in 2008.  *See* 42 U.S.C. § 12201(h) ("A covered entity . . . need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section"); *see also* 42 U.S.C. § 12102(1)(C) (subparagraph (C) refers to an individual

---

[7] The *Simpson v. G4S* case begins on page 84 of Ex. A, and the *Jordan v. E&A Protective Servs.* case begins on page 90 of Ex. A.

"being regarded as having" an impairment).  Plaintiff's citation to pre-ADAAA jurisprudence is patently irrelevant.  *See* 42 U.S.C. § 12201(h); 29 C.F.R. § 1630.2(o)(4); *see also* 29 C.F.R. § 1630.2(o)(4) ("A covered entity is . . . not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong" of the ADA).[8]

The Sixth Circuit has said, "although a 'regarded as' plaintiff must still show that they are 'qualified' for a position, **inquiries into 'reasonable accommodations' are irrelevant**." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 n.8 (6th Cir. 2019) (emphasis added) (internal citations omitted).[9]  Importantly, the Sixth Circuit held employers did not have to accommodate perceived disabilities long before Congress passed the 2008 ADA Amendments Act.  *See Workman v. Frito Lay*, 165 F.3d 460, 467 (6th Cir. 1999).  Because Tyson was under no legal obligation to accommodate an alleged perceived disability, Plaintiff's disability discrimination claims under the ADA and KCRA must be dismissed.

---

[8] Plaintiff's Response argues, "[Tyson] claims Plaintiff cannot seek relief for disability discrimination on the grounds it is acceptable to discriminate against employees that a company perceives as disabled as long as the company's prejudice turns out incorrect." (Pl.'s Resp., p. 2).  Plaintiff's argument falls flat in the face of the ADA's unequivocal statutory language, applicable regulations, and controlling Sixth Circuit authority that unquestionably demonstrate an employer is not obligated to reasonably accommodate an individual who is perceived as disabled.  (*See* Mem. in Supp., Part IV.D.2).

[9] Because the KCRA mirrors the ADA, courts in Kentucky generally interpret claims brough under the KCRA consistently with the standards developed under the ADA.  *See e.g.*, *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007); *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2004); *Koch v. Thames Healthcare Grp.*, No. 20-5367 at *7 (6th Cir. May 13, 2021).  Accordingly, Plaintiff's KCRA disability claim must suffer the same fate as his ADA claim - they must both be dismissed for failure to state a claim because both pre- and post-ADAAA jurisprudence in the Sixth Circuit did not impose an obligation to reasonably accommodate Plaintiff's alleged, perceived disability. *See, e.g.*, *Workman*, 165 F.3d at 467; *Babb*, 942 F.3d at 308 n.8.

**C.**    **Plaintiff Cannot Salvage His Claims Under the ADA and KCRA Because He Has Not Alleged an Impairment (Counts Two and Four).**

Plaintiff's ADA and KCRA claims also fail because he has not alleged facts sufficient to support his assertion that Tyson regarded him as disabled under either statute.  Plaintiff summarily asserts Tyson's Policy reflects Tyson's belief that Plaintiff has an impairment of "functions of the immune system."  (*See* Pl.'s Resp., p. 5).  He sidesteps the EEOC's definition of impairment by raising the ADA's directive that courts broadly construe the definition of disability "in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter." 42 U.S.C. 12102(4)(a).  Plaintiff implies the EEOC's definition can be ignored in pursuit of a broad construction of disability.  It cannot.  Plaintiff offers no authority to support the position that a belief that one is *susceptible* to COVID-19 sufficiently alleges a physiological disorder or physiological condition.[10]  The alleged impact on Plaintiff's immune system in the absence of the vaccine is simply irrelevant.

Neither the absence of the vaccine in Plaintiff's body nor the possibility that Plaintiff may get COVID-19 is sufficient to allege an impairment.  Recent rulings confirm lacking immunity to a novel virus is not a disability.  *See Speaks v. Health Systems Management, Inc.*, No. 5:22-cv-00077-KDB-DCK at *2 (W.D.N.C. Aug. 17, 2022) (dismissing ADA claim where plaintiff "has not sufficiently alleged that she has a disability within the meaning of the ADA simply because her employer implemented a COVID-19 policy requiring vaccination and she chose not to become vaccinated . . . .").[11]  If it were, the entire population of Earth would be disabled each time a new

---

[10] *Taylor v. Burlington Northern RR Holdings*, 904 F.3d 846, 850 (9th Cir. 2018) (in reviewing the definition of impairment in EEOC regulations, the lack of a comma following "disorder" suggests that a "condition" must be caused by something physiological in nature).

[11] The *Speaks v. Health Systems* case begins on page 92 of Ex. A.

virus is observed.  *See id.* ("[I]nferring that the Company classified Speaks as impaired by requiring her to become vaccinated or seek an exemption would mean that Health Systems considered all its employees to have an 'impairment,' which is of course **not a plausible inference**, particularly in light of the possibility of an exemption.") (emphasis added); *see also Hice v. Mazzella Lifting Techs., Inc.*, No. 2:21CV281, 2022 WL 636640, at *7–8 (E.D. Va. Mar. 4, 2022) (possible future exposure to COVID-19 does not constitute an impairment under the ADA).[12] Because Plaintiff has not sufficiently alleged Tyson regarded him as having a disability, his ADA and KCRA discrimination claims must be dismissed.

### D.     KRS 39A.275 Grants Tyson Immunity From Plaintiff's KCRA Claims (Counts One and Two).

Plaintiff fails to articulate a valid reason why his KCRA claims should overcome the broad immunity granted by KRS 39A.275.  Plaintiff argues the statute does not apply to his claims because "the purpose of such legislation was to provide a liability shield that restricted workers' compensation coverage for employee claims for essential employers who remained open during the peak of COVID-19 and whose employees may be infected [] due to workplace exposure."  (Pl.'s Resp., p. 8).  To support this conclusion, Plaintiff cites a scholarly journal article that references KRS 39A.275 only once; specifically, in footnote 176 the author states KRS 39A.275 is among twenty of thirty liability shield statutes that have "limited liability for all businesses unless they act with gross negligence or recklessness."  *See* Alexia Brunet Marks, *Essential but Ignored: Covid-19 Litigation and the Meatpacking Industry*, 14 Ne. U.L. Rev. 47, 77 n. 176 (2022).  This article does not support Plaintiff's argument and, ironically, its author seems to support employee vaccination, noting "increasing vaccination rates lead[] to lower risk

---

[12] The *Hice v. Mazzella* case begins on page 100 of Ex. A.

of spread" within the meat and poultry industries and generally.  *Id.* at 109.

Plaintiff also cites to *Tipton v. St. Joseph Health System* but fails to realize it rebuts his own argument that liability shield laws are for workers' compensation claims only.  (*See* Pl.'s Resp., p. 8 citing *Tipton v. St. Joseph Health Sys., Inc.*, No. 2021-CA-0985-MR, 2022 WL 2541827 (Ky. Ct. App. July 8, 2022)).[13]  In *Tipton*, the plaintiffs were patients of defendants' home-based health care services, not employees with workplace injuries.  *See Tipton*, 2022 WL 2541827 at *2.  The Tiptons asserted the following claims: "breach of warranty, breach of contract, negligence, negligent supervision and entrustment, estoppel, strict liability, and a violation of Kentucky's Consumer Protection Act."  *Id.* at *1.  The Kentucky Court of Appeals affirmed the trial court's dismissal of all these claims because they were shielded by KRS 39A.275.  *Id.* at *1-3,11.

Plaintiff also argues liability shield statutes such as KRS 39A.275 "limit the scope of immunity to claims arising out of exposure to COVID-19."  (*Id.*).  The plain language of KRS 39A.275, however, provides much broader coverage than Plaintiff suggests.  For example, a claim arises from COVID-19 under the statute if it is caused by or results from: (1) exposure, transmission, or contraction of the virus; (2) services, treatment, or other action performed to limit or prevent the spread of the virus; and (3) services performed by an entity outside the normal course of its business in response to the virus.  KRS § 39A.275(1)(a).  Exposure claims are thus only one of many claims KRS § 39A.275 expressly precludes.[14]  Further, there is no question

---

[13] The *Tipton v. St. Joseph* case begins on page 113 of Ex. A.

[14] It is well settled courts must give effect to all provisions of a statute.  *See Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883) (courts are required to "give effect, if possible to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed."); *see also See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void, or insignificant[.]"); *Travelers Indemnity Company v.*

Tyson's mandatory vaccination policy fits squarely within the statutory language referencing "action performed to limit or prevent the spread of the virus." *Id*.

Finally, the *Tipton* court noted, "[q]uestions of immunity should be addressed promptly at the outset of a suit, considering that immunity is not just immunity from an eventual adverse judgment but from the ordeal of being a party to a suit at all." *Tipton*, No. 2021-CA-0985-MR at *10-11. For this reason, the court was not moved by the plaintiffs' argument that they needed more discovery to gather evidence that defendants were grossly negligent.

Similarly, while Plaintiff argues Tyson's vaccine mandate was an act of gross negligence or wanton, willful, or malicious conduct, it is merely an unwarranted factual inference this Court need not accept as true. Without additional factual allegations, Plaintiff's bald assertion should be insufficient to preclude dismissal pursuant to KRS § 39A.275 to protect Tyson "from the ordeal of being a party to a suit" concerning an "action performed to limit or prevent the spread of COVID-19." *Tipton*, *supra*; KRS § 39A.275.

### E.    The April 28, 2020 Executive Order, FMIA, and PPIA Preempt Plaintiff's KCRA Claims (Counts One and Two).

#### 1.    Plaintiff's KCRA claims are preempted by executive order.

Plaintiff makes three primary arguments in his attempt to avoid preemption: (1) Executive Order 13917 (the "Order") was not a proper exercise of authority under the Defense Production Act ("DPA"); (2) the Order simply designated "the meat and poultry industry to fall under" the definition of critical and strategic materials within the DPA and delegated authority to the

---

*Armstrong*, 565 S.W.3d 550, 563 (Ky. 2018). Ignoring this fundamental canon of statutory interpretation, Plaintiff asks this Court to defy the U.S. and Kentucky Supreme Courts and interpret KRS 39A.275 in a way that renders more than half of its provisions superfluous and insignificant.

Secretary of Agriculture; and (3) the USDA has not exercised the authority delegated by Executive Order 13917.  (*See* Pl.'s Resp., pp. 10-11).  Each of these arguments is without merit.

First, Plaintiff offers no explanation as to why the Order does not "constitute an exercise of DPA authority." (*Id.* at 11).  Second, Plaintiff's characterization of the content of the Order represents a cherry-picked, unreasonably limited recitation of its substance and scope.  In stark contrast to Plaintiff's portrayal, the Order specifically discusses the importance of the meat and poultry industry's ability to continue operations and the threat COVID-19 poses to that ability. Specifically, the Order states:

> It is important that processors of [meat and poultry] . . . continue operating and fulfilling orders to ensure a continued supply of protein for Americans. However, outbreaks of COVID-19 among workers at some processing facilities have led to the reduction in some of those facilities' production capacity. . .. [C]losures threaten the continued functioning of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency.

85 Fed. Reg. 26,313 (Apr. 28, 2020).  Thus, the Order delegated authority to the Secretary of Agriculture "to ensure the continued supply of meat and poultry, consistent with the guidance for the operations of meat and poultry processing facilities jointly issued by the CDC and OSHA." *Id.*

Plaintiff's assertion that the Secretary of Agriculture and the USDA have not acted on their delegated authority under the Order overlooks the USDA's actions.  The *very day* the Order was issued, the USDA disseminated a statement citing the Order and proclaiming that "[m]aintaining the health and safety of these heroic employees in order to ensure that these critical facilities can continue operating is paramount" and the USDA would "continue to work with the CDC, OSHA, FDA, and state and local officials to ensure that facilities [are] implementing this guidance to keep

employees safe [and] continue operating." USDA Release No. 0234.20.[15] On May 5, 2020, the Secretary of Agriculture sent letters to leaders of meat processing companies "establishing the [USDA's] clear expectations for the implementation of President Donald J. Trump's Executive Order," noting the Order "directs plants to follow the [CDC and OSHA] guidance specific to the meat processing industry to keep these critical facilities open while maintaining worker safety." USDA Release No. 0243.20.[16]

The release regarding the letters further stated, "[u]nder the Executive Order and the authority of the [DPA], USDA will work with meat processing to affirm they will operate in accordance with the CDC and OSHA guidance" and "expect[s] our partners across the country to work with us on this issue." *Id.* Tyson's Policy does just that: implementing CDC guidance regarding vaccination to maintain worker and community safety and keep its facilities operational to secure the food supply in accordance with the Order. Consequently, the Order preempts Plaintiff's state law claims.

## 2. The FMIA and PPIA preempt Plaintiff's state law claims.

Plaintiff relies on arguments of statutory interpretation pertaining to the scope of the FMIA and the PPIA (together, the "Acts") to argue the Acts do not preempt his state law claims. Plaintiff, however, misinterprets case law "limiting" the scope of the Acts' preemption clauses and fails to recognize that prevention of infectious diseases spread by employees explicitly falls within the scope of the Acts' regulations.

---

[15] Available at https://www.usda.gov/media/press-releases/2020/04/28/usda-implement-president-trumps-executive-order-meat-and-poultry, attached hereto at Ex. B.

[16] Available at https://www.usda.gov/media/press-releases/2020/05/06/secretary-perdue-issues-letters-meat-packing-expectations, attached hereto at Ex. C.

FP 45202824.1

"A state law is expressly preempted when a federal statute states the congressional intention to preempt state law by defining the scope of preemption." *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices, Litig.*, 621 F.3d 781, 792 (8th Cir. 2010) (citations omitted). The Acts' preemption clauses did so here by stating requirements within the scope of the Acts are preempted with "respect to premises, facilities, and operations" of any establishment. *See* 21 U.S.C §§ 678, 467e.

Plaintiff correctly states the Acts' preemption clauses apply to matters that are "within the scope" of the Acts. (Pl.'s Resp., p. 12). However, Plaintiff erroneously restricts the Acts' scope and their preemption clauses to those matters explicitly stated within the confines of the Acts. *See Fields v. Brown*, 519 F. Supp. 3d 388, 394 (E.D. Tex. 2021), *motion to certify appeal granted*, No. 6:20-CV-00475, 2021 WL 2814893 (E.D. Tex. May 14, 2021) (describing plaintiffs' view that "the PPIA only expressly preempts state laws that cover marking, labeling, packaging, or ingredients" as "cherry-picking" and "ostensibly ignor[ing] the opening of the clause, which prohibits state-law requirements 'with respect to premises, facilities and operations.'").

Here, Congress did not expressly address every aspect of, or every issue within the scope of, the Acts' four corners. Instead, it delegated authority to the Secretary of Agriculture "to set out 'such conditions as he may prescribe . . . that will be consistent with the purposes of this Act.'" *Dailey v. Veneman*, No. 01-3146, 2002 WL 31780191, at *6 (6th Cir. Dec. 3, 2002) (quoting 21 U.S.C. §§ 605, 465).[17] Therefore, to aid the court in determining congressional intent concerning the Acts' preemption clauses, the court may look to "the statute itself and any regulations enacted

---

[17] The *Dailey v. Veneman* case begins on page 120 of Ex. A.

pursuant to the statute's authority." *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices, Litig.,* 621 F.3d at 792 (citations omitted).

The FMIA regulates a "broad range of activities at slaughterhouses" and "the PPIA covers the same standards for poultry processing." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455 (2012); *Fields v. Tyson Foods, Inc.*, No. 6:20-CV-00475, 2021 WL 4302836, at *2 (E.D. Tex. Sept. 22, 2021).[18] Both Acts are administered by the Food Safety and Inspection Service ("FSIS") and "the FSIS has issued extensive regulations to govern the inspection of animals and meat, as well as other aspects of slaughterhouses' operations and facilities." *Nat'l Meat Ass'n*, 565 U.S. at 456. Of those "other aspects," the FSIS has specifically issued regulations pertaining to employee hygiene and disease control, requiring that employees who "ha[ve] or appear[] to have an infectious disease . . . or any other abnormal source of microbial contamination" be excluded from facility operations.  9 C.F.R. § 416.5.  Thus, Tyson's Policy, which serves to prevent the spread of COVID-19, an infectious disease caused by microbial infection, falls within the scope of the Acts' interpretive regulations. *See Wazelle v. Tyson Foods, Inc.*, No. 2:20-cv-203-Z, 2021 WL 2637335, *3 (N.D. Tex. June 25, 2021) ("[W]orkplace conditions and procedures related to disease prevention implicate food safety . . . could bring Plaintiff's claims under the ambit of the FMIA.").[19]

Plaintiff relies on *United States v. Stanko* for the position that Plaintiff's claims are outside the FMIA's (and by analogy the PPIA's) preemptive reach. *United States v. Stanko*, 491 F.3d 408 (8th Cir. 2007).  However, in *Stanko*, the claims at issue pertained to unfair trade practices, an

---

[18] The *Fields v. Tyson* case begins on page 125 of Ex. A.

[19] The *Wazelle v. Tyson* case begins on page 129 of Ex. A.

issue neither the FMIA nor its regulations address.  *Id.*  Therefore, *Stanko* is distinguishable from the issue at hand – infectious disease prevention – which the FSIS regulations have expressly addressed.  Plaintiff's attempt to distinguish *Nat'l Meat Ass'n v. Harris* likewise fails, as Plaintiff's argument neglects to recognize the Acts' preemption clauses preclude not just conflicting state requirements but also any that are "in addition to" the Acts' requirements, and that the FSIS regulations have in fact addressed issues of workers spreading infectious disease.  565 U.S. at 45.  Therefore, the FMIA and the PPIA preempt Plaintiff's state law claims arising from Tyson's Policy, which Tyson implemented to prevent the spread of an infectious disease.

## **CONCLUSION**

For the reasons discussed herein, Tyson requests that this Court grant its motion and dismiss Plaintiff's Complaint in its entirety with prejudice.

Respectfully submitted,

*/s/ Laurel K. Cornell*
Laurel K. Cornell
Aleksandr "Sasha" Litvinov
FISHER & PHILLIPS LLP
220 West Main Street, Suite 1700
Louisville, Kentucky  40202
Phone:  (502) 561-3976
Fax:  (502) 561-3976
E-mail:  lcornell@fisherphillips.com
              alitvinov@fisherphillips.com

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2022, I electronically filed the foregoing ***Reply in Support of Defendant's Motion to Dismiss Plaintiff's Complaint*** with the Clerk of the Court by using the CM/ECF System, and via email to the following:

Taylor J. Ferguson, Atty No. 97655
BIESECKER DUTKANYCH & MACER, LLC
144 N. Delaware St.
Indianapolis, Indiana 46204
Phone:  (317) 991-4765
Fax: (812) 424-1005
E-mail:  tferguson@fdblegal.com

COUNSEL FOR PLAINTIFF

Robert E. Barnes, Esq.
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Phone:  (310) 510-6211
Fax: (310) 510-6225
E-mail:  robertbarnes@barneslawllp.com

COUNSEL FOR PLAINTIFF

*/s/ Laurel K. Cornell*
COUNSEL FOR DEFENDANT

FP 45202824.1