# EXHIBIT  A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBBIE JOHNSON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **NO. 21-cv-01161-STA-jay** |
| vs. | ) | |
| | ) | |
| TYSON FOODS, INC. and | ) | |
| RHONDA GOOCH, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**ORDER PARITALLY GRANTING DEFENDANTS' MOTION TO DISMISS
AND
PARTIALLY DENYING MOTION TO DISMISS**

Plaintiff Robbie Johnson filed this action in the Dyer County Chancery Court against her employer Tyson Foods, Inc. and a human resources manager at the company Rhonda Gooch. Plaintiff alleges that Defendants violated her rights under the First, Fourth, and Fifth Amendments to the United States Constitution; the Tennessee Constitution, Article I, Section 3; the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12010 *et seq.*; the Nuremberg Code; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3; the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4–21–101 *et seq.*; the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8–50–103 *et seq.*; and Tenn. Code Ann. § 14-1-101 *et seq.*, by requiring her to be vaccinated with the COVID-19 vaccine prior to November 1, 2021, or else go on unpaid leave without the assurance of ever reclaiming her job. Plaintiff also alleges a state common law claim of assault. (Amd. Cmplt., No. 18.) Plaintiff seeks declaratory

1

relief that Tyson Foods violated the THRA, TDA, and state tort law, and injunctive relief enjoining Tyson Foods from discriminating against employees by refusing to grant religious or health accommodations to its COVID-19 vaccine mandate as well as damages.

Defendant Tyson Foods removed the action on October 20, 2021, asserting that this Court has jurisdiction over the matter under diversity-of-citizenship jurisdiction pursuant to 28 U.S.C. §1332 and federal officer jurisdiction under 28 U.S.C. § 1442(a)(1).  (ECF No. 1.) On November 3, 2021, the Court denied Plaintiff's motion to remand finding that the Court has jurisdiction under 28 U.S.C. § 1442(a)(1). (ECF No. 17.)  Plaintiff filed an amended complaint on November 18, 2021.  (ECF No. 18.)

Defendants have now filed a motion to dismiss the amended complaint.  (ECF No. 24.) Plaintiff has responded to the motion (ECF No. 29), and Defendants have filed a reply to the response.  (ECF No. 34.)  For the reasons set forth below, the motion is **PARTIALLY GRANTED** and **PARTIALLY DENIED.**

<u>Standard of Review</u>

The Federal Rules of Civil Procedure require that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint may be attacked for failure "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When considering a Rule 12(b)(6) motion to dismiss, a Court will presume that all the factual allegations in the complaint are true and will draw all reasonable inferences in favor of the nonmoving party. *See Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Great Lakes Steel v. Deggendorf*, 716 F.2d 1101, 1105 (6th Cir. 1983)).  "The court need not, however, accept unwarranted factual inferences." *Id.* (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). Instead, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted). That is, a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Id.* at 570. A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). If the Court cannot "infer more than the mere possibility of misconduct, the complaint has alleged — but has not 'show[n]' — 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

<u>Analysis</u>

Plaintiff has brought thirteen claims in her amended complaint. Many of those claims are based on the underlying premise that Defendants are government or state actors,[1] specifically the claims alleging violations of the Free Exercise Clause of the First Amendment (claim one); the RFRA (claim five); the FDCA (claim nine); the Nuremberg Code (claim ten); and the Fourth and Fifth Amendments (claim eleven). Plaintiff relies, in part, on the Court's previous finding of federal officer jurisdiction in support of her contention that Defendants acted as government or state actors during the events giving rise to this lawsuit while Defendants argue that removal under

---

[1] The Court has used "government actor" and "state actor" interchangeably in this order.

the federal officer removal statute did not transform them into government actors.  The Court will address this issue first.

A review of the Court's order denying Plaintiff's motion to remand and finding federal officer jurisdiction is informative. In that order (ECF No. 17), the Court explained that the federal officer removal statute permits a defendant to remove to federal court a state court action for an act made while the defendant was acting under an agency or officer of the United States. 28 U.S.C. § 1442(a)(1).  That is, the removal statute applies to private persons when they "lawfully assist" a federal officer "in the performance of his official duty,"  *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 150–57 (2007) (quoting *Davis v. South Carolina*, 107 U.S. 597, 600 (1883)), while the private party is "authorized to act with or for [the federal officer] in affirmatively executing duties under . . . federal law." *City of Greenwood v. Peacock*, 384 U.S. 808, 824 (1966).   A Court will find federal officer removal to be appropriate when "the defendant (1) is a person within the meaning of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable federal defense." *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018).

In their response to the motion to remand, Defendants argued that Tyson acted under a federal officer pursuant to President Donald J. Trump's April 28, 2020 Executive Order which expressly invoked the President's authority under the Defense Production Act of 1950 ("DPA"), as amended, 50 U.S.C. § 4501 *et seq.* The Executive Order directed meat and poultry processing companies, such as Tyson, to stay open and continue operations, subject to the supervision of the Secretary of Agriculture. *See Food Supply Chain Resources*, 85 Fed. Reg. at 26,313, 2020 WL 2060381, at *1.  Defendants reasoned that, because Tyson is operating under the DPA and supervision from the Secretary of Agriculture, removal under 28 U.S.C. § 1442(a)(1) was

4

warranted. That is, removal was proper because each Defendant was a "person" within the meaning of the statute who "acted under the direction of a federal officer" and its actions were for or related to acts performed under color of federal office. *See Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010) (stating that a defendant seeking removal under § 1442(a)(1) must establish that it is a "person" who "acted under" a federal officer). The Court adopted Defendants' reasoning, relying in part on *Fields v. Brown*, 519 F. Supp.3d 388 (E.D. Tex. Feb. 11, 2021), and *Wazelle v. Tyson Foods, Inc.*, 2021 WL 2637335 (N.D. Tex. June 25, 2021). *Wazelle* and *Fields* concluded that Tyson Foods (also a defendant in those cases) acted under a federal officer because it worked closely with the government to "guarantee that there was an adequate food supply" for the country. *Wazelle*, 2021 WL 2637335, at *4 (explaining that the Department of Agriculture and the Food Safety and Inspection Service ("FSIS") "closely monitored Tyson Foods' meatpacking plants, staffing some employees onsite during the pandemic," and that "Congress even allocated additional funding to FSIS to ensure that they had the resources" to supervise meatpacking plants during the pandemic); *Fields*, 519 F. Supp. at 393 (same).

This Court also found persuasive the following reasoning of *Wazelle* and *Fields*. "When a national emergency was declared in response to the COVID-19 pandemic on March 13, 2020, Tyson Foods, along with other components of the Food and Agriculture Sector, was designated as critical infrastructure." *Fields*, 519 F. Supp. 3d at 392. From that point forward, Tyson Foods "interacted," "collaborat[ed]," and "work[ed] directly with" federal officers to assist the U.S. government to fulfill the government's responsibility of "guarantee[ing] that there was an adequate food supply." *Id.* at 293. "Accordingly, . . . [Tyson was] 'acting under' the directions of federal officials" from the time of the national emergency declaration. *Wazelle*, 2021 WL 2637335, at *5.

Section 1442(a)(1) additionally requires that a defendant removing a case demonstrate that the alleged conduct by the defendant is for, or relates to, an act under color of federal office. A plaintiff's claims are removable as long as they are "connected" or "associated" with federal directions. *Latiolais v. Huntington Ingalls, Inc.*, 951 F. 3d 286, 292 (5th Cir. 2020). This Court found that Plaintiff's claims satisfied the causal connection required by § 1442(a). Plaintiff's claims related to Tyson Foods' vaccination policy are connected to the federal directive to "continue operating and fulfilling orders to ensure a continued supply of protein for Americans," Executive Order at *1, and are in compliance with CDC and OSHA workplace safety guidelines.

In their motion to dismiss, Defendants argue that removal of this action under the federal officer removal did not transform Tyson into a government actor, and, therefore, federal constitutional claims cannot be brought against Defendants. Plaintiff has responded that Tyson's vaccine mandate constitutes state action based on this Court's order denying Plaintiff's motion to remand. Plaintiff acknowledges that Tyson "is a corporation that operates as a worldwide food processing and marketing company" (Amd. Cmplt. ¶ 11, ECF No. 18) but posits that deciding whether to attribute state action to a private party is a fact-based inquiry not appropriate at the pleading state.

It is well-settled that an entity is only liable for claims based on constitutional violations if the entity is held to be a government actor. *Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *see also Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011) (explaining that a constitutional claim requires that the "constitutional violation be taken under color of state law either by government actors or private individuals acting as agents of the state"). "In certain circumstances, however, the acts of even private parties may be deemed to be state action;" however, "'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Cox*

*ex rel. Dermitt v. Liberty Healthcare Corp.*, 622 F. Supp. 2d 487, 491–92 (E.D. Ky. 2008) (quoting *Revis v. Meldrum*, 489 F.3d 273, 289 (6th Cir. 2007), and *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

At the outset, the Court must decide whether its finding of federal officer jurisdiction equates to a finding of government or state action. It does not. Section 1442(a)(1) enables defendants who are federal officers or who are acting under a federal officer to have access to a federal forum when asserting federal defenses against a claim that relates to an act under color of such office or a claim that is for such an act. *See Watson v. Philip Morris Cos.*, 551 U.S. 142, 150–51 (2007). As noted by Defendants, the statute merely determines which court hears a case; it does not transform a private party into a government actor. In denying Plaintiff's motion to remand, the Court held that Defendant "acted under a federal officer" — not that either Defendant was a federal officer or government actor.

Defendants correctly point out that the standard for removal under § 1442(a)(1) is different from the test for determining when a private defendant can be deemed a government actor. The statute permits removal of a civil action brought "for or relating to any act under color of [federal] office," 28 U.S.C. § 1442(a)(1), whereas a private party is not considered to be a government actor unless one of three tests are met. *Snodgrass-King Pediatric Dental Assocs., P.C. v. DentaQuest USA Ins. Co., Inc.*, 780 F. App'x 197, 198 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 898 (2020). Those tests are the "public function test, the state compulsion test, and the nexus test." *Ellison v. Garbarino*, 48 F.3d 192, 195 (6th Cir. 1995).[2] Therefore, Plaintiff's reliance on this Court's order

---

[2] "The very existence of the three tests to determine whether a private party's actions can be fairly attributed to the state indicates a presumption — a reasonable and correct one — that a private party has not acted under color of state law." *Hines v. Chandra*, 2007 WL 9658631, at *3 n.4 (N.D. Ohio May 17, 2007).

denying her motion to remand is unavailing in determining whether Defendants can be considered government actors under the Constitution.  Turning to the public function, state compulsion, and nexus tests, the Court finds that Plaintiff has not shown that any of these tests encompass Defendants' actions during the events giving rise to this lawsuit.[3]

Under the public function test, "a private party is deemed a state actor if he or she exercised powers traditionally reserved exclusively to the state." *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003). *See also Anderson v. United Airlines, Inc.*, 2021 WL 6337144, at *5 (M.D. Fla. Dec. 30, 2021) ("[T]he public function test shows state action only when private actors are given powers (or perform functions) that are traditionally the exclusive prerogative of the State." (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1131 (11th Cir. 1992)) This test is usually interpreted narrowly and has rarely been used to find state action on the part of a private actor. *Chapman*, 319 F.3d at 833–34.

To the extent that Plaintiff alleges that Defendants have taken on a public function under this test, the Court finds that her allegations are not sufficiently plausible.  A private business's implementation of an employee vaccination policy is not akin to any of "those limited activities – for example running a city — that have 'traditionally *and exclusively*' been performed by the government." *United States v. Miller*, 982 F.3d 412, 423 (6th Cir. 2020) (emphasis in original)

---

[3]  Plaintiff contends that "the issue of state action attributable to a private party is one fundamentally unsuited for adjudication at the pleading stage of the case."  (Resp. p. 3, ECF No. 32.)  However, when a plaintiff has failed to plead facts supporting a finding of government action, as in the present case, dismissal is warranted. *See*, *e.g.*, *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007) (affirming grant of defendant's motion to dismiss "because the complaint failed to allege facts showing state action"); *Rose v. Emergency Med. Training Processionals*, 2019 WL 4784607, at *2 (E.D. Ky. Sept. 30, 2019) ("Plaintiff has failed to allege facts that would support a determination under any of the three tests that [the defendant's] conduct is 'fairly attributable' to the state.")

(quoting *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 341 (6th Cir. 2006)).[4]   Although Plaintiff argues that Defendants' provision of "a critical infrastructure to exercise the federal government's public function of guaranteeing an adequate food supply during the government declared COVID-19 pandemic" is a public function (Resp. p. 4, ECF No. 32), the Court cannot find that meat and poultry processing is an activity usually reserved for the government. Furthermore, private companies often implement vaccination policies for their employees.

The state compulsion test "requires that the state 'exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state.'" *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007) (quoting *Wolotsky v. Huhn*, 960 F.2d 1131, 1335 (6th Cir. 1992)). Under this test, there must be more than merely the approval or acquiescence of the state in the decisions or actions of the private actor. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). ("[A]lthough the factual setting of each case will be significant, our precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." (citations omitted)).

Even though then-President Trump instructed meat and poultry processing plants to stay open and continue operations in his executive order, he did not direct or require Tyson to implement a vaccine requirement.[5]   Defendants note that Tyson's vaccine policy was guided by

---

[4] *Miller* noted that "[m]ost activities — such as providing electricity, operating a nursing home, or managing a public-access television station — will not qualify" as "public functions." 982 F.3d 423 (citations omitted).

[5] Plaintiff acknowledges that there is no governmental order or law requiring Tyson to mandate the COVID-19 vaccine for its employees.  (Resp. p. 14, ECF No. 32.)

the Government but was not coerced by it. *See S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 565 (6th Cir. 2007) (finding that a private individual working with park rangers was not a state actor when he erased security tapes even though the rangers "encouraged" but did not compel him to do so).

The third "state-action test" is the nexus test. As explained by the *Cox* Court,

Under this test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter maybe fairly treated as that of the state itself." *Wolotsky*, 960 F.2d 1331, 1335 (6th Cir.1992). As with the public-function test, the Court's review of case law reveals the application of this nexus test to be very restrictive. "[T]he Sixth Circuit has made clear that the ties between the private party and the State must be substantial." *Jackim v. City of Brooklyn*, 2007 WL 893868, at *24, 2007 U.S. Dist. LEXIS 20355, at *85 (N.D. Ohio Mar. 22, 2007) (citing *Wolotsky*, 960 F.2d at 1335); *see also Siskaninetz v. Wright State Univ.*, 175 F.Supp.2d 1018, 1023 (S.D. Ohio 2001) (same); *Marchese v. Weeman*, 1993 U.S. Dist. LEXIS 11826, at *7 (E.D. Mich. July 24, 1993) (plaintiff "must establish a substantial degree of cooperative action" between state and private actor).

*Cox*, 622 F. Supp. 2d at 493–94. Moreover,

[c]ertain factors have been deemed insufficient, in and of themselves, to establish the required nexus between the private actor's complained-of conduct and the State. Extensive state regulation of a private entity's operations does not establish state action via the nexus test. *See, e.g.*, *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S. Ct. 2764, 73 L.Ed.2d 418 (1982); *Adams v. Vandemark*, 855 F.2d 312 (6th Cir. 1988); *Crowder v. Conlan*, 740 F.2d 447 (6th Cir. 1984). Public funding of nearly all of the private actor's activities, as well as the private actor's use of public property, are similarly insufficient to establish the required nexus. *See, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 102 S. Ct. 2777, 73 L.Ed.2d 534 (1982); *Wolotsky*, 960 F.2d at 1336; *Crowder*, 740 F.2d at 450, 453. The minority presence of public officials on the private actor's decision-making board also does not satisfy the nexus test for state action. *See, e.g.*, *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S. Ct. 449, 42 L.Ed.2d 477 (1974); *Lansing* [*v. City of Memphis*], 202 F.3d [821, 831 (6th Cir. 2000)]; *Crowder*, 740 F.2d at 447. Also, the utilization of public services by private actors does not by itself establish the requisite nexus for state action. *See, e.g.*, *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 119 S. Ct. 977, 143 L.Ed.2d 130 (1999); *Ellison v. Garbarino*, 48 F.3d 192 (6th Cir. 1995).

*Cox*, 622 F. Supp. 2d at 494-95 (citing "[n]umerous cases [that] illustrate the restrictive approach the Sixth Circuit has taken with the nexus test, similar to its interpretation of the public function test" and stating that "that precedent counsels great caution in finding state action by virtue of a symbiotic relationship.")

Plaintiff contends that Defendants acted as an "agent of the government … by imposing strict worker vaccination rules to (in the estimation of the federal government), in order to preserve the integrity of the national food supply." (Resp. p. 7, ECF No. 29.) However, no facts are pled that would enable the Court to find a sufficient nexus between Tyson's vaccine policy and the involvement of the Government. The mere fact that Tyson relied on OSHA and CDC guidance in formulating its vaccine policy does not make either Defendant an "agent of the government." Nor does the fact that Tyson is subject to the federal government's COVID-19 guidance for meat and poultry plants convert Defendants into government actors. Government "regulation, even when extensive, is not sufficient to justify a finding of a close nexus between the state and the regulated entity." *Lansing*, 202 F.3d at 830 (collecting Supreme Court and Sixth Circuit cases holding that private parties' actions do not constitute government action despite extensive regulation).

Because Plaintiff has failed to show that Defendants' actions in requiring employees to be vaccinated is equivalent to government or state action, the claims requiring state action must be dismissed. As previously stated, these claims are those alleging violations of the Free Exercise Clause of the First Amendment (claim one); the RFRA (claim five); the FDCA (claim nine); the Nuremberg Code (claim ten); and the Fourth and Fifth Amendments (claim eleven). Defendants' motion as to these claims is granted, and the claims are dismissed with prejudice.

Next, Defendants contend that Plaintiff has failed to state a claim for religious discrimination under Article I, Section 3, of the Tennessee Constitution (claim two) because the

Tennessee Constitution does not provide for a private right of action and/or because Defendants are not state actors.[6]  Because the Court has determined that Defendants are not state actors, it will focus on Defendants' private right of action argument. In support of the argument, Defendants rely on *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) ("The plaintiff can state no claim of a state constitutional violation in this case because Tennessee does not recognize a private cause of action for violations of the Tennessee Constitution." (citation omitted)); *Bowden Bldg. Corp. v. Tennessee Real Estate Comm'n*, 15 S.W.3d 434, 446 (Tenn. Ct. App. 1999) ("Tennessee, however, has not recognized any such implied cause of action for damages based upon violations of the Tennessee Constitution") (citations omitted)); *Siler v. Scott*, 591 S.W.3d 84, 102 n.2 (Tenn. Ct. App. 2019) (affirming order granting summary judgment in favor of defendant that dismissed plaintiff's claim alleging a violation of the Tennessee Constitution for failure to state a claim); and *Wooley v. Madison County, Tennessee*, 209 F. Supp. 2d 836, 844 (W.D. Tenn. 2002) (dismissing the plaintiff's "freedom of speech claim under article I, section 19 of the Tennessee Constitution" since "it is well established that Tennessee does not recognize an implied private cause of action for damages based upon violation of the Tennessee Constitution." (citations omitted)).

Plaintiff agrees that there is no private right of action for damages under the Tennessee Constitution but argues that she may seek injunctive relief.  (Resp. p. 13, ECF No. 29.)  Even if Plaintiff is correct that she may seek injunctive relief for a violation of her rights under the Tennessee Constitution, it is not clear whether Plaintiff would be eligible for an injunction

---

[6]  The Tennessee Constitution provides "that all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience, . . . that no human authority can, in any case whatever, control or interfere with the rights of conscience; and that no preference shall ever be given, by law, to any religious establishment or mode of worship." Tenn. Const. Art. I § 3.

prohibiting Defendants from taking an adverse action against her.  Plaintiff's Amended Complaint alleges that Defendant actually terminated her employment on November 1, 2021.  Am. Compl. ¶ 9 ("Then, on November 1, 2021, Defendants sent Plaintiff a permanent discharge notice, notifying her that she was fired.").  In view of this allegation, any claim Plaintiff had for injunctive relief is now moot.  Accordingly, claim two is dismissed with prejudice.

Defendants next contend that Plaintiff has failed to state a claim for religious discrimination under Title VII (claim three) and the ADA (claim six) or race discrimination under Title VII (claim eight) because she failed to exhaust her administrative remedies.  It is well-settled that exhaustion of administrative remedies is a prerequisite to filing a district court lawsuit alleging discrimination under Title VII, s*ee Brown v. General Serv. Admin.*, 425 U.S. 820, 823-33 (1976), and that a plaintiff may only bring a Title VII action in district court after he has exhausted the administrative remedies provided under 42 U.S.C. § 2000e-16. [7]  Thus, timely filing a charge with the Equal Employment Opportunity Commission ("EEOC") and subsequently filing a complaint in federal district court in a timely manner are prerequisites to maintaining a Title VII action.  *See Lomax v. Sears, Roebuck, & Co.*, 2000 WL 1888715, at *6 (6th Cir. Dec. 19, 2000) (reiterating that "when a claim is not first presented to the EEOC, the claim may not be brought in court").

In order to exhaust the administrative remedies of Title VII and the ADA, a plaintiff must "trigger the investigatory and conciliatory procedures of the EEOC so that the Commission may first attempt to obtain voluntary compliance with the law.... These investigatory and conciliatory procedures notify potential defendants of the nature of plaintiffs' claims and provide them with the opportunity to settle the claims before the EEOC rather than litigate them." *Davis v. Sodexho,*

---

[7]  Section 107(a) of the ADA states that the remedies and procedures used in the event of a Title VII violation also apply to claims brought under the ADA. 42 U.S.C. § 12117(a).

*Cumberland College Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998).  A plaintiff must exhaust his or her administrative remedies for each and every claim.  *Id.* In the present case, it is undisputed that Plaintiff has not filed a charge with the EEOC.

Plaintiff argues that she is only seeking injunctive relief, not monetary damages, which she claims is a generally accepted exception to the administrative remedy exhaustion requirement.  In support of her argument, she cites *Malone v. City of E. Cleveland*, 1978 WL 186, at *1 (N.D. Ohio Oct. 6, 1978) (relying on *Drew v. Liberty Mutual Insurance Co.*, 480 F.2d 69 (5th Cir. 1973), which held that, when temporary injunctive relief would be appropriate, "filing of the complaint and request for such relief before exhaustion of EEOC conciliation procedures is not fatal to the Court's jurisdiction over the complaint."  However, Plaintiff fails to make the distinction that in the cases she cites, excluding *Costantino v. TRW, Inc.*, 13 F.3d 969 (6th Cir. 1994), the issue presented to the court was whether a plaintiff could bring a claim for injunctive relief before receipt of a notice of right to sue from the EEOC.  *See*, *e.g.*, *Drew*, 480 F.2d at 72  ("We conclude that in the *limited class of cases*, such as the present, in which irreparable injury is shown and likelihood of ultimate success has been established, (here this has been determined by the trial court), the individual employee may bring her own suit to maintain the status quo pending the action of the Commission on the basic charge of discrimination  (emphasis added)); *Malone*, 1978 WL 186, at *2 ("[I]f a temporary restraining order is otherwise appropriate under Rule 65, Fed. R. Civ. P., filing of the complaint and request for such relief before exhaustion of EEOC conciliation procedures is not fatal to the Court's jurisdiction over the complaint."); *Sughrim v. New York,* 503 F.Supp.3d 68, 96 (2020) (When "a person has filed a Title VII charge with the EEOC, the court has jurisdiction to entertain a motion for temporary injunctive relief against employer retaliation while the charge is pending before the EEOC and before the EEOC has issued a right to sue letter"

(citations omitted). *Constantino* concerns ERISA exhaustion. ERISA, unlike Title VII and the ADA, "does not explicitly require exhaustion of administrative remedies" *Id.* at 974 (citation omitted). Instead, unlike Title VII and the ADA's express administrative exhaustion requirements, ERISA administrative exhaustion is left to the district court's discretion. *Id.* at 974-75.

Here, Plaintiff has not filed charges with the EEOC; *a fortiori*, the cases cited by Plaintiff are inapposite to her claims. Plaintiff's failure to file an EEOC charge is dispositive, and Plaintiff's Title VII and ADA claims (claims three, six, and eight) must be dismissed without prejudice for failure to exhaust her administrative remedies. What is more, Plaintiff alleges that Tyson has already terminated her employment. Any injunctive relief related to Tyson's vaccine mandate is no longer available to Plaintiff. Her argument to excuse her failure to exhaust is not persuasive.

Plaintiff has brought a claim under the THRA for Defendants' alleged failure to accommodate her religious beliefs (claim four). Plaintiff alleges that she holds sincere religious beliefs that preclude her from receiving a COVID19 vaccine and that "Defendant's accommodation of one year of unpaid leave, with no guaranteed positions upon potential return, is no reasonable accommodation at all, but rather a punitive measure taken against employees who choose to exercise their religious rights." (Amd. Cmplt. ¶¶ 159, ECF No. 18.)

In their motion to dismiss, Defendants contend that the THRA does not require an employer to accommodate an employee's religious beliefs. Plaintiff acknowledges that there is no explicit language in the Tennessee Human Rights Act imposing a duty to accommodate religious beliefs, but she argues that the Tennessee Supreme Court has held that THRA claims are analyzed in the same manner as Title VII claims, and Title VII does prescribe a duty to accommodate an employee's religious beliefs. (Resp. p. 16, ECF No. 32.)

Defendants have raised the issue of preemption. Defendants contend that this claim and Plaintiff's other state statutory claims are preempted by (1) President Trump's Executive Order, (2) the Federal Meat Inspection Act, 21 U.S.C. §§ 601 *et seq*., and (3) the Poultry Production Inspection Act, 21 U.S.C. § 451 *et seq*.[8]   The Supremacy Clause provides that the Constitution, federal statutes, and treaties constitute "the supreme Law of the Land." Art. VI, cl. 2.   If federal law "imposes restrictions or confers rights on private actors" and "a state law confers rights or imposes restrictions that conflict with the federal law," "the federal law takes precedence and the state law is preempted." *Murphy v. National Collegiate Athletic Assn.*, 138 S. Ct. 1461, 1480 (2018).  *See also Torres v. Precision Indus., Inc.*, 938 F.3d 752, 755 (6th Cir. 2019) (reiterating that preemption presents the constitutional question whether state and federal law "conflict (citations omitted)).

When a litigant challenges the constitutionality of a Tennessee statute, the Tennessee Attorney General must be notified. As explained in *In re Adoption of E.N.R.*, 42 S.W.3d 26 (Tenn. 2001),

> [T]he court is required, pursuant to Tenn. R. Civ. P. 24.04, to ensure that notice of the constitutional challenge has been provided to the Office of the Attorney General.
>
> This rule makes it clear that the trial court sits as gatekeeper to inquire whether notice has been provided to the Attorney General by the challenger and **to suspend proceeding on the constitutional challenge until such notice has been provided and a response from the Attorney General received.**

*In re Adoption of E.N.R.*, 42 S.W.3d at 33 (emphasis added).

---

[8]  Plaintiff's state statutory claims are brought under the THRA (claim four), Tenn. Code Ann. § 4–21–101 *et seq.*; the TDA, Tenn. Code Ann. § 8–50–103 *et seq.* (claim seven); and Tenn. Code Ann. § 14-1-101 *et seq.* (claim twelve).  Plaintiff has also brought a state constitutional claim (claim two).  Because the Court has declined supplemental jurisdiction over that claim, Defendants need not notify the Attorney General of claim two.  *See Torres*, 938 F.3d at 755 (pointing out that "courts should not address a question of preemption if they can resolve the case on other grounds.")

The Court in *Waters v. Farr*, 291 S.W.3d 873 (Tenn. 2009), further expounded,

[a] second jurisprudential principle, embodied in Tenn. Code Ann. § 29–14–107(b) (2000), Tenn. R. Civ. P. 24.04, and Tenn. R. App. P. 32, requires parties challenging the constitutionality of a statute to notify the Attorney General and Reporter of the challenge by serving a copy of their papers on the Attorney General. The purposes for these requirements are two-fold. First, the notice enables the Office of the Attorney General to discharge its responsibility to defend the constitutionality of state statutes. Tenn. Code Ann. § 8–6–109(b)(9) (Supp. 2008). Second, the joinder of the Attorney General assures that the statute will be vigorously defended. Compliance with this statute and the related rules is mandatory.

*Waters*, 291 S.W.3d at 918 (concurrence) (some citations omitted).

Here, there is no indication in the record that the Tennessee Attorney General has been notified of the constitutional challenge to the state statutory claims. Therefore, the Court will deny Defendants' motion to dismiss the state law claims (claims four, seven, twelve) without prejudice. Defendant will be given twenty-eight days from the entry of this order in which to notify of the Court of its compliance with Tenn. Code Ann. § 29–14–107(b) and Tenn. R. Civ. P. 24.04.

Defendants have moved to dismiss Plaintiff's RFRA claim (claim five) on the ground that RFRA claims may be brought only against a government actor for government conduct. RFRA provides that the "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). "The text of the statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party." *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010).

Plaintiff does not dispute the principle that only government actors may be held liable under the RFRA ("If Tyson is a federal officer, then it is obligated to follow the limits imposed on federal officers under the Religious Freedom Restoration Act." And, "In essence, a federal actor's

17

burden on a person's exercise of religion must satisfy strict scrutiny." Amd. Cmplt. ¶¶ 186, 188, ECF No. 21.)  Instead, she continues to argue that Defendants are government actors for the purposes of this lawsuit.  However, the Court has already decided this issue against Plaintiff. Therefore, the RFRA claim must be dismissed.

The Court agrees with Defendants that Plaintiff has failed to state a claim for Defendants' alleged violation of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3 (claim nine), because there is no private right of action under that statute.  Section 564 of the FDCA, 21 U.S.C. § 360bbb-3, authorizes the Secretary of Health and Human Services to issue an "emergency use authorization" ("EUA") of a medical product in certain emergency situations. That section further provides that "with respect to the emergency use of an unapproved product, the Secretary . . . shall for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization . . . as the Secretary finds necessary or appropriate to protect the public health, including" that health care professionals administering the product are informed that the Secretary have authorized emergency use, the significant and potential benefits and risks of such use, and of the extent to which the benefits and risks are unknown, and of the alternatives to the product that are available and of their benefits and risks, 21 U.S.C. §360bbbe-(3)(1)(A)(i), and that individuals on whom the product is administered are provided the same information along with the option to refuse or accept the administration of the product. 21 U.S.C. §360bbbe-(3)(1)(A)(ii).  Section 564(l) specifically states that "[t]his section only has legal effect on a person who carries out an activity for which an authorization under this section is issued." 21 U.S.C. §360bbb-3(l).

Plaintiff claims that "as a corporation mandating a vaccine . . ., Defendants failed to follow the requirements associated with EUA products" by not giving Plaintiff the option to refuse the

vaccine, and by not providing the information specified in 21 U.S.C. §360bbbe-(3)(1)(A)(ii). (Amd. Cmplt. ¶¶ 227, ECF No. 18.) However, there is no allegation that Defendants actually administered the vaccine.

> It is well-settled that there is no private right of action under the FDCA. *See Buckrnan Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n. 4, 121 S. Ct. 1012, 148 L.Ed.2d 854 (2001) (there is "no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance" with the FDCA); *Bailey v. Johnson*, 48 F.3d 965, 968 (6th Cir.1995) ("Congress did not intend, either expressly or by implication, to create a private cause of action under the FDCA"); *Griffin v. O'Neal, Jones & Feldman, Inc.*, 604 F. Supp. 717, 718 (S.D. Ohio 1985) ("It is clear from the face of the statute that no civil private right of action exists").

*Edwards v. Warner-Lambert*, 2012 WL 2156246, at *4 (S.D. Ohio June 13, 2012)

As explained in *Bridges v. Houston Methodist Hosp.*, 543 F. Supp. 3d 525, 527 (S.D. Tex. 2021),

> [the FDCA] confers certain powers and responsibilities to the Secretary of Health and Human Services in an emergency. It neither expands nor restricts the responsibilities of private employers; in fact, it does not apply at all to private employers like the hospital in this case. It does not confer a private opportunity to sue the government, employer, or worker. Bridges's claim that the injection requirement violates 21 U.S.C. § 360bbb-3 fails.

*See also Doe v. Franklin Square Union Free Sch. Dist.*, 2021 WL 4957893, at *20 (E.D.N.Y. Oct. 26, 2021) ("Section 564 does not include a private right of action.")

Plaintiff's claims brought under the Nuremberg Code (claim ten) must also be dismissed. Plaintiff alleges that Defendants have "offended long-held and fundamental principles of international law," that Tyson's "employees are being coerced into unknowingly participating in a national medical experiment" and that Defendant has "failed to provide sufficient balanced information to satisfy informed consent" (Amd. Cmplt. ¶¶ 235-236, ECF No. 18), in violation of the Nuremberg Code which requires the voluntary consent of any human subject in order to participate in medical experiments. *See Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 175 (2d Cir. 2009)

(describing the "sources of international law that categorically forbid medical experimentation on non-consenting human subjects").

The Court agrees with Defendants that there is no private right of action for a violation of international law based on the Nuremberg Code. *See Washington Univ. v. Catalona*, 437 F. Supp. 2d 985, 1000 (E.D. Mo. 2006), *aff'd*, 490 F.3d 667 (8th Cir. 2007). "Covid-19 vaccine mandates are simply not equivalent to the forced experimentation on concentration camp victims that led to the writing of the Nuremberg Code." *Anderson v. United Airlines, Inc.*, 2021 WL 6337144, at *7 (M.D. Fla. Dec. 30, 2021). *See Heinrich ex rel. Heinrich v. Sweet*, 49 F. Supp. 2d 27, 42 (D. Mass. 1999) (noting that there is no private right of action under the Nuremberg Code). Furthermore, the Nuremberg Code does not apply to private employers. *See Bridges v. Houston Methodist Hosp.*, 2021 WL 2399994, at *2 (S. D. Tex. June 12, 2021) ("Equating the injection requirement to medical experimentation in concentration camps is reprehensible.") Plaintiff cites no law in opposition to this argument and, instead, just makes a policy argument.

As explained in by the *Catalona* Court,

> There is no private right of action for an alleged violation of international law for the protection of human research subjects based upon the Declaration of Helsinki and the Nuremberg Code. *White v. Paulsen*, 997 F. Supp. 1380, 1383 (E.D. Wash. 1998); *Hoover v. West Virginia Dept. of Health and Human Resources*, 984 F. Supp. 978, 980 (S.D.W.Va.1997) *aff'd* 129 F.3d 1259, 1997 WL 705385 (4th Cir.1997); *see also*, *Abdullahi, et al. v. Pfizer, Inc.*, 2005 WL 1870811 (S.D.N.Y. 2005). Furthermore, this Court agrees with the conclusions reached by its fellow district courts in Michigan and Oklahoma that the standard in the United States for conducting research on human subjects is contained in the Code of Federal Regulations and therefore United States federal courts have no need to resort to international law to impute a standard. *Ammend v. Bioport, Inc.*, 322 F. Supp.2d 848, 872–73 (W.D. Mich. 2004); *Robertson v. McGee*, 2002 WL 535045 (N.D.Okla.2002).

437 F. Supp. 2d at 1000–01. Accordingly, this claim must be dismissed with prejudice.

Finally, Defendants contend that Plaintiff has failed to state a claim for common law assault (claim thirteen). Claim thirteen alleges as follows:

262. Defendants have threatened intentional, imminent harmful and offensive contact upon Plaintiff by way of forced vaccine injection of an experimental, untested, and ineffective mRNA vaccine, under penalty of being terminated from their employment. A penalty they in fact exercised.

263. Furthermore, Defendant Rhonda Gooch has continuously harassed and threatened Plaintiff regarding her choice not to receive the vaccine.

264. Defendant's coercion, emboldened by tight deadlines, uncompromising exemption protocols, and a hostile and censored work environment, contributed to Plaintiff's stress and fear concerning Defendants' vaccine mandate.

265. Tyson's COVID-19 vaccine mandate caused Mrs. Johnson to reasonably fear imminent bodily injury from being forced to inject an experimental, untested, and potentially unsafe substance into her body, under penalty of termination from employment for failure to comply. A penalty that was in fact exercised by Defendants.

266. Plaintiff did not consent to Defendants' conduct, nor did she consent to receiving the COVID-19 vaccine. Defendant's unlawful requirement of employment was an
unwelcome invasion of Plaintiff's privacy and bodily integrity.

267. Tyson's COVID-19 vaccine mandate has and continues to cause Plaintiff harm, including but not limited to by way of fear, anxiety, fright over being threatened with the injection of an untested and potentially unsafe substance into the body, and the imminent and subsequent loss of her income and livelihood.

(Amd. Cmplt., ECF No. 18.)  Defendants assert that Plaintiff has failed to plead sufficient facts to support a common law claim of assault because she had not alleged an overt act or a physical movement sufficient to set forth a plausible assault claim for which relief may be granted under Tennessee law. Defendants posit that the threat of the loss of income cannot sustain a claim for assault.  The Court finds Defendants' argument to be meritorious.

Under Tennessee common law, assault is defined as "any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against that person." *Vafaie v. Owens*, 1996 WL 502133, at *3 (Tenn. Ct. App. 1996) (citing *Huffman v. State*, 292 S.W.2d 738, 742 (Tenn. 1956),

overruled on other grounds by *State v. Irvin*, 603 S.W.2d 121 (Tenn. 1980)).   In *Vafaie*, the

Tennessee Court of Appeals affirmed the grant of summary judgment to the defendant on the

plaintiff's assault claim because "the alleged threats were always threats of future harm, and were

not threats of immediate or imminent harm. In no instance, were the threats 'coupled with the

present ability to act,' or, to borrow the words of the criminal statute, there was never a threat of

'imminent bodily injury.'"   1996 WL 502133, at *4.

> In Tennessee, assault is defined as "any act tending to do corporal injury to another,
> accompanied with such circumstances as denote at the time an intention, coupled
> with the present ability, of using actual violence against the person." *Thompson v.*
> *Williamson Cnty.*, 965 F. Supp. 1026, 1037 (M.D. Tenn. 1997). A defendant is not
> liable for assault unless he or she commits an "intentional act creating a reasonable
> apprehension of imminent physical harm on the part of the plaintiff." *Baker v.*
> *Moreland*, 1989 WL 89758, at *5 (Tenn. Ct. App. Aug. 9, 1989).
>
> A civil action for assault cannot be sustained upon the basis of words alone. *Id.*
> Rather, there must be an overt act or physical movement causing the plaintiff to
> believe he was in imminent physical harm or danger. *Id.* "An overt act is an
> essential element of an assault, and mere preparation or a threat to commit an
> assault unaccompanied by physical effort to do so, does not amount to an assault."
> *Id.* In other words, the defendant must make a physical movement "which might be
> reasonably interpreted as the beginning of a physical attack upon the plaintiff." *Id.*,
> at *6.

*Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 855 (E.D. Tenn. 2011).

In the present case, Defendants do not administer the vaccine, and Plaintiff may choose not

to take the vaccine - albeit at the risk of losing her job.  *C.f.*, *Reese v. Tyson Foods, Inc.*, 2021 WL

5625411, at *3 (W.D. Mo. Nov. 30, 2021) (denying the employee plaintiff's motion for a

temporary restraining order and preliminary injunction to be able to keep his job during the

pendency of the litigation and not have to receive the vaccine and pointing out that "Plaintiff

admitted he had not been forced to get the COVID-19 vaccine and that no one had tried to or

physically made him get it" even though he had alleged in his complaint that he believed that the

defendant employer would "force" him to be vaccinated).

The court in *McCutcheon v. Enlivant ES, LLC*, 2021 WL 5234787, at *3 (S.D.W. Va. Nov. 9, 2021), explained,

> Ms. McCutcheon's claims are similar to those offered in *Bridges v. Houston Methodist Hosp.*, ——— F. Supp. 3d ———, Case No. H-21-1774, 2012 WL 2399994 (S.D. Tex. June 12, 2021). Among other good observations, Judge Hughes correctly noted that vaccine mandates by public employers do not coerce employees. *Id.* at *7. The same might be said of private employers -- particularly those in the medical and assisted living industries -- which impose vaccination policies to protect their residents, patients, and staff members. Ms. McCutcheon is free to accept or refuse the COVID-19 vaccine. If she refuses, she need only to pursue employment elsewhere.

*C.f., Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (rejecting substantive due process claim that "a compulsory vaccination law is ... hostile to the inherent right of every freeman to care for his own body" and "nothing short of an assault upon his person"). Here, there has been no assault upon Plaintiff because she is "free to accept or refuse the COVID-19 vaccine," and, if she refuses, she "need only to pursue employment elsewhere." For this reason, claim thirteen is dismissed with prejudice.

In summary, Defendants' motion to dismiss is **PARTIALLY GRANTED** and **PARTIALLY DENIED**. The motion is granted with prejudice as to claims one, two, five, nine, ten, eleven, and thirteen. The motion is granted without prejudice as to claims three, six, and eight.

The motion is denied without prejudice as to claims four, seven, and twelve. As previously stated, Defendants will be given twenty-eight days from the entry of this order in which to notify the Court of its compliance with Tenn. Code Ann. § 29–14–107(b) and Tenn. R. Civ. P. 24.04.

**IT IS SO ORDERED**.

s/ S. Thomas Anderson
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: June 15, 2022

23

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SYMANTHA REED, CHARLES** | ) | |
| **GOEZ, JAMES SPAULDING,** | ) | |
| **GARY CRAWFORD, WENDY** | ) | |
| **WHARTON, MICHELLE** | ) | |
| **WHITEHEAD,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **NO. 21-cv-01155-STA-jay** |
| **vs.** | ) | |
| | ) | |
| **TYSON FOODS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

___

**ORDER PARITALLY GRANTING DEFENDANT'S MOTION TO DISMISS**
**AND**
**PARTIALLY DENYING MOTION TO DISMISS**

___

Plaintiffs Symantha Reed, Charles Goez, James Spaulding, Gary Crawford, Wendy

Wharton, and Michelle Whitehead filed this action in the Dyer County Chancery Court against

their employer Tyson Foods, Inc.  Plaintiffs allege that Defendant Tyson Foods violated their rights

under the First, Fourth, and Fifth Amendments to the United States Constitution; the Tennessee

Constitution, Article I, Section 3; the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §

2000bb *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12010 *et seq.*; the

Nuremberg Code; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Food,

Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3; the Tennessee Human Rights Act

("THRA"), Tenn. Code Ann. § 4–21–101 *et seq.*; the Tennessee Disability Act ("TDA"), Tenn.

Code Ann. § 8–50–103 *et seq.*; and Tenn. Code Ann. § 14-1-101 *et seq.*, by requiring them to be

vaccinated with the COVID-19 vaccine prior to November 1, 2021, or else go on unpaid leave

1

without the assurance of ever reclaiming their jobs. Plaintiffs also allege a state common law claim of assault. (Amd. Cmplt., No. 21.)  Plaintiffs seek declaratory relief that Tyson Foods violated the THRA, TDA, and state tort law, and injunctive relief enjoining Tyson Foods from discriminating against employees by refusing to grant religious or health accommodations to its COVID-19 vaccine mandate as well as damages.

Defendant Tyson Foods removed the action on October 15, 2021, asserting that this Court has jurisdiction over the matter under diversity-of-citizenship jurisdiction pursuant to 28 U.S.C. §1332 and federal officer jurisdiction under 28 U.S.C. § 1442(a)(1).  (ECF No. 1.) On November 3, 2021, the Court denied Plaintiffs' motion to remand finding that the Court has jurisdiction under 28 U.S.C. § 1442(a)(1). (ECF No. 20.)  Plaintiffs filed an amended complaint on November 18, 2021.  (ECF No. 21.)

Defendant has now filed a motion to dismiss the amended complaint.  (ECF No. 27.) Plaintiffs have responded to the motion (ECF No. 32), and Defendant has filed a reply to the response.  (ECF No. 37.)  For the reasons set forth below, the motion is **PARTIALLY GRANTED** and **PARTIALLY DENIED.**

<u>Standard of Review</u>

The Federal Rules of Civil Procedure require that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint may be attacked for failure "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When considering a Rule 12(b)(6) motion to dismiss, a Court will presume that all the factual allegations in the complaint are true and will draw all reasonable inferences in favor of the nonmoving party. *See Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Great Lakes Steel v. Deggendorf*, 716 F.2d 1101, 1105

(6th Cir. 1983)). "The court need not, however, accept unwarranted factual inferences." *Id.* (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). Instead, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted). That is, a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Id.* at 570. A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). If the Court cannot "infer more than the mere possibility of misconduct, the complaint has alleged — but has not 'show[n]' — 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

<u>Analysis</u>

Plaintiffs have brought twelve claims in their amended complaint. Many of those claims are based on the underlying premise that Defendant is a government or state actor,[1] specifically the claims alleging violations of the Free Exercise Clause of the First Amendment (claim one); the RFRA (claim five); the FDCA (claim eight); the Nuremberg Code (claim nine); and the Fourth and Fifth Amendments (claim ten). Plaintiffs rely, in part, on the Court's previous finding of

---

[1] The Court has used "government actor" and "state actor" interchangeably in this order.

federal officer jurisdiction in support of their contention that Defendant acted as a government or state actor during the events giving rise to this lawsuit while Defendant argues that removal under the federal officer removal statute did not transform it into a government actor.  The Court will address this issue first.

A review of the Court's order denying Plaintiffs' motion to remand and finding federal officer jurisdiction is informative. In that order (ECF No. 20), the Court explained that the federal officer removal statute permits a defendant to remove to federal court a state court action for an act made while the defendant was acting under an agency or officer of the United States. 28 U.S.C. § 1442(a)(1).  That is, the removal statute applies to private persons when they "lawfully assist" a federal officer "in the performance of his official duty," *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 150–57 (2007) (quoting *Davis v. South Carolina*, 107 U.S. 597, 600 (1883)), while the private party is "authorized to act with or for [the federal officer] in affirmatively executing duties under . . . federal law." *City of Greenwood v. Peacock*, 384 U.S. 808, 824 (1966).   A Court will find federal officer removal to be appropriate when "the defendant (1) is a person within the meaning of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable federal defense." *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018).

In its response to the motion to remand, Defendant argued that it acted under a federal officer pursuant to President Donald J. Trump's April 28, 2020 Executive Order which expressly invoked the President's authority under the Defense Production Act of 1950 ("DPA"), as amended, 50 U.S.C. § 4501 *et seq.* The Executive Order directed meat and poultry processing companies, such as Defendant, to stay open and continue operations, subject to the supervision of the Secretary of Agriculture. *See Food Supply Chain Resources*, 85 Fed. Reg. at 26,313, 2020 WL 2060381, at

*1.  Defendant reasoned that, because it is operating under the DPA and supervision from the Secretary of Agriculture, removal under 28 U.S.C. § 1442(a)(1) was warranted.  That is, removal was proper because Defendant is a "person" within the meaning of the statute who "acted under the direction of a federal officer" and its actions were for or related to acts performed under color of federal office.  *See Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010) (stating that a defendant seeking removal under § 1442(a)(1) must establish that it is a "person" who "acted under" a federal officer).  The Court adopted Defendant's reasoning, relying in part on *Fields v. Brown*, 519 F. Supp.3d 388 (E.D. Tex. Feb. 11, 2021), and *Wazelle v. Tyson Foods, Inc.*, 2021 WL 2637335 (N.D. Tex. June 25, 2021).  *Wazelle* and *Fields* concluded that Tyson Foods (also a defendant in those cases) acted under a federal officer because it worked closely with the government to "guarantee that there was an adequate food supply" for the country.  *Wazelle*, 2021 WL 2637335, at *4 (explaining that the Department of Agriculture and the Food Safety and Inspection Service ("FSIS") "closely monitored Tyson Foods' meatpacking plants, staffing some employees onsite during the pandemic," and that "Congress even allocated additional funding to FSIS to ensure that they had the resources" to supervise meatpacking plants during the pandemic); *Fields*, 519 F. Supp. at 393 (same).

This Court also found persuasive the following reasoning of *Wazelle* and *Fields*.  "When a national emergency was declared in response to the COVID-19 pandemic on March 13, 2020, Tyson Foods, along with other components of the Food and Agriculture Sector, was designated as critical infrastructure." *Fields*, 519 F. Supp. 3d at 392. From that point forward, Tyson Foods "interacted," "collaborat[ed]," and "work[ed] directly with" federal officers to assist the U.S. government to fulfill the government's responsibility of "guarantee[ing] that there was an adequate

food supply." *Id.* at 293. "Accordingly, . . . [Tyson was] 'acting under' the directions of federal officials" from the time of the national emergency declaration. *Wazelle*, 2021 WL 2637335, at *5.

Section 1442(a)(1) additionally requires that a defendant removing a case demonstrate that the alleged conduct by the defendant is for, or relates to, an act under color of federal office. A plaintiff's claims are removable as long as they are "connected" or "associated" with federal directions. *Latiolais v. Huntington Ingalls, Inc.*, 951 F. 3d 286, 292 (5th Cir. 2020). This Court found that Plaintiffs' claims satisfied the causal connection required by § 1442(a). Plaintiffs' claims related to Tyson Foods' vaccination policy are connected to the federal directive to "continue operating and fulfilling orders to ensure a continued supply of protein for Americans," Executive Order at *1, and are in compliance with CDC and OSHA workplace safety guidelines.

In its motion to dismiss, Defendant argues that removal of this action under the federal officer removal did not transform it into a government actor, and, therefore, federal constitutional claims cannot be brought against it. Plaintiffs have responded that Defendant's vaccine mandate constitutes state action based on this Court's order denying Plaintiffs' motion to remand. Plaintiffs acknowledge that Defendant "is a corporation that operates as a worldwide food processing and marketing company" (Amd. Cmplt. ¶ 15, ECF No. 21) but posit that deciding whether to attribute state action to a private party is a fact-based inquiry not appropriate at the pleading state.

It is well-settled that an entity is only liable for claims based on constitutional violations if the entity is held to be a government actor. *Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *see also Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011) (explaining that a constitutional claim requires that the "constitutional violation be taken under color of state law either by government actors or private individuals acting as agents of the state"). "In certain circumstances, however, the acts of even private parties may be deemed to be state action;" however, "'the party

6

charged with the deprivation must be a person who may fairly be said to be a state actor.'"  *Cox ex rel. Dermitt v. Liberty Healthcare Corp.*, 622 F. Supp. 2d 487, 491–92 (E.D. Ky. 2008) (quoting *Revis v. Meldrum*, 489 F.3d 273, 289 (6th Cir. 2007), and *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

At the outset, the Court must decide whether its finding of federal officer jurisdiction equates to a finding of government or state action.  It does not.  Section 1442(a)(1) enables defendants who are federal officers or who are acting under a federal officer to have access to a federal forum when asserting federal defenses against a claim that relates to an act under color of such office or a claim that is for such an act. *See Watson v. Philip Morris Cos.*, 551 U.S. 142, 150–51 (2007).  As noted by Defendant, the statute merely determines which court hears a case; it does not transform a private party into a government actor.  In denying Plaintiffs' motion to remand, the Court held that Defendant "acted under a federal officer" — not that Defendant is a federal officer or government actor.

Defendant correctly points out that the standard for removal under § 1442(a)(1) is different from the test for determining when a private defendant can be deemed a government actor. The statute permits removal of a civil action brought "for or relating to any act under color of [federal] office," 28 U.S.C. § 1442(a)(1), whereas a private party is not considered to be a government actor unless one of three tests are met. *Snodgrass-King Pediatric Dental Assocs., P.C. v. DentaQuest USA Ins. Co., Inc.*, 780 F. App'x 197, 198 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 898 (2020). Those tests are the "public function test, the state compulsion test, and the nexus test." *Ellison v. Garbarino*, 48 F.3d 192, 195 (6th Cir. 1995).[2]  Therefore, Plaintiffs' reliance on this Court's order

---

[2]  "The very existence of the three tests to determine whether a private party's actions can be fairly attributed to the state indicates a presumption — a reasonable and correct one — that a private

denying their motion to remand is unavailing in determining whether Defendant can be considered a government actor under the Constitution.  Turning to the public function, state compulsion, and nexus tests, the Court finds that Plaintiffs have not shown that any of these tests encompass Defendant's actions during the events giving rise to this lawsuit.[3]

Under the public function test, "a private party is deemed a state actor if he or she exercised powers traditionally reserved exclusively to the state." *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003). *See also Anderson v. United Airlines, Inc.*, 2021 WL 6337144, at *5 (M.D. Fla. Dec. 30, 2021) ("[T]he public function test shows state action only when private actors are given powers (or perform functions) that are traditionally the exclusive prerogative of the State." (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1131 (11th Cir. 1992)) This test is usually interpreted narrowly and has rarely been used to find state action on the part of a private actor. *Chapman*, 319 F.3d at 833–34.

To the extent that Plaintiffs allege that Defendant has taken on a public function under this test, the Court finds that their allegations are not sufficiently plausible.  A private business's implementation of an employee vaccination policy is not akin to any of "those limited activities – for example running a city — that have 'traditionally *and exclusively*' been performed by the

---

party has not acted under color of state law."  *Hines v. Chandra*, 2007 WL 9658631, at *3 n.4 (N.D. Ohio May 17, 2007).

[3]   Plaintiffs contend that "the issue of state action attributable to a private party is one fundamentally unsuited for adjudication at the pleading stage of the case."  (Resp. p. 3, ECF No. 32.)  However, when a plaintiff has failed to plead facts supporting a finding of government action, as in the present case, dismissal is warranted. *See*, *e.g.*, *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007) (affirming grant of defendant's motion to dismiss "because the complaint failed to allege facts showing state action"); *Rose v. Emergency Med. Training Processionals*, 2019 WL 4784607, at *2 (E.D. Ky. Sept. 30, 2019) ("Plaintiff has failed to allege facts that would support a determination under any of the three tests that [the defendant's] conduct is 'fairly attributable' to the state.")

government." *United States v. Miller*, 982 F.3d 412, 423 (6th Cir. 2020) (emphasis in original) (quoting *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 341 (6th Cir. 2006)).[4]   Although Plaintiffs argue that Defendant's provision of "a critical infrastructure to exercise the federal government's public function of guaranteeing an adequate food supply during the government declared COVID-19 pandemic" is a public function (Resp. p. 4, ECF No. 32), the Court cannot find that meat and poultry processing is an activity usually reserved for the government. Furthermore, private companies often implement vaccination policies for their employees.

The state compulsion test "requires that the state 'exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state.'" *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007) (quoting *Wolotsky v. Huhn*, 960 F.2d 1131, 1335 (6th Cir. 1992)). Under this test, there must be more than merely the approval or acquiescence of the state in the decisions or actions of the private actor. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). ("[A]lthough the factual setting of each case will be significant, our precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." (citations omitted)).

Even though then-President Trump instructed meat and poultry procession plants to stay open and continue operations in his executive order, he did not direct or require Defendant to

---

[4]  *Miller* noted that "[m]ost activities — such as providing electricity, operating a nursing home, or managing a public-access television station — will not qualify" as "public functions." 982 F.3d 423 (citations omitted).

implement a vaccine requirement.[5]   Defendant notes that its vaccine policy was guided by the

Government but was not coerced by it.  *See S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499

F.3d 553, 565 (6th Cir. 2007) (finding that a private individual working with park rangers was not

a state actor when he erased security tapes even though the rangers "encouraged" but did not

compel him to do so).

The third "state-action test" is the nexus test. As explained by the *Cox* Court,

> Under this test, "the action of a private party constitutes state action when there is
> a sufficiently close nexus between the state and the challenged action of the
> regulated entity so that the action of the latter maybe fairly treated as that of the
> state itself." *Wolotsky*, 960 F.2d 1331, 1335 (6th Cir.1992). As with the public-
> function test, the Court's review of case law reveals the application of this nexus
> test to be very restrictive. "[T]he Sixth Circuit has made clear that the ties between
> the private party and the State must be substantial." *Jackim v. City of Brooklyn*,
> 2007 WL 893868, at *24, 2007 U.S. Dist. LEXIS 20355, at *85 (N.D. Ohio Mar.
> 22, 2007) (citing *Wolotsky*, 960 F.2d at 1335); *see also Siskaninetz v. Wright State
> Univ.*, 175 F.Supp.2d 1018, 1023 (S.D. Ohio 2001) (same); *Marchese v. Weeman*,
> 1993 U.S. Dist. LEXIS 11826, at *7 (E.D. Mich. July 24, 1993) (plaintiff "must
> establish a substantial degree of cooperative action" between state and private
> actor).

*Cox*, 622 F. Supp. 2d at 493–94.  Moreover,

> [c]ertain factors have been deemed insufficient, in and of themselves, to establish
> the required nexus between the private actor's complained-of conduct and the State.
> Extensive state regulation of a private entity's operations does not establish state
> action via the nexus test. *See, e.g., Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.
> Ct. 2764, 73 L.Ed.2d 418 (1982); *Adams v. Vandemark*, 855 F.2d 312 (6th Cir.
> 1988); *Crowder v. Conlan*, 740 F.2d 447 (6th Cir. 1984). Public funding of nearly
> all of the private actor's activities, as well as the private actor's use of public
> property, are similarly insufficient to establish the required nexus. *See, e.g., Blum
> v. Yaretsky*, 457 U.S. 991, 102 S. Ct. 2777, 73 L.Ed.2d 534 (1982); *Wolotsky*, 960
> F.2d at 1336; *Crowder*, 740 F.2d at 450, 453. The minority presence of public
> officials on the private actor's decision-making board also does not satisfy the
> nexus test for state action. *See, e.g., Jackson v. Metropolitan Edison Co.*, 419 U.S.
> 345, 95 S. Ct. 449, 42 L.Ed.2d 477 (1974); *Lansing* [*v. City of Memphis*], 202 F.3d
> [821, 831 (6th Cir. 2000)]; *Crowder*, 740 F.2d at 447. Also, the utilization of public
> services by private actors does not by itself establish the requisite nexus for state

---

[5] Plaintiffs acknowledge that there is no governmental order or law requiring Defendant to mandate
the COVID-19 vaccine for its employees.  (Resp. p. 14, ECF No. 32.)

action. *See*, *e.g.*, *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 119 S. Ct. 977,
143 L.Ed.2d 130 (1999); *Ellison v. Garbarino*, 48 F.3d 192 (6th Cir. 1995).

*Cox*, 622 F. Supp. 2d at 494-95 (citing "[n]umerous cases [that] illustrate the restrictive approach

the Sixth Circuit has taken with the nexus test, similar to its interpretation of the public function

test" and stating that "that precedent counsels great caution in finding state action by virtue of a

symbiotic relationship.")

Plaintiffs contend that Defendant acted as an "agent of the government … by imposing

strict worker vaccination rules to (in the estimation of the federal government), in order to preserve

the integrity of the national food supply." (Resp. p. 7, ECF No. 32.) However, no facts are pled

that would enable the Court to find a sufficient nexus between Defendant's vaccine policy and the

involvement of the Government.  The mere fact that Defendant relied on OSHA and CDC guidance

in formulating its vaccine policy does not make Defendant an "agent of the government." Nor does

the fact that Defendant is subject to the federal government's COVID-19 guidance for meat and

poultry plants convert Defendant into a government actor. Government "regulation, even when

extensive, is not sufficient to justify a finding of a close nexus between the state and the regulated

entity." *Lansing*, 202 F.3d at 830 (collecting Supreme Court and Sixth Circuit cases holding that

private parties' actions do not constitute government action despite extensive regulation).

Because Plaintiffs have failed to show that Defendant's action in requiring its employees

to be vaccinated is equivalent to government or state action, the claims requiring state action must

be dismissed.  As previously stated, these claims are those alleging violations of the Free Exercise

Clause of the First Amendment (claim one); the RFRA (claim five); the FDCA (claim eight); the

Nuremberg Code (claim nine); and the Fourth and Fifth Amendments (claim ten).  Defendant's

motion as to these claims is granted, and the claims are dismissed with prejudice.

Next, Defendant contends that Plaintiffs have failed to state a claim for religious discrimination under Article I, Section 3, of the Tennessee Constitution (claim two) because the Tennessee Constitution does not provide for a private right of action and/or because Defendant is not a state actor.[6]  Because the Court has determined that Defendant is not a state actor, it will focus on Defendant's private right of action argument. In support of its argument, Defendant relies on *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) ("The plaintiff can state no claim of a state constitutional violation in this case because Tennessee does not recognize a private cause of action for violations of the Tennessee Constitution." (citation omitted)); *Bowden Bldg. Corp. v. Tennessee Real Estate Comm'n*, 15 S.W.3d 434, 446 (Tenn. Ct. App. 1999) ("Tennessee, however, has not recognized any such implied cause of action for damages based upon violations of the Tennessee Constitution") (citations omitted)); *Siler v. Scott*, 591 S.W.3d 84, 102 n.2 (Tenn. Ct. App. 2019) (affirming order granting summary judgment in favor of defendant that dismissed plaintiff's claim alleging a violation of the Tennessee Constitution for failure to state a claim); and *Wooley v. Madison County, Tennessee*, 209 F. Supp. 2d 836, 844 (W.D. Tenn. 2002) (dismissing the plaintiff's "freedom of speech claim under article I, section 19 of the Tennessee Constitution" since "it is well established that Tennessee does not recognize an implied private cause of action for damages based upon violation of the Tennessee Constitution." (citations omitted)).

---

[6]  The Tennessee Constitution provides "that all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience, . . . that no human authority can, in any case whatever, control or interfere with the rights of conscience; and that no preference shall ever be given, by law, to any religious establishment or mode of worship." Tenn. Const. Art. I § 3.

Plaintiffs agree that there is no private right of action for damages under the Tennessee Constitution but argue that they may seek injunctive relief.  (Resp. p. 13, ECF No. 32.)[7]  A few of the cases that have addressed the issue of whether a plaintiff has a private right of action for injunctive relief under the Tennessee Constitution have looked favorably on similar arguments by Plaintiffs.  For example, in *Anderson v. Clarksville Montgomery Cty. Sch. Sys.*, the District Court for the Middle District of Tennessee found as follows:

> Plaintiffs have alleged that Defendants violated Plaintiffs' rights to freedom of speech and association and equal protection under the Tennessee Constitution. Defendants claim there is no private right of action under the Tennessee Constitution, citing *Cline v. Rogers*, 87 F.3d 176 (6th Cir. 1996), which held that Tennessee does not recognize a private cause of action for violations of the Tennessee Constitution. *Id.* at 179.
>
> Plaintiffs argue that there is a private right of action under the Tennessee Constitution where, as here, the remedy sought is injunctive relief rather than money damages. Plaintiffs cite *Planned Parenthood of Middle Tennessee v. Sundquist*, 38 S.W.3d 1 (Tenn. 2000), in which the Tennessee Supreme Court granted injunctive relief after declaring certain state statutes unconstitutional under the Tennessee Constitution. Even though there is no authority for the recovery of damages for a violation of the Tennessee Constitution, *Lee v. Ladd*, 834 S.W.2d 323, 325 (Tenn. Ct. App.1992), the Court has the inherent power to enjoin unconstitutional conduct. The plaintiffs in both Cline and Lee sought money damages, not injunctive relief.
>
> Accordingly, Defendants' Motion to Dismiss Plaintiffs' claims under the Tennessee Constitution is DENIED.

*Anderson v. Clarksville Montgomery Cty. Sch. Sys.*, 2006 WL 1639438, at *2–3 (M.D. Tenn. June 13, 2006).  *See also Hines v. Town of Vonore*, 2011 WL 1532420, at *2 (E.D. Tenn. Apr. 22, 2011)

---

[7]  Even if Plaintiffs are correct that they may seek injunctive relief for a violation of their rights under the Tennessee Constitution, only Plaintiffs Reed, Goetz, Spaulding, and Wharton would be eligible for an injunction prohibiting Defendant from taking an adverse action against them as they are the only plaintiffs currently employed by Defendant who declined to be vaccinated and were placed on unpaid leave.  (Amd. Cmplt. ¶¶ 9-11, 13 ECF No. 21.)  Plaintiff Crawford left his employment with Defendant and is employed elsewhere. (*Id.* at ¶12.) Plaintiff Whitehead received the vaccination and remains employed by Defendant. (*Id.* at ¶14.)

(denying the defendant's motion to dismiss the request for injunctive relief under the state constitutional based on the reasoning in *Anderson*).

In *Peterson v. Dean*, 2009 WL 3517542, at *1 (M.D. Tenn. Oct. 23, 2009), the Court acknowledged the lack of clarity as to whether "Tennessee courts have either recognized or proscribed a private right of action for injunctive relief, or whether they would be inclined to do so in the future." *Peterson* rejected the plaintiffs' reliance on *Planned Parenthood* and other cases as finding that there is a private right of action for injunctive relief under the Tennessee Constitution because "[t]hose cases enjoined the enforcement of facially unconstitutional statutes as to everyone; they did not concern individual unconstitutional actions." *Id.* (citations omitted).

> In [those] cases, the statute rather than the official was the underlying target of the injunction. Given the foregoing analysis, it does not seem clear to this Court that Tennessee courts have either recognized or proscribed a private right of action for injunctive relief, or whether they would be inclined to do so in the future. The only thing clear at this point is that Tennessee does not allow for a private right of action for damages based on violations of the Tennessee Constitution, which is not at issue in this case.

*Id.* Rather than decide the issue, the Court declined to exercise supplemental jurisdiction over the plaintiffs' pendent state law claims pursuant to 28 U.S.C. § 1367,[8] in part, because "the question of whether the Tennessee Constitution allows for a private right of action for injunctive relief as to an individual remains an unsettled issue of state law." *Id.* at *2. This Court agrees with the

---

[8] Section 1367 provides in relevant part that a district court may decline to exercise supplemental jurisdiction over a particular claim when:
(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

14

decision in *Peterson* and also "declines to exercise supplemental jurisdiction over this novel issue of state law pursuant to § 1367(c)(1)." *Id.*

Accordingly, claim two seeking injunctive relief on behalf of Plaintiffs Crawford and Whitehead is dismissed with prejudice, and claim two seeking injunctive relief on behalf of Plaintiffs Reed, Goetz, Spaulding, and Wharton is remanded to the Dyer County Chancery Court.[9]

---

[9] The Court is not convinced that Plaintiffs Reed, Goetz, Spaulding, and Wharton have brought a true claim for injunctive relief because they can be made whole with damages and reinstatement if they prevail. This issue was discussed in *Reese v. Tyson Foods, Inc.*, 2021 WL 5625411 (W.D. Mo. Nov. 30, 2021).

> Plaintiff's motion alleges, absent the extraordinary remedy of a temporary restraining order or preliminary injunction, he is faced with the threat of irreparable harm in the form of permanent leave without pay and the loss of salary, pay, and his earned annual bonus. It is well established, however, that this type of harm does not constitute irreparable harm warranting the entry of a temporary restraining order or a preliminary injunction. *Sampson v. Murray*, 415 U.S. 61, 90, 91-92, 92 n.68 (1974) (acknowledging that a discharged employee might be entitled to a preliminary injunction in a "genuinely extraordinary situation" but that a satisfactory showing of loss of income coupled with damage to reputation "falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case."); *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009); *Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 300 (8th Cir. 1996) (finding preliminary injunctive relief was not warranted where a plaintiff had "an adequate remedy at law, namely, the damages and other relief to which she will be entitled if she prevails.").

> More to the point, courts recently have consistently rejected claims that vaccine policies like Defendant's cause irreparable nonmonetary harms. *See Barrington v. United Airlines, Inc.*, No. 21-cv-2602, 2021 WL 4840855, at *7 (D. Colo. Oct. 14, 2021) (denying employee's motion for a temporary restraining order where private employer's COVID-19 vaccine policy provided unpaid leave as accommodation, finding "simple economic loss" does not constitute irreparable harm); *Johnson v. Brown*, No. 21-cv-1494, 2021 WL 4846060, at *25 (D. Ore. Oct. 18, 2021) (fears about paying bills, finding another job, or paying for medical care are "routine," not "irreparable," and are "compensable by money damages"); *Beckerich v. St. Elizabeth Med. Ctr.*, 2021 WL 4398027, at *6 (E.D. Ky. Sept. 24, 2021) ("broader implications" of vaccination policies do not support preliminary injunction because irreparable harm "must be actually suffered by the plaintiffs in question"); *Valdez v. Grisham*, 2021 WL 4145746, at *43 (D.N.M. Sept. 13, 2021) ("potential termination and/or inability to continue to work as a nurse" not irreparable harm);

Defendant contends that Plaintiffs have failed to state a claim for religious discrimination under Title VII (claim three) and the ADA (claim six) because they failed to exhaust their administrative remedies.  It is well-settled that exhaustion of administrative remedies is a prerequisite to filing a district court lawsuit alleging discrimination under Title VII, s*ee Brown v. General Serv. Admin.*, 425 U.S. 820, 823-33 (1976), and that a plaintiff may only bring a Title VII action in district court after he has exhausted the administrative remedies provided under 42 U.S.C. § 2000e-16. [10]  Thus, timely filing a charge with the Equal Employment Opportunity Commission ("EEOC") and subsequently filing a complaint in federal district court in a timely manner are prerequisites to maintaining a Title VII action.  *See Lomax v. Sears, Roebuck, & Co.*, 2000 WL 1888715, at *6 (6th Cir. Dec. 19, 2000) (reiterating that "when a claim is not first presented to the EEOC, the claim may not be brought in court").

In order to exhaust the administrative remedies of Title VII and the ADA, a plaintiff must "trigger the investigatory and conciliatory procedures of the EEOC so that the Commission may first attempt to obtain voluntary compliance with the law.... These investigatory and conciliatory procedures notify potential defendants of the nature of plaintiffs' claims and provide them with the opportunity to settle the claims before the EEOC rather than litigate them." *Davis v. Sodexho, Cumberland College Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998).  A plaintiff must exhaust his or her administrative remedies for each and every claim.  *Id.* In the present case, it is undisputed that Plaintiffs have not filed a charge with the EEOC.

---

*Norris v. Stanley*, 2021 WL 3891615, at *8-9 (W.D. Mich. Aug. 31, 2021) (lost pay and benefits from termination for refusing COVID-19 vaccine not irreparable harm warranting injunctive relief).

*Reese*, 2021 WL 5625411, at *4.

[10]  Section 107(a) of the ADA states that the remedies and procedures used in the event of a Title VII violation also apply to claims brought under the ADA. 42 U.S.C. § 12117(a).

16

Plaintiffs argue that they are only seeking injunctive relief, not monetary damages, which they claim is a generally accepted exception to the administrative remedy exhaustion requirement. In support of their argument, they cite *Malone v. City of E. Cleveland*, 1978 WL 186, at *1 (N.D. Ohio Oct. 6, 1978) (relying on *Drew v. Liberty Mutual Insurance Co.*, 480 F.2d 69 (5th Cir. 1973), which held that, when temporary injunctive relief would be appropriate, "filing of the complaint and request for such relief before exhaustion of EEOC conciliation procedures is not fatal to the Court's jurisdiction over the complaint." However, Plaintiffs fail to make the distinction that in the cases they cite, excluding *Costantino v. TRW, Inc.*, 13 F.3d 969 (6th Cir. 1994), the issue presented to the court was whether a plaintiff could bring a claim for injunctive relief before receipt of a notice of right to sue from the EEOC. *See*, *e.g.*, *Drew*, 480 F.2d at 72 ("We conclude that in the *limited class of cases*, such as the present, in which irreparable injury is shown and likelihood of ultimate success has been established, (here this has been determined by the trial court), the individual employee may bring her own suit to maintain the status quo pending the action of the Commission on the basic charge of discrimination (emphasis added)); *Malone*, 1978 WL 186, at *2 ("[I]f a temporary restraining order is otherwise appropriate under Rule 65, Fed. R. Civ. P., filing of the complaint and request for such relief before exhaustion of EEOC conciliation procedures is not fatal to the Court's jurisdiction over the complaint."); *Sughrim v. New York,* 503 F.Supp.3d 68, 96 (2020) (When "a person has filed a Title VII charge with the EEOC, the court has jurisdiction to entertain a motion for temporary injunctive relief against employer retaliation while the charge is pending before the EEOC and before the EEOC has issued a right to sue letter" (citations omitted). *Costantino* concerns ERISA exhaustion. ERISA, unlike Title VII and the ADA, "does not explicitly require exhaustion of administrative remedies" *Id.* at 974 (citation

omitted). Instead, unlike Title VII and the ADA's express administrative exhaustion requirements, ERISA administrative exhaustion is left to the district court's discretion. *Id.* at 974-75.

Here, Plaintiffs have not filed charges with the EEOC; *a fortiori*, the cases cited by Plaintiffs are inapposite to their claims.  Plaintiffs' failure to file an EEOC charge is dispositive, and Plaintiffs' Title VII and ADA claims (claims three and six) must be dismissed without prejudice for failure to exhaust their administrative remedies.

Plaintiffs have brought a claim under the THRA for Defendant's alleged failure to accommodate their religious beliefs (claim four). Plaintiffs allege that they hold sincere religious beliefs that preclude them from receiving a COVID19 vaccine and that "Defendant's accommodation of one year of unpaid leave, with no guaranteed positions upon potential return, is no reasonable accommodation at all, but rather a punitive measure taken against employees who choose to exercise their religious rights." (Amd. Cmplt. ¶¶ 176, 180, ECF No. 21.)

In its motion to dismiss, Defendant contends that the THRA does not require an employer to accommodate an employee's religious beliefs.  Plaintiffs acknowledge that there is no explicit language in the Tennessee Human Rights Act imposing a duty to accommodate religious beliefs, but they argue that the Tennessee Supreme Court has held that THRA claims are analyzed in the same manner as Title VII claims, and Title VII does proscribe a duty to accommodate an employee's religious beliefs. (Resp. p. 16, ECF No. 32.)

Defendant has raised the issue of preemption. Defendant contends that this claim and Plaintiffs' other state statutory claims are preempted by (1) President Trump's Executive Order, (2) the Federal Meat Inspection Act, 21 U.S.C. §§ 601 *et seq*., and (3) the Poultry Production

Inspection Act, 21 U.S.C. § 451 *et seq.*[11]   The Supremacy Clause provides that the Constitution,

federal statutes, and treaties constitute "the supreme Law of the Land." Art. VI, cl. 2.   If federal

law "imposes restrictions or confers rights on private actors" and "a state law confers rights or

imposes restrictions that conflict with the federal law," "the federal law takes precedence and the

state law is preempted." *Murphy v. National Collegiate Athletic Assn.*, 138 S. Ct. 1461, 1480

(2018).  *See also Torres v. Precision Indus., Inc.*, 938 F.3d 752, 755 (6th Cir. 2019) (reiterating

that preemption presents the constitutional question whether state and federal law "conflict

(citations omitted)).

When a litigant challenges the constitutionality of a Tennessee statute, the Tennessee

Attorney General must be notified. As explained in *In re Adoption of E.N.R.*, 42 S.W.3d 26 (Tenn.

2001),

> [T]he court is required, pursuant to Tenn. R. Civ. P. 24.04, to ensure that notice of
> the constitutional challenge has been provided to the Office of the Attorney
> General.
>
> This rule makes it clear that the trial court sits as gatekeeper to inquire whether
> notice has been provided to the Attorney General by the challenger and **to suspend
> proceeding on the constitutional challenge until such notice has been provided
> and a response from the Attorney General received.**

*In re Adoption of E.N.R.*, 42 S.W.3d at 33 (emphasis added).

The Court in *Waters v. Farr*, 291 S.W.3d 873 (Tenn. 2009), further expounded,

> [a] second jurisprudential principle, embodied in Tenn. Code Ann. § 29–14–107(b)
> (2000), Tenn. R. Civ. P. 24.04, and Tenn. R. App. P. 32, requires parties
> challenging the constitutionality of a statute to notify the Attorney General and
> Reporter of the challenge by serving a copy of their papers on the Attorney General.

---

[11]  Plaintiffs' state statutory claims are brought under the THRA (claim four), Tenn. Code Ann. §
4–21–101 *et seq.*; the TDA, Tenn. Code Ann. § 8–50–103 *et seq.* (claim seven); and Tenn. Code
Ann. § 14-1-101 *et seq.* (claim eleven).  Plaintiffs have also brought a state constitutional claim
(claim two).  Because the Court has declined supplemental jurisdiction over that claim, Defendant
need not notify the Attorney General of claim two.  *See Torres*, 938 F.3d at 755 (pointing out that
"courts should not address a question of preemption if they can resolve the case on other grounds.")

The purposes for these requirements are two-fold. First, the notice enables the Office of the Attorney General to discharge its responsibility to defend the constitutionality of state statutes. Tenn. Code Ann. § 8–6–109(b)(9) (Supp. 2008). Second, the joinder of the Attorney General assures that the statute will be vigorously defended. Compliance with this statute and the related rules is mandatory.

*Waters*, 291 S.W.3d at 918 (concurrence) (some citations omitted).

Here, there is no indication in the record that the Tennessee Attorney General has been notified of the constitutional challenge to the state statutory claims.  Therefore, the Court will deny Defendant's motion to dismiss the state law claims (claims four, seven, eleven) without prejudice. Defendant will be given twenty-eight days from the entry of this order in which to notify of the Court of its compliance with Tenn. Code Ann. § 29–14–107(b) and Tenn. R. Civ. P. 24.04.

Defendant has moved to dismiss Plaintiffs' RFRA claim (claim five) on the ground that RFRA claims may be brought only against a government actor for government conduct. RFRA provides that the "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). "The text of the statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party."  *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010).

Plaintiffs do not dispute the principle that only government actors may be held liable under the RFRA ("If Tyson is a federal officer, then it is obligated to follow the limits imposed on federal officers under the Religious Freedom Restoration Act." And, "In essence, a federal actor's burden on a person's exercise of religion must satisfy strict scrutiny." Amd. Cmplt. ¶¶ 186, 188, ECF No. 21.)  Instead, they continue to argue that Defendant is a government actor for the purposes of this

lawsuit. However, the Court has already decided this issue against Plaintiffs. Therefore, the RFRA claim must be dismissed.

The Court agrees with Defendant that Plaintiffs have failed to state a claim for Defendant's alleged violation of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3 (claim eight), because there is no private right of action under that statute. Section 564 of the FDCA, 21 U.S.C. § 360bbb-3, authorizes the Secretary of Health and Human Services to issue an "emergency use authorization" ("EUA") of a medical product in certain emergency situations. That section further provides that "with respect to the emergency use of an unapproved product, the Secretary . . . shall for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization . . . as the Secretary finds necessary or appropriate to protect the public health, including" that health care professionals administering the product are informed that the Secretary have authorized emergency use, the significant and potential benefits and risks of such use, and of the extent to which the benefits and risks are unknown, and of the alternatives to the product that are available and of their benefits and risks, 21 U.S.C. §360bbbe-(3)(1)(A)(i), and that individuals on whom the product is administered are provided the same information along with the option to refuse or accept the administration of the product. 21 U.S.C. §360bbbe-(3)(1)(A)(ii). Section 564(l) specifically states that "[t]his section only has legal effect on a person who carries out an activity for which an authorization under this section is issued." 21 U.S.C. §360bbb-3(l).

Plaintiffs claim that "as a corporation mandating a vaccine . . ., Defendants failed to follow the requirements associated with EUA products" by not giving Plaintiffs the option to refuse the vaccine, and by not providing the information specified in 21 U.S.C. §360bbbe-(3)(1)(A)(ii).

(Amd. Cmplt. ¶¶ 234-238, ECF No. 21.) However, there is no allegation that Defendant actually administered the vaccine.

> It is well-settled that there is no private right of action under the FDCA. *See Buckrnan Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n. 4, 121 S. Ct. 1012, 148 L.Ed.2d 854 (2001) (there is "no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance" with the FDCA); *Bailey v. Johnson*, 48 F.3d 965, 968 (6th Cir.1995) ("Congress did not intend, either expressly or by implication, to create a private cause of action under the FDCA"); *Griffin v. O'Neal, Jones & Feldman, Inc.*, 604 F. Supp. 717, 718 (S.D. Ohio 1985) ("It is clear from the face of the statute that no civil private right of action exists").

*Edwards v. Warner-Lambert*, 2012 WL 2156246, at *4 (S.D. Ohio June 13, 2012)

As explained in *Bridges v. Houston Methodist Hosp.*, 543 F. Supp. 3d 525, 527 (S.D. Tex. 2021),

> [the FDCA] confers certain powers and responsibilities to the Secretary of Health and Human Services in an emergency. It neither expands nor restricts the responsibilities of private employers; in fact, it does not apply at all to private employers like the hospital in this case. It does not confer a private opportunity to sue the government, employer, or worker. Bridges's claim that the injection requirement violates 21 U.S.C. § 360bbb-3 fails.

*See also Doe v. Franklin Square Union Free Sch. Dist.*, 2021 WL 4957893, at *20 (E.D.N.Y. Oct. 26, 2021) ("Section 564 does not include a private right of action.")

Plaintiffs' claims brought under the Nuremberg Code (claim nine) must also be dismissed. Plaintiffs allege that Defendant has "offended long-held and fundamental principles of international law," that Defendant's "employees are being coerced into unknowingly participating in a national medical experiment" and that Defendant has "failed to provide sufficient balanced information to satisfy informed consent" (Amd. Cmplt. ¶¶ 245-246, ECF No. 21), in violation of the Nuremberg Code which requires the voluntary consent of any human subject in order to participate in medical experiments. *See Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 175 (2d Cir. 2009)

(describing the "sources of international law that categorically forbid medical experimentation on non-consenting human subjects").

The Court agrees with Defendant that there is no private right of action for a violation of international law based on the Nuremberg Code. *See Washington Univ. v. Catalona*, 437 F. Supp. 2d 985, 1000 (E.D. Mo. 2006), *aff'd*, 490 F.3d 667 (8th Cir. 2007). "Covid-19 vaccine mandates are simply not equivalent to the forced experimentation on concentration camp victims that led to the writing of the Nuremberg Code." *Anderson v. United Airlines, Inc.*, 2021 WL 6337144, at *7 (M.D. Fla. Dec. 30, 2021). *See Heinrich ex rel. Heinrich v. Sweet*, 49 F. Supp. 2d 27, 42 (D. Mass. 1999) (noting that there is no private right of action under the Nuremberg Code). Furthermore, the Nuremberg Code does not apply to private employers. *See Bridges v. Houston Methodist Hosp.*, 2021 WL 2399994, at *2 (S. D. Tex. June 12, 2021) ("Equating the injection requirement to medical experimentation in concentration camps is reprehensible.") Plaintiffs cite no law in opposition to this argument and, instead, just make a policy argument.

As explained in by the *Catalona* Court,

> There is no private right of action for an alleged violation of international law for the protection of human research subjects based upon the Declaration of Helsinki and the Nuremberg Code. *White v. Paulsen*, 997 F. Supp. 1380, 1383 (E.D. Wash. 1998); *Hoover v. West Virginia Dept. of Health and Human Resources*, 984 F. Supp. 978, 980 (S.D.W.Va.1997) *aff'd* 129 F.3d 1259, 1997 WL 705385 (4th Cir.1997); *see also*, *Abdullahi, et al. v. Pfizer, Inc.*, 2005 WL 1870811 (S.D.N.Y. 2005). Furthermore, this Court agrees with the conclusions reached by its fellow district courts in Michigan and Oklahoma that the standard in the United States for conducting research on human subjects is contained in the Code of Federal Regulations and therefore United States federal courts have no need to resort to international law to impute a standard. *Ammend v. Bioport, Inc.*, 322 F. Supp.2d 848, 872–73 (W.D. Mich. 2004); *Robertson v. McGee*, 2002 WL 535045 (N.D.Okla.2002).

437 F. Supp. 2d at 1000–01. Accordingly, this claim must be dismissed with prejudice.

Finally, Defendant contends that Plaintiffs have failed to state a claim for common law

assault (claim twelve).  Claim twelve alleges as follows:

270. Defendant has threatened intentional, imminent harmful and offensive contact
upon Plaintiffs by way of forced vaccine injection of an experimental, untested, and
ineffective mRNA vaccine, under penalty of being terminated from their
employment.

271. Defendant's coercion, emboldened by tight deadlines, uncompromising
exemption protocols, and a hostile and censored work environment, contributed to
Plaintiffs' stress and fear concerning Defendant's vaccine mandate.

272. Defendant's COVID-19 vaccine mandate caused Plaintiffs to reasonably
believe that Defendant was about to carry out the threat of harmful and offensive
contact upon them, by way of forcing Plaintiffs to inject an untested and potentially
unsafe substance into their bodies.

273. Plaintiffs did not consent to Tyson's conduct, nor did they consent to receiving
the COVID-19 vaccine. Defendant's unlawful requirement of employment was an
unwelcome invasion of Plaintiffs' privacy and bodily integrity.

274. Tyson's COVID-19 vaccine mandate has and continues to cause Plaintiffs'
harm, including but not limited to by way of fear, anxiety, fright over being
threatened with the injection of an untested and potentially unsafe substance into
the body, and the resulting loss of their income and livelihoods.

(Amd. Cmplt., ECF No. 21.)  Defendant asserts that Plaintiffs have failed to plead sufficient facts

to support a common law claim of assault because they have not alleged an overt act or a physical

movement sufficient to set forth a plausible assault claim for which relief may be granted under

Tennessee law. Defendant posits that the threat of the loss of income cannot sustain a claim for

assault.  The Court finds Defendant's argument to be meritorious.

Under Tennessee common law, assault is defined as "any act tending to do corporal injury

to another, accompanied with such circumstances as denote at the time an intention, coupled with

the present ability, of using actual violence against that person." *Vafaie v. Owens*, 1996 WL

502133, at *3 (Tenn. Ct. App. 1996) (citing *Huffman v. State*, 292 S.W.2d 738, 742 (Tenn. 1956),

overruled on other grounds by *State v. Irvin*, 603 S.W.2d 121 (Tenn. 1980)). In *Vafaie*, the

Tennessee Court of Appeals affirmed the grant of summary judgment to the defendant on the

plaintiff's assault claim because "the alleged threats were always threats of future harm, and were

not threats of immediate or imminent harm. In no instance, were the threats 'coupled with the

present ability to act,' or, to borrow the words of the criminal statute, there was never a threat of

'imminent bodily injury.'" 1996 WL 502133, at *4.

> In Tennessee, assault is defined as "any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against the person." *Thompson v. Williamson Cnty.*, 965 F. Supp. 1026, 1037 (M.D. Tenn. 1997). A defendant is not liable for assault unless he or she commits an "intentional act creating a reasonable apprehension of imminent physical harm on the part of the plaintiff. *Baker v. Moreland*, 1989 WL 89758, at *5 (Tenn. Ct. App. Aug. 9, 1989).
>
> A civil action for assault cannot be sustained upon the basis of words alone. *Id.* Rather, there must be an overt act or physical movement causing the plaintiff to believe he was in imminent physical harm or danger. *Id.* "An overt act is an essential element of an assault, and mere preparation or a threat to commit an assault unaccompanied by physical effort to do so, does not amount to an assault." *Id.* In other words, the defendant must make a physical movement "which might be reasonably interpreted as the beginning of a physical attack upon the plaintiff." *Id.*, at *6.

*Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 855 (E.D. Tenn. 2011).

In the present case, Defendant does not administer the vaccine, and Plaintiffs may choose

not to take the vaccine - albeit at the risk of losing their jobs. *C.f.*, *Reese v. Tyson Foods, Inc.*,

2021 WL 5625411, at *3 (W.D. Mo. Nov. 30, 2021) (denying the employee plaintiff's motion for

a temporary restraining order and preliminary injunction to be able to keep his job during the

pendency of the litigation and not have to receive the vaccine and pointing out that "Plaintiff

admitted he had not been forced to get the COVID-19 vaccine and that no one had tried to or

physically made him get it" even though he had alleged in his complaint that he believed that the

defendant employer would "force" him to be vaccinated).

The court in *McCutcheon v. Enlivant ES, LLC*, 2021 WL 5234787, at *3 (S.D.W. Va. Nov. 9, 2021), explained,

> Ms. McCutcheon's claims are similar to those offered in *Bridges v. Houston Methodist Hosp.*, —— F. Supp. 3d ——, Case No. H-21-1774, 2012 WL 2399994 (S.D. Tex. June 12, 2021). Among other good observations, Judge Hughes correctly noted that vaccine mandates by public employers do not coerce employees. *Id.* at *7. The same might be said of private employers -- particularly those in the medical and assisted living industries -- which impose vaccination policies to protect their residents, patients, and staff members. Ms. McCutcheon is free to accept or refuse the COVID-19 vaccine. If she refuses, she need only to pursue employment elsewhere.

*C.f., Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (rejecting substantive due process claim that "a compulsory vaccination law is ... hostile to the inherent right of every freeman to care for his own body" and "nothing short of an assault upon his person").  Here, there has been no assault upon Plaintiffs because they are "free to accept or refuse the COVID-19 vaccine," and, if they refuse, they "need only to pursue employment elsewhere."  For this reason, claim twelve is dismissed with prejudice.

In summary, Defendant's motion to dismiss is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.  The motion is granted with prejudice as to claims one, five, eight, nine, ten, and twelve.  The motion is also granted with prejudice on Plaintiffs Crawford and Whitehead's claim two. The motion is granted without prejudice as to claims three and six.

The motion is denied without prejudice as to claims four, seven, and eleven.  As previously stated, Defendant will be given twenty-eight days from the entry of this order in which to notify the Court of its compliance with Tenn. Code Ann. § 29–14–107(b) and Tenn. R. Civ. P. 24.04.

The Court declines to accept supplemental jurisdiction over Plaintiffs Reed, Goetz, Spaulding, and Wharton's claim two pursuant to 28 U.S.C. § 1367(c), and this claim is hereby remanded to the Dyer County Chancery Court.

    **IT IS SO ORDERED**.

                    **s/ S. Thomas Anderson**
                    S. THOMAS ANDERSON
                    CHIEF UNITED STATES DISTRICT JUDGE

                    Date:  June 14, 2022.

563 F.Supp.3d 633
United States District Court, E.D. Kentucky,
Northern Division.
at Covington.

Christy BECKERICH, et al., Plaintiffs
v.
ST. ELIZABETH MEDICAL CENTER, et al.,
Defendants

CIVIL CASE NO. 21-105-DLB-EBA
|
Signed 09/24/2021

**Synopsis**

**Background:** Healthcare workers currently and formerly employed by medical center brought action alleging that medical center's policy mandating that employees be vaccinated against COVID-19 or obtain a valid exemption violated the Americans with Disabilities Act (ADA), Title VII, and employees' constitutional rights. Healthcare workers moved for a temporary restraining order and/or preliminary injunction.

**Holdings:** The District Court, David L. Bunning, J., held that:

[1] healthcare workers could not succeed on merits of their constitutional claims;

[2] healthcare workers were unlikely to succeed on merits of their ADA claim;

[3] healthcare workers were unlikely to succeed on merits of their Title VII claim;

[4] healthcare workers would not suffer irreparable harm absent a preliminary injunction and/or temporary restraining order; and

[5] public interest weighed against granting a preliminary injunction and/or temporary restraining order.

Motion denied.

**Procedural Posture(s):** Motion for Preliminary Injunction; Motion for Temporary Restraining Order (TRO).

West Headnotes (30)

**[1]** **Injunction** Discretionary Nature of Remedy

Decision to grant or deny injunctive relief falls solely within discretion of district court.

**[2]** **Injunction** Relation or conversion to preliminary injunction

The same factors are considered in determining whether to issue a temporary restraining order or preliminary injunction; thus the district court can evaluate both the temporary restraining order and the preliminary injunction by the same analysis.

**[3]** **Injunction** Grounds in general; multiple factors
**Injunction** Grounds in general; multiple factors

The four factors used in evaluating temporary restraining orders and/or preliminary injunctions are: (1) whether the moving party demonstrates a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable harm without the order; (3) whether the order would cause substantial harm to others; and (4) whether the public interest would be served by the order.

1 Cases that cite this headnote

**[4]** **Injunction** Balancing or weighing factors; sliding scale

Beckerich v. St. Elizabeth Medical Center, 563 F.Supp.3d 633 (2021)
2021 WL 4398027, 64 NDLR P 23

**Injunction** ⬤—Balancing or weighing factors; sliding scale

The four factors used in evaluating temporary restraining orders and/or preliminary injunctions are not prerequisites that must be met, but are interrelated concerns that must be balanced against one another.

**[5]** **Injunction** ⬤—Extraordinary or unusual nature of remedy
**Injunction** ⬤—Extraordinary or unusual nature of remedy

Temporary restraining orders and preliminary injunctions are extraordinary and drastic remedies, never awarded as of right.

**[6]** **Injunction** ⬤—Factors Considered in General
**Injunction** ⬤—Factors Considered in General

A party must demonstrate the legal factors that necessitate the granting of a preliminary injunction or temporary restraining order, if not fully, then at least to the extent that the factors cumulatively weigh in the moving party's favor.

**[7]** **Injunction** ⬤—Likelihood of success on merits
**Injunction** ⬤—Serious or substantial question on merits

A party seeking to demonstrate a strong likelihood of success on the merits for the purpose of its motion for a preliminary injunction is not required to prove its case in full; it is ordinarily sufficient if the plaintiff has raised questions going to the merits that are serious, substantial, difficult, and doubtful.

**[8]** **Federal Civil Procedure** ⬤—Absence of genuine issue of fact in general
**Injunction** ⬤—Standard of proof in general

The proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion, which merely requires establishing a genuine issue of material fact.

**[9]** **Injunction** ⬤—Likelihood of success on merits

If a plaintiff can demonstrate a strong likelihood of success on the merits for the purposes of a preliminary injunction by merely raising questions going to the merits of the action, those questions must be exceptionally significant, and grounded in actual legal disputes, not conjectures and conspiracies.

**[10]** **Civil Rights** ⬤—Employment practices
**Civil Rights** ⬤—Employment practices

Healthcare workers currently and formerly employed by medical center could not succeed on merits of their claim that medical center's policy mandating that employees be vaccinated against COVID-19 or obtain a valid exemption violated workers' constitutional rights, for purpose of workers' motion for a preliminary injunction and/or temporary restraining order prohibiting medical center from enforcing mandatory vaccination policy; medical center was a private hospital, and thus not a state actor for purpose of constitutional questions. U.S. Const. Amend. 14.

1 Cases that cite this headnote

Beckerich v. St. Elizabeth Medical Center, 563 F.Supp.3d 633 (2021)

2021 WL 4398027, 64 NDLR P 23

**[11]    Constitutional Law**—Fourteenth Amendment in general

There exists a line between state action subject to Fourteenth Amendment scrutiny and private conduct, however exceptionable, that is not; this principle is generally known as the "state action doctrine." U.S. Const. Amend. 14.

**[12]    Constitutional Law**—Fourteenth Amendment in general

A private entity may qualify as a state actor for the purposes of the Fourteenth Amendment state action doctrine when it exercises powers traditionally exclusively reserved to the state. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[13]    Constitutional Law**—Fourteenth Amendment in general

The fact that the government licenses, contracts with, or grants a monopoly to a private entity does not convert the private entity into a state actor for purposes of the Fourteenth Amendment state action doctrine, unless the private entity is performing a traditional, exclusive public function; the same principle applies if the government funds or subsidizes a private entity. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[14]    Constitutional Law**—Fourteenth Amendment in general

Private hospitals, no matter how much federal funding they may receive, are generally not state actors for purposes of the Fourteenth Amendment state action doctrine. U.S. Const.

Amend. 14.

1 Cases that cite this headnote

**[15]    Civil Rights**—Preliminary injunction

Requirements of administrative exhaustion under the ADA and Title VII cut against the likelihood of success on the merits for the purposes of injunctive relief. Civil Rights Act of 1964 § 706, 42 U.S.C.A. § 2000e-5(e)(1); Americans with Disabilities Act of 1990 § 107, 42 U.S.C.A. § 12117(a).

**[16]    Civil Rights**—Exhaustion of Administrative Remedies Before Resort to Courts

Title VII's administrative exhaustion requirement is not jurisdictional. Civil Rights Act of 1964 § 706, 42 U.S.C.A. § 2000e-5(e)(1).

**[17]    Civil Rights**—Preliminary injunction

Healthcare workers currently and formerly employed by medical center were unlikely to succeed on merits of their claim that medical center's policy mandating that employees be vaccinated against COVID-19 or obtain a valid exemption violated ADA, for purpose of workers' motion for a preliminary injunction and/or temporary restraining order prohibiting medical center from enforcing mandatory vaccination policy; medical center granted either full exemptions or deferments to 75% of employees who requested a medical accommodation to vaccination requirement, including some healthcare workers who filed action against medical center, and no healthcare worker who was a party to that action suffered an adverse employment decision because of a disability. Americans with Disabilities Act of

1990 § 3, 42 U.S.C.A. § 12102(2)(A); 29 C.F.R. § 1630.2(j)(1)(iii).

1 Cases that cite this headnote

**[18]    Civil Rights**⬥Practices prohibited or required in general;  elements

The ADA broadly prohibits discrimination against a qualified individual on the basis of disability as it applies to aspects of employment, including hiring, advancement, and firing. Americans with Disabilities Act of 1990 § 107, 42 U.S.C.A. § 12117(a).

**[19]    Civil Rights**⬥In general;  elements of accommodation claims

The ADA requires employers to provide disabled employees with reasonable accommodations to avoid discrimination; thus, if an employer does not provide reasonable accommodations to disabled employees, an employee has an actionable claim under the ADA. Americans with Disabilities Act of 1990 § 107, 42 U.S.C.A. § 12117(a).

1 Cases that cite this headnote

**[20]    Civil Rights**⬥Practices prohibited or required in general;  elements

A person seeking relief under the ADA for termination must establish (1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability. Americans with Disabilities Act of 1990 § 3, 42 U.S.C.A. § 12102(2)(A).

**[21]    Civil Rights**⬥Discrimination by Reason of Handicap, Disability, or Illness

A court's role in assessing an ADA claim is whether employers have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment is a disability. Americans with Disabilities Act of 1990 § 107, 42 U.S.C.A. § 12117(a); 29 C.F.R. § 1630.2(j)(1)(iii).

**[22]    Civil Rights**⬥Preliminary injunction

Healthcare workers currently and formerly employed by medical center were unlikely to succeed on merits of their claim that medical center's policy mandating that employees be vaccinated against COVID-19 or obtain a valid exemption violated Title VII, for purpose of workers' motion for a preliminary injunction and/or temporary restraining order prohibiting medical center from enforcing mandatory vaccination policy; medical center had granted over 57% of requests for religious exemptions to vaccine requirement, 11 of 40 healthcare workers who brought action against medical center had been granted religious exemptions, no worker who was a party to that action had been denied a religious exemption, and workers who did not seek exemptions did not inform medical center of religious conflict. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a); 42 U.S.C.A. § 2000e-2(j).

**[23]    Civil Rights**⬥Accommodations

Analysis of any religious accommodation case under Title VII begins with question of whether employee has established prima facie case of religious discrimination. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a); 42

Beckerich v. St. Elizabeth Medical Center, 563 F.Supp.3d 633 (2021)
2021 WL 4398027, 64 NDLR P 23

U.S.C.A. § 2000e-2(j).

**[24]    Civil Rights**⚷Practices prohibited or required in general;  elements

To establish prima facie case of religious discrimination under Title VII, employee must show that (1) she holds sincere religious belief that conflicts with employment requirement, (2) she has informed employer about conflicts, and (3) she was discharged or disciplined for failing to comply with conflicting employment requirement. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a); 42 U.S.C.A. § 2000e-2(j).

**[25]    Injunction**⚷Adverse employment actions
**Injunction**⚷Health

Healthcare workers currently and formerly employed by medical center would not suffer irreparable harm absent a preliminary injunction and/or temporary restraining order prohibiting medical center from enforcing policy mandating that employees be vaccinated against COVID-19 or obtain a valid exemption; healthcare workers who had not sought medical or religious exemptions from vaccine requirement recognized that they could be terminated from their employment, at least one worker who was party to action against medical center had already found other employment after voluntarily leaving employment with medical center, no worker who was party to action was being forcibly vaccinated against his or her will, and any injuries stemming from termination were compensable by monetary damages.

6 Cases that cite this headnote

**[26]    Injunction**⚷Irreparable injury

Irreparable harm is indispensable requirement for preliminary injunction, and in absence of irreparable harm, injunctive relief cannot be granted.

11 Cases that cite this headnote

**[27]    Injunction**⚷Irreparable injury

An inquiry into irreparable harm for the purpose of injunctive relief is focused on the group for whom the policy is a restriction, not the group for whom the policy is irrelevant.

1 Cases that cite this headnote

**[28]    Injunction**⚷Irreparable injury
**Injunction**⚷Recovery of damages

For an injury to be irreparable for the purpose of injunctive relief, the injury resulting from the denial of injunctive relief cannot be fully compensable by monetary damages.

3 Cases that cite this headnote

**[29]    Injunction**⚷Adverse employment actions

Loss of employment is not considered to be an irreparable injury for the purpose of injunctive relief because it is fully compensable by monetary damages.

9 Cases that cite this headnote

**[30]    Injunction**⚷Employment and Compensation
**Injunction**⚷Health

Public interest weighed against granting a

Beckerich v. St. Elizabeth Medical Center, 563 F.Supp.3d 633 (2021)

2021 WL 4398027, 64 NDLR P 23

preliminary injunction and/or temporary restraining order prohibiting medical center from enforcing policy mandating that employees be vaccinated against COVID-19 or obtain a valid exemption, although healthcare workers presented opinions of medical professionals supporting their suspicions about efficacy and safety of COVID-19 vaccines; public had a substantial interest in ending COVID-19 pandemic, which constituted an international public health crisis, and medical center, as a private employer, had a right to set conditions of employment for its employees.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*637** Anthony Dominick Romeo, Deters Law Firm, Independence, KY, Alan J. Statman, Statman, Harris & Eyrich, LLC, Cincinnati, OH, for Plaintiffs.

Christopher B. Markus, Mark D. Guilfoyle, Michael Joseph Enzweiler, Nicholas Charles Birkenhauer, Dressman Benzinger LaVelle P.S.C., Crestview Hills, KY, for Defendants.

**MEMORANDUM ORDER**

David L. Bunning, United States District Judge

**\*\*1** This matter is before the Court on Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction. (Doc. # 7). Pursuant to the Court's Order (Doc. # 8), the Motion has been fully briefed (Docs. # 15 and 22), and an Oral Argument was held before the Court on Wednesday, September 22, 2021. (Doc. # 31). Alan Statman argued for Plaintiffs, and Mark Guilfoyle argued for Defendants. Having heard the oral arguments, and having reviewed the filings and accompanying affidavits and exhibits submitted by both parties, the Court **denies** Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction, for the reasons stated herein.

**I. BACKGROUND**

At its core, this case is about conditions of employment, and whether a private employer can modify its employment conditions to require employees to be vaccinated in response to an unprecedented global pandemic. Within that framework, the Court has been asked to determine if the law requires preliminary enjoinment of a mandatory vaccination policy. For the reasons that follow, the Court concludes that it does not, and denies the motion.

Plaintiffs are a group of healthcare workers, some past and others presently employed by Defendants St. Elizabeth Medical Center and Summit Medical Group, d/b/a St. Elizabeth Physicians (both hereinafter "St. Elizabeth"). (*See* Doc. # 7). Plaintiffs are seeking injunctive relief from the Court to prohibit St. Elizabeth from enforcing a mandatory vaccination policy it enacted in response to the COVID-19 pandemic. (*See id.*) Under that policy, St. Elizabeth employees are required to "either receive a COVID-19 vaccine or submit a request for a medical exemption or exemption for sincerely held religious beliefs" before October 1, 2021. (Doc. # 1-17).[1] The policy further states that "[f]ailure to comply ... without an accepted exemption may result in termination ...." (*Id.*).

[1]   The cited document is the vaccination policy from St. Elizabeth Physicians, but Defendants have noted that the policy is "substantially the same" for both St. Elizabeth Physicians and St. Elizabeth Medical Center. (Doc. # 15 at 5 n.3). After reviewing both policies, the Court agrees, and refers to them as one. The quote included here is contained in both policies.

Plaintiffs have raised numerous causes of action under both state and federal law in their Complaint. (Doc. # 1). But in support of their motion for injunctive relief, Plaintiffs have concentrated on their positions that the vaccination policy infringes **\*638** upon their constitutional rights (Doc. # 7 at 3), and that Defendants have not approved religious and medical accommodations to the vaccination policy in accord with the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title VII"). (Doc. # 22 at 11).

Beckerich v. St. Elizabeth Medical Center, 563 F.Supp.3d 633 (2021)

2021 WL 4398027, 64 NDLR P 23

## II. ANALYSIS

[1] [2]The decision to grant or deny injunctive relief falls solely within the discretion of the district court. *See Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). In the Sixth Circuit, the "same factors [are] considered in determining whether to issue a TRO or preliminary injunction." *Id.* Thus, the Court can evaluate both the temporary restraining order and the preliminary injunction by the same analysis. *See also id.* (applying the aforementioned factors to a temporary restraining order); *Overstreet v. Lexington-Fayette Urban Cnty. Gov't.*, 305 F.3d 566, 573 (6th Cir. 2002) (applying the same to a preliminary injunction).

**2 [3] [4] [5] [6]The four factors used in evaluating temporary restraining orders and/or preliminary injunctions are: (1) whether the moving party demonstrates a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable harm without the order; (3) whether the order would cause substantial harm to others; and (4) whether the public interest would be served by the order. *Id.* (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)). The four factors are not prerequisites that must be met, but are interrelated concerns that must be balanced against one another. *Ne. Ohio Coal. for Homeless and Serv. Emps. Int'l Union v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). Lastly, temporary restraining orders and preliminary injunctions are "extraordinary and drastic remed[ies], ... never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 690-91, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008) (internal citations omitted). Rather, a party must demonstrate the legal factors that necessitate the granting of a preliminary injunction or temporary restraining order—if not fully, then at least to the extent that the factors cumulatively weigh in the moving party's favor. *See id.; see also Blackwell*, 467 F.3d at 999.

### (a) Strong Likelihood of Success on the Merits

[7] [8] [9]The first factor requires the moving party to demonstrate a "strong likelihood of success on the merits," *Overstreet*, 305 F.3d at 573. Oftentimes, this factor is determinative, *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020), which warrants its analysis being first and foremost. Plaintiffs are correct that at this stage, they are not required to "prove [their] case in full," and that "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful...." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012). However, "the proof required for the plaintiff to obtain a preliminary injunction

is much more stringent than the proof required to survive a summary judgment motion," *Leary*, 228 F.3d at 739, which merely requires establishing a "genuine issue of material fact." *Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 613 (6th Cir. 1998). Thus, if Plaintiff can satisfy this factor by merely raising questions – those questions must be exceptionally significant, and grounded in actual legal disputes, not conjectures and conspiracies. Unfortunately for Plaintiffs, here, they have not raised sufficiently significant questions where they seek to do so, and they have otherwise **639 not established a strong likelihood of success on any of their claims.

### (1) St. Elizabeth is not a state actor, and Plaintiffs' constitutional claims are thus inapplicable.

[10]In their Complaint and in their briefings on the instant motion, Plaintiffs have raised numerous constitutional concerns. (*See* Doc # 1 ¶ 463, 570, 584 *et seq.*, Doc. # 7 at 3; Doc. # 22 at 7). Furthermore, in support of the instant motion, Plaintiffs have cited numerous cases noting the importance of their constitutional concerns, primarily in terms of an allegedly irreparable injury. (*See* Doc. # 7 at 3 and 22 at 6-8). None of these cases, however, were brought against a singular private, non-government actor.[2]

[2]   *Elrod v. Burns*, 427 U.S. 347, 349, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (Doc. # 7 at 3; brought by public employees against county sheriff's office); *Obergefell v. Kasich*, No. 1:13-CV-501, 2013 WL 3814262, at *1 (S.D. Ohio July 22, 2013) (Doc. # 7 at 3; "The issue is whether the *State of Ohio* can discriminate....") (emphasis added); *Jacobson v. Mass.*, 197 U.S. 11, 24, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (Doc. # 22 at 6; "The power of *the State* [of Massachusetts] to enact this statute....") (emphasis added); *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (Doc. # 22 at 6; brought against Pennsylvania governor and other officials); *Guertin v. Mich.*, 912 F.3d 907, 915 (6th Cir. 2019) (Doc. # 22 at 7; brought against "numerous state, city, and private-actor defendants"); *Washington v. Harper*, 494 U.S. 210, 213, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (Doc. # 22 at 8; "The central question before us is whether ... *the State* may treat ....") (emphasis added).

**3 [11]Notably, a well settled principle of constitutional law is that there exists "a line between state action subject to Fourteenth Amendment scrutiny and private conduct

Beckerich v. St. Elizabeth Medical Center, 563 F.Supp.3d 633 (2021)

2021 WL 4398027, 64 NDLR P 23

(however exceptionable) that is not." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 297, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (citing *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988)). Because of that principle, generally known as the state action doctrine, the Court sees Plaintiffs' constitutional assertions as bearing more on their likelihood of success than on the irreparable harm factor. Put simply, without establishing that Defendants are state actors, Plaintiffs' constitutional claims cannot stand, and thus have zero likelihood of success on the merits.

[12] [13] [14]The Supreme Court has made clear that "a private entity may qualify as a state actor when it exercises 'powers traditionally exclusively reserved to the state.' " *Manhattan Cmty. Access Corp. v. Halleck*, ––– U.S. ––––, 139 S. Ct. 1921, 1928, 204 L.Ed.2d 405 (2019) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477, (1974)). Furthermore, "the fact that the government licenses, contracts with, or grants a monopoly to a private entity does not convert the private entity into a state actor – unless the private entity is performing a traditional, exclusive public function. The same principle applies if the government funds or subsidizes a private entity." *Id.* at 1931-32 (internal citations omitted). Private hospitals, no matter how much federal funding they may receive, are generally not state actors for purposes of constitutional questions. *See, e.g. Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 612 (6th Cir. 2018). Plaintiffs' attempts to turn Defendants into state actors, based on Plaintiffs' counsel's statements during oral argument that a hospital can become a "quasi-state actor" by how much government funding it receives is unavailing. Not only is such a claim in direct conflict with controlling precedent, *Halleck*, 139 S. Ct. at 1928, Plaintiffs have been unable to *640 provide a case in support of that assertion. For these reasons, Plaintiffs' likelihood of success on the merits of their constitutional claims is virtually nonexistent, weighing heavily against granting injunctive relief.

**(2) Plaintiffs have not established a strong likelihood of success on the merits with respect to their claims under the ADA and Title VII.**

In their Complaint, Plaintiffs have labeled their claim brought under the ADA as their "strongest claim." (Doc. #1 at 9). They are correct that under the ADA and Title VII, private employers such as St. Elizabeth are required to offer medical and religious accommodations to its mandatory vaccination policy. *See, e.g., Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 165 (S.D.N.Y. 2020) ("Doubtless, some reactions to vaccines can be severe enough ... to rise to the level of a disability under the ADA."); *Fallon v. Mercy Cath. Med. Ctr.*, 877 F.3d 487, 490 (3d Cir. 2017) (analyzing a religious objection to an employer's vaccine mandate by Title VII framework).

[15] [16]Initially, the Court recognizes that employment discrimination claims brought under the ADA and Title VII both require exhaustion of administrative remedies before the filing of a lawsuit. 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1). While both statutes' requirements of administrative exhaustion cut against the likelihood of success on the merits from the outset, "Title VII's [administrative exhaustion requirement] is not jurisdictional," *Fort Bend Cty. v. Davis*, ––– U.S. ––––, 139 S. Ct. 1843, 1846, 204 L.Ed.2d 116 (2019), and so the Court will evaluate the likelihood of success on the merits of Plaintiffs' ADA and Title VII claims by focusing on the prima facie elements of each.

**(i) ADA Claim**

**4 [17] [18] [19]The Americans with Disabilities Act "broadly prohibits discrimination against a qualified individual on the basis of disability as it applies to aspects of employment, including hiring, advancement, and firing." *Hostettler v. College of Wooster*, 895 F.3d 844, 848 (6th Cir. 2018). Put simply, the ADA requires employers to provide disabled employees with "reasonable accommodations" to avoid discrimination. *See, e.g., Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). With specific respect to vaccination mandates, the Equal Employment Opportunity Commission has advised employers that the ADA does require employers to provide a process by which a disabled employee can seek a medical exemption to a COVID-19 vaccine requirement. (Doc. # 15-6 at 33). Thus, if an employer does not provide reasonable accommodations to disabled employees, an employee has an actionable claim under the ADA. *Kleiber*, 485 F.3d at 868.

Here, as their "strongest claim," Plaintiffs have asserted that in violation of the ADA, Defendants have "corrupted" the process by which they are required to provide reasonable accommodations to disabled employees. (Doc. # 1 at 9). Plaintiffs also assert that Defendants have provided them with no right to appeal the denial of a requested exemption. For the reasons that follow, Plaintiffs have failed to demonstrate a strong likelihood of success on an ADA violation claim against

Beckerich v. St. Elizabeth Medical Center, 563 F.Supp.3d 633 (2021)

2021 WL 4398027, 64 NDLR P 23

Defendants.

[20]"A person seeking relief under the ADA for termination must establish (1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability." *641 McKay v. Toyota Motor Mfg., U.S.A., Inc., 110 F.3d 369, 371 (6th Cir. 1997) (internal citations omitted). The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more of the major life activities of [the affected] individual." 42 U.S.C. § 12102(2)(A).

[21]A court's role in assessing an ADA claim is " 'whether

[employers] have complied with their obligations and whether discrimination has occurred', not whether an individual's impairment is a disability." Hostettler, 895 F.3d at 853 (quoting 29 C.F.R. § 1630.2(j)(1)(iii)). In this case, Plaintiffs simply have not shown that Defendants have not complied with the ADA in providing necessary medical accommodations to the vaccination requirement. The following table shows the status of Defendants' processing of medical accommodations through September 21, 2021, provided by Defendants at oral argument.

## MEDICAL EXEMPTIONS

| Requests Received | 232 | |
| --- | --- | --- |
| Granted Fully | 31 | 13.36 % |
| Granted Deferments | 143 | 61.64 % |
| Denied | 34 | 14.66 % |
| Pending | 24 | 10.34 % |

Of 232 requests received by Defendants for medical accommodations, they have fully granted 31 requests, granted 143 deferment requests, denied 34 requests, and have 24 pending requests. These statistics reveal that Defendants have either granted full exemptions or granted deferments to 75 percent of employees who have requested a medical accommodation to the vaccine requirement.

In support of the allegedly "corrupt" process, Plaintiffs posited at oral argument that it is an apparently common practice of defense attorneys to "poach" members of a class of plaintiffs into cooperating with the defendants, so

that the defense counsel can show an earnest effort in making accommodations. The Court is not convinced. In granting 31 medical exemptions and in granting 143 deferments, Defendants have granted more medical accommodations than there are Plaintiffs in this case. In their Reply in support of the instant motion, Plaintiffs attest that Defendants are misrepresenting the number of applications for religious accommodations, writing that "[they] understand over 5,000"[3] medical and religious exemptions have been filed. (Doc. # 22 at 3). However, Plaintiffs provide no evidence in support of that assertion.

[3]    Defendants attested at oral argument that they

have approximately 11,000 employees, and that approximately 971 had requested either a medical or religious exemption, representing approximately 11 percent of their workforce.

**5 Furthermore, no Plaintiff in this case has suffered an adverse employment decision because of a disability, which is the third element of a prima facie case under *642 the ADA. In fact, Plaintiff April Hoskins has received a medical exemption, and another Plaintiff, Veronica Crump, was approved for a medical exemption after initially being denied a religious exemption. (Doc. # 32, Plaintiffs' Exh. 1). The complete lack of adverse employment effects suffered by Plaintiffs inhibits their ability to establish a prima facie case under the ADA. In the absence of the claim's prima facie elements, their ADA claim has very little likelihood of success, and accordingly, Plaintiffs have not shown a strong likelihood of success on the merits with respect to their ADA claim.

### (ii) Title VII Claim

[22] [23] [24]Much like the ADA, Title VII makes it unlawful to discriminate against an employee, but on the basis of religion, instead of disability. *See* 42 U.S.C. § 2000e-2(a). The statute broadly defines "religion" to mean "all aspects of religious observance and practice, as well as belief." *Id.* at § 2000e-2(j). "The analysis of any religious accommodation case begins with the question of whether the employee has established a prima facie case of religious discrimination." *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987), *cert. denied*, 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988). To establish a prima facie case of religious discrimination, a plaintiff must show that (1) she holds a sincere religious belief that conflicts with an employment requirement; (2) she has informed the employer about the conflicts; and (3) she was discharged or disciplined for failing to comply with the conflicting employment requirement. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007).

Applied to the relevant facts here, those elements would require a plaintiff to show (1) a sincere religious belief in conflict with the vaccine requirement; (2) that she informed Defendants of the conflict by filling out a religious exemption form, and (3) that she was discharged or disciplined for failing to comply with the requirement. After a prima facie case is established, a burden shifting framework is applied to adjudicate the claim on its merits. *Tepper*, 505 F.3d at 514. But in the absence of a prima facie case, a claim has no likelihood of success on the merits – let alone a strong likelihood of success.

In this case, Plaintiffs have failed to even suggest that they could raise a prima facie case of religious discrimination, weighing against the granting of injunctive relief. According to a document provided by Plaintiffs at oral argument, 11 of the 40 Plaintiffs have been granted religious exemptions to the vaccine requirement and thus will not be required to obtain the vaccine. (Doc. # 32, Plaintiff's Exhibit 1). Furthermore, according to the same document, no Plaintiff has been denied a religious exemption, and only one was marked still pending (*id.*), but corroborating documents provided by Defendants show that even the pending religious exemption has been granted. (Doc. # 32, Defendants' Exh. 1). Because none of the Plaintiffs in this case have been denied a religious exemption, they are unable to establish the third element, which requires discharge or discipline from their employer.

Furthermore, with respect to the second element, to the extent that there are Plaintiffs who have not sought a religious exemption, they have not informed or notified their employer about a potential religious conflict. In reference to one of the granted religious exemptions, Plaintiffs state that "The applicant's beliefs are shared by many, many Christians, and ... Defendants should be granting vast numbers of similar requests." (Doc. # 22 at 11). The below chart summarizes the current status of Defendants' processing of religious exemptions, as of September 21, *643 2021, and based on Defendants' attestations at oral argument.

### RELIGIOUS EXEMPTIONS

| Requests Received | 739 | |
|---|---|---|
| Granted | 425 | 57.51 % |

Beckerich v. St. Elizabeth Medical Center, 563 F.Supp.3d 633 (2021)

2021 WL 4398027, 64 NDLR P 23

| Denied | 39 | 5.28 % |
| --- | --- | --- |
| Pending | 275 | 37.21 % |

**\*\*6** As Plaintiffs have failed to show a strong likelihood of success on their claims of religious discrimination under Title VII, this factor does not support the granting of injunctive relief.

**(b) Irreparable Harm by the Moving Party**

[25] [26] [27]Irreparable harm is an "indispensable" requirement for a preliminary injunction, and in the absence of irreparable harm, injunctive relief cannot be granted. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019). Furthermore, an inquiry into irreparable harm is focused on "the group for whom the [policy] is a restriction, not the group for whom the [policy] is irrelevant." *Planned Parenthood of S.E. Penn. v. Casey*, 505 U.S. 833, 894, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Thus, in this case, the Plaintiffs need to show "certain and immediate" harm, not "speculative or theoretical" harm that would result in the absence of granting injunctive relief. *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (quoting *D.T.*, 942 F.3d at 327 (internal quotations omitted)). Here, Plaintiffs have failed to show that irreparable harm will result in the absence of injunctive relief, weighing heavily against the granting of injunctive relief.

[28] [29]First, for an injury to be irreparable, the injury resulting from the denial of injunctive relief cannot be "fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578. Furthermore, loss of employment is not considered to be an irreparable injury. *See, e.g., Aluminum Workers Int'l. Union, AFL-CIO, Loc. Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 443 (6th Cir. 1982).[4] Loss of employment is not irreparable because it is fully compensable by monetary damages. *See Hayes v. City of Memphis*, 73 F.App'x 140, 141 (6th Cir. 2003). In fact, wrongful termination claims exist for that very reason—whether brought under the ADA, Title

VII, or some other state or federal law, a wrongfully terminated plaintiff can receive monetary damages to compensate their loss of employment. In this case, the remaining Plaintiffs who have not sought accommodations recognize that they may be terminated from employment. (Doc. # 8).

[4]   *See also Doe v. Ronan*, No. 1:09-CV-105, 2009 WL 10679456, at \*2 (S.D. Ohio Apr. 20, 2009) ("It is well settled law that the loss of employment is not irreparable harm.").

However, Plaintiffs also assert that injuries arising from "their constitutional right to privacy, their [in]ability to obtain employment in any other appropriate job, and emotional and physical wellbeing" establishes **\*644** irreparable injury. (*Id.* at 8-9). As previously stated, constitutional rights are not at question here, as Defendants are not state actors. *See supra* Part II(a)(1). Thus, Plaintiffs' "constitutional right to privacy" falls short of establishing irreparable harm. With respect to an inability to obtain other employment, Plaintiffs themselves have shown that at least one Plaintiff has, in fact, been able to obtain another job after voluntarily leaving employment with Defendants. (Doc. #13-1 at 38, *Affidavit of Erin Marshall*). Otherwise, emotional injuries stemming from wrongful termination claims are routinely compensated by monetary damages in this Court and in courts across the country. Lastly, with respect to the "national consequences" referred to by Plaintiffs in their reply (Doc. # 22 at 1) and with respect to the broader implications on the community implied by Plaintiffs' counsel at oral argument, those concerns are irrelevant to this question, as the irreparable harm suffered in the absence of injunctive relief must be actually suffered by the plaintiffs in question. *Casey*, 505 U.S. at 894, 112 S.Ct. 2791.

**\*\*7** Lastly, no Plaintiff in this case is being forcibly vaccinated. *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019), relied upon heavily by Plaintiffs, dealt with the

"right to bodily integrity" with respect to access to clean drinking water in a case against the Michigan state government. *Guertin* cites forcible injection cases, including *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), which involved the government seeking a warrant to surgically remove a bullet from someone's chest, and *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), which involved an inmate being forcibly injected with antipsychotic drugs that had known side effects. Guertin refers to the forcible injections as a "foreign substance," in analogizing the forcible vaccination cases to its own issue. 912 F.3d at 919. To be clear, though, the "foreign substance" at issue in *Guertin* was lead contamination of the municipal drinking water in Flint, Michigan. *Id.* at 915. The *Guertin* plaintiffs and other Flint residents bathed in and drank the lead-contaminated water without knowledge of its contamination, and suffered from lead poisoning as a result. *Id.* Their hair fell out, they developed rashes, they tested positive for E. coli, many died from Legionnaire's Disease, and children in their community had lethally-high levels of lead in their blood. *Id.* Here, no Plaintiff is being imprisoned and vaccinated against his or her will. Nor is any Plaintiff unknowingly ingesting lead-contaminated water. Rather, these Plaintiffs are choosing whether to comply with a condition of employment, or to deal with the potential consequences of that choice. Even if they believe the condition or the consequences are wrong, the law affords them an avenue of recourse – and that avenue is not injunctive relief on this record. Thus, no Plaintiff in this case will suffer irreparable harm, as that term has been clearly defined by the law, in the absence of injunctive relief.

### (c) Substantial Harm to Others and Public Interest Factors

[30]The last two factors in the injunctive relief framework involve the interests of nonparties, whereas the first two factors deal with the interests of the parties in the lawsuit. Oftentimes, balancing these two factors against the first two is referred to as "balancing equities." *Entm't Prods., Inc. v. Shelby Cnty.*, 588 F.3d 372, 395 (6th Cir. 2009). Specifically, the equities being balanced are private equities and public equities, which have both been prominently raised in this case.

The "greater good" is a somewhat vague concept. In today's world, determining the **\*645** "greater good" depends on whom you ask. Plaintiffs here suggest that perhaps, the greater good is not that important to us at all,

as it is not mentioned in the Bill of Rights, and as it has nothing to do with individual liberties. (Doc. # 22 at 4). To the contrary, Defendants suggest that the greater good in this case has to do with "the thousands of people ... who will benefit from additional vaccinations in the community[.]" (Doc. # 15 at 15). Still, it is not lost on the Court that Plaintiffs also believe their case will "help save these workers, and by extrapolation, this country." (Doc. # 1 at 7). So perhaps, the best way to categorize the Plaintiffs' position on the greater good is not that it is unimportant, but rather, that their individual liberties are *more* important.

Specifically, Plaintiffs believe that their individual liberties include a right to be employed by a private hospital, and without that employment being conditioned upon their receiving a COVID-19 vaccine. No matter any individual stance on COVID-19, every person, including the parties in this case, can agree that ending the COVID-19 pandemic is in our collective best interest—and in the public's best interest, as well, for purposes of balancing equities.

The point at which we all start to diverge, however, is where we begin to discuss *how* to end the pandemic. Some, such as the affiants provided by Plaintiffs, believe that the best way to end the pandemic is to simply return to life as usual and let natural immunity take its course. (Doc. # 1-10 at 2-3). Defendants, however, made their own choice about how to end the pandemic – they chose to require their employees to get vaccinated, to "assist our community in becoming the healthiest in America and to safeguard the health and well-being of associates, [their] patients, visitors, and others who spend time in [their] facilities." (Doc. # 15-9 at 2). Plaintiffs, in opposition, believe that their individual choices about the pandemic—their individual liberties—should override Defendants' choice to require vaccination of their employees, in furtherance of a goal to protect its business and its community. And thus, the question at hand returns to the "greater good." Is the "greater good" made up of many different individual liberties, is it a singular collective liberty, or is it both?

**\*\*8** For more than 200 years, the American courts have attempted to answer that question. Justice Marshall wrote in *Marbury v. Madison* that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." 5 U.S. 137, 163, 1 Cranch 137, 2 L.Ed. 60 (1803). This Court recognizes that essence, and it accordingly celebrates Plaintiffs' rights to zealously claim the protection of the laws. But the Court is nonetheless limited to the law, and the law states that vaccination

Beckerich v. St. Elizabeth Medical Center, 563 F.Supp.3d 633 (2021)

2021 WL 4398027, 64 NDLR P 23

mandates, both public and private, are permissible with appropriate exceptions.

More than a century ago, Justice John Marshall Harlan, a great Kentuckian born in this judicial district, wrote in *Jacobson v. Massachusetts* about a state-imposed vaccination mandate:

> But the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis, organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. **\*646** Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own ... regardless of the injury that may be done to others.

197 U.S. 11, 26, 25 S.Ct. 358, 49 L.Ed. 643 (1905). *Jacobson* and its holding have not been overturned by the Supreme Court, and this Court will thus abide by it and its principles. Actual liberty for all of us cannot exist where individual liberties override potential injury done to others. For that reason, the state of Massachusetts was permitted to impose a vaccine mandate without exception, and with a penalty of imprisonment, during the smallpox pandemic. *See id.* The case before this Court deals with a private actor, and with no actual coercion. Being substantially less restrictive than the *Jacobson* mandate, and being enacted by a private actor, Defendants' policy is well within the confines of the law, and it appropriately balances the public interests with individual liberties. *See, e.g., Valdez v. Grisham*, No. 1:21-CV-783-MV-JHR, 559 F.Supp.3d 1161 (D. N.M. Sept. 13, 2021).

Plaintiffs have made clear that they are suspicious about the efficacy and safety of the COVID-19 vaccines. They have also presented the opinions of medical professionals who share the same suspicions. But unfortunately, suspicions cannot override the law, which recognizes Defendants' right to set conditions of employment. In *Jacobson*, the Supreme Court "emphasized that the 'possibility that the belief [in the efficacy of vaccines] may be wrong, and that science may yet show it to be wrong' was 'not conclusive; for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases.' " *Valdez*, 559 F.Supp.3d at 1175 (quoting *Jacobson*, 197 U.S. at 35, 25 S.Ct. 358). Furthermore, as is the case here, the *Jacobson* plaintiffs also presented the opinions of medical professionals in support of their case. But nonetheless, the Supreme Court "considered *and rejected* the defendants 'offers of proof' of 'those in the medical profession' " who cast doubt on the efficacy of smallpox vaccines, in favor of a prevailing public interest. *Id.*

More plainly, the Supreme Court in *Jacobson* upheld state legislative action in the face of doubt (from both laypeople and professionals) on the efficacy of the smallpox vaccine, because the state had a rational basis for its decision—preventing the spread of contagious diseases. *See Jacobson*, 197 U.S. at 35, 25 S.Ct. 358. That holding still stands, and if legislative action to prevent the spread of contagious diseases must be upheld, even in spite of doubt—and in spite of individual liberties—then private action must be upheld, too, because "[i]ndeed, 'this case is easier than *Jacobson*.' "[5] *Valdez*, 559 F.Supp.3d at 1177 (quoting *Klaassen v. Trs. of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021)).

[5]  In the alternate, even if this case were not an "easier case" than *Jacobson* and state action were present, St. Elizabeth would still have a rational basis for its policy, in the same way as the state of Massachusetts did in 1905 – preventing the spread of contagious diseases. *Jacobson*, 197 U.S. at 35, 25 S.Ct. 358.

**\*\*9** In these cases "easier" than *Jacobson*, which deal with private, non-state actors, courts have rationalized that each of us trade off our individual liberties every day in exchange for employment. Alongside Judge Easterbrook in the Seventh Circuit, "[w]e assume with plaintiffs that they have a right in bodily integrity. They also have a right to hold property." *Klaassen*, 7 F.4th at 593. Yet, to work at St. Elizabeth, Plaintiffs agree to wear a certain uniform, **\*647** to arrive at work at a certain time, to leave work at a certain time, to park their vehicle in a certain spot, to sit at a certain desk and to work on certain tasks. They also agree to receive an influenza vaccine, which Defendants have required of their employees for the past five years. These are all conditions of

**Beckerich v. St. Elizabeth Medical Center, 563 F.Supp.3d 633 (2021)**

2021 WL 4398027, 64 NDLR P 23

employment, and "every employment includes limits on the worker's behavior in exchange for his remuneration." *Bridges v. Houston Methodist Hosp.*, No. H-21-1774, 543 F.Supp.3d 525, 528 (S.D. Tex. June 12, 2021). If an employee believes his or her individual liberties are more important than legally permissible conditions on his or her employment, that employee can and should choose to exercise another individual liberty, no less significant – the right to seek other employment.

Finally, and in close, the Court recognizes that the COVID-19 pandemic has become unfortunately political and vitriolic, on all sides. But the Court expressly refuses to adjudicate the political assertions raised in this case. Irrespective of politics, the Court has evaluated and analyzed the law and the legal arguments raised by both

sides. Unfortunately for Plaintiffs, they have not stated a viable legal theory in support of injunctive relief, as each of the factors required to be considered, individually and collectively, weigh against the denial of injunctive relief.

Accordingly, **IT IS ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction (Doc. # 7) is **DENIED.**

**All Citations**

563 F.Supp.3d 633, 2021 WL 4398027, 64 NDLR P 23

---

     © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Harsman v. Cincinnati Children's Hospital Medical Center, Slip Copy (2021)

2021 WL 4504245

2021 WL 4504245
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Western
Division.

Kimberly HARSMAN, et al., Plaintiffs,
v.
CINCINNATI CHILDREN'S HOSPITAL
MEDICAL CENTER, et al., Defendants.

Case No. 1:21-cv-597
|
Signed 09/30/2021

**Attorneys and Law Firms**

Glenn D. Feagan, Cleveland, OH, Alan J. Statman, Statman Harris & Eyrich, Cincinnati, OH, for Plaintiffs.

Aaron Mark Herzig, Beth A. Bryan, Russell S. Sayre, Spencer S. Cowan, Taft Stettinius & Hollister LLP, Jean Geoppinger McCoy, Dinsmore & Shohl, LLP, Cincinnati, OH, for Defendant Cincinnati Children's Hopital Medical Center.

Allison Knerr, David Paul Kamp, Jean Geoppinger McCoy, Jon David Brittingham, Dinsmore and Shohl - 1, Cincinnati, OH, for Defendants Christ Hospital, The Christ Hospital Physicians, LLC.

Elizabeth M. Johnson, Bradley D, McPeek, Matthew C. Curran, Lindhorst & Dreidame Co. L.P.A, Jean Geoppinger McCoy, Dinsmore & Shohl, LLP, Cincinnati, OH, for Defendant Trihealth, Inc.

Bradley D. McPeek, Matthew C. Curran, Lindhorst & Dreidame - 1, Elizabeth M. Johnson, Lindhorst & Dreidame Co. L.P.A, Jean Geoppinger McCoy, Dinsmore & Shohl, LLP, Cincinnati, OH, for Defendants Trihealth G, LLC, Bethesda Hospital, Inc., Bethesda North, Good Samaritan Hospital.

Jean Geoppinger McCoy, Dinsmore & Shohl, LLP, Patricia Anderson Pryor, Jackson Lewis LLP, Adair Martin Smith, Cincinnati, OH, for Defendants UC Health, LLC, University of Cincinnati Medical Center, LLC.

Amanda Brooke Stubblefield, Bryce James Yoder, James Eugene Burke, III, William Alan Posey, Keating Muething & Klekamp, Jean Geoppinger McCoy, Dinsmore & Shohl, LLP, Thomas Joseph Wiencek, Cincinnati, OH, for Defendants Mercy Health West Hospitals, LLC, Mercy Health Physicians Cincinnati

LLC, Jewish Hospital, LLC, Mercy Health Cincinnati LLC, Mercy Health - Anderson Hospital LLC, University of Cincinnati Physicians Company, LLC.

**ORDER DENYING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

Timothy S. Black, United States District Judge

**\*1** This civil case is before the Court on Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 14), and Defendants'[1] responsive memoranda (Docs. 34, 35, 37, and 39). Plaintiffs seek an emergency order restraining Defendants from requiring Plaintiffs to be vaccinated for COVID-19 prior to October 1, 2021,[2] and from taking any adverse employment action against Plaintiffs for failing to be vaccinated or refusing to disclose their vaccination status.

[1]  Defendants are five Cincinnati area hospital systems comprising Cincinnati Children's Hospital Medical Center ("CCHMC"); The Christ Hospital and The Christ Hospital Physicians, LLC ("TCHHN"); TriHealth, Inc., TriHealth G, LLC, d/b/a TriHealth Physician Partners and Group Health Physician Partners, Bethesda Hospital, Inc., Bethesda North and Good Samaritan Hospital ("TriHealth"); UC Health, LLC, University of Cincinnati Medical Center, LLC and University of Cincinnati Physicians Company, LLC ("UC"); and Mercy Health Cincinnati, LLC, Mercy Health – Anderson Hospital LLC, Mercy Health – West Hospital LLC, Mercy Health Physicians Cincinnati LLC and The Jewish Hospital, LLC, d/b/a The Jewish Hospital – Mercy Health ("Mercy") (collectively, "Defendants").

[2]  October 1, 2021, which applies to the TCHHN and UC Defendants, is the earliest vaccination deadline. The other Defendants have moved back their deadlines. TriHealth Defendants will require vaccination by October 31, CCHMC by November 1, and Mercy by December 1, 2021.

# I. BACKGROUND

The factual background, though stated in a remarkable 570-paragraph complaint, is straightforward in this case. (Doc. 13). On August 5, 2021, Defendants, five of the major healthcare systems in the Cincinnati area, announced vaccine mandates for all of their employees to combat the COVID-19 pandemic. The specific details of each Defendant's mandate vary, but the general thrust is that all of Defendants' employees would be required get a COVID-19 vaccine or else qualify for a medical or religious exemption. (*Id.* at 9, ¶ 1). Plaintiffs, who are presumably healthcare workers for the major healthcare systems, oppose the vaccine mandate. (*See generally, id.*).[3]

[3]   Plaintiffs do not actually allege that they are employees of the Defendants in their complaint or, indeed, any facts about themselves. Nor is the class definition limited to employees of the Defendants. (Doc. 13 at ¶ 6).

The procedural background is more tortuous. On August 23, 2021, Plaintiffs' counsel filed separate class action complaints against all five of the Defendants here,[4] and one against Kentucky-based healthcare system St. Elizabeth Medical Center and Summit Medical Group, d/b/a St. Elizabeth Physicians ("St. Elizabeth's").[5] On August 25, 2021, Plaintiffs also filed a complaint in this Court alleging federal antitrust claims against Defendants and St. Elizabeth's.[6] Over the next few days, UC, TriHealth, and CCHMC each removed their cases to federal court. The case against the Mercy Defendants remained in the Hamilton County Court of Common Pleas, where, on August 27, 2021, Judge Jennifer Branch denied a request for a temporary restraining order.[7] Two days later, Plaintiffs' counsel voluntarily dismissed all of the complaints they had filed in all three courts—state court, this Court, and the federal court in Northern Kentucky.

[4]   *Aldridge v. Mercy Health Cincinnati, LLC*, Case No. A2102965 (Hamilton Cnty. C.P.); *Alexander v. Cincinnati Children's Hosp. Med. Ctr.*, Case No. 1:21-cv-00545 (S.D. Ohio) (removed from Hamilton Cnty. C.P.); *Allen v. TriHealth, Inc.*, Case No. A2102964 (Hamilton Cnty. C.P.); *Durrough v. Christ Hosp.*, Case No. 1:21-cv-00549 (S.D. Ohio) (removed from Hamilton Cnty. C.P.); and *Beier v. UC Health,*

*LLC*, Case No. 1:21-cv-00551 (S.D. Ohio) (removed from Hamilton Cnty. C.P.).

[5]   *Beckerich v. St. Elizabeth Med. Ctr., Inc.*, Case No. 2:21-cv-00100 (E.D. Ky.) (removed from Boone Cnty. Cir. Ct.).

[6]   *Beckerich v. St. Elizabeth Med. Ctr., Inc.*, Case No. 1:21-cv-00548 (S.D. Ohio).

[7]   *Aldridge*, No. A2102965, Entry Denying Pls.' Mot. Temp. Restraining Order, Aug. 27, 2021.

**\*2** Plaintiffs' counsel reappeared on September 3, 2021. They again filed a complaint against St. Elizabeth's in the federal district court for the Eastern District of Kentucky.[8] And in this Court, they filed another class action complaint against all of the present Defendants and St. Elizabeth's (but only alleged federal antitrust claims against St. Elizabeth's).[9] On September 10, 2021, this Court conferred with defense counsel and Plaintiffs' counsel in a Rule 65 teleconference. Later that day, Plaintiffs' counsel voluntarily dismissed their case in this Court a second time. The case against St. Elizabeth's in Kentucky carried on, however. On September 24, 2021, in a thoughtful and well-reasoned Order, Judge Bunning denied injunctive relief to the Plaintiffs. *Beckerich v. St. Elizabeth Med. Ctr.*, No. CIV 21-105-DLB-EBA, 2021 WL 4398027 (E.D. Ky. Sept. 24, 2021).

[8]   *Beckerich v. St. Elizabeth Med. Ctr., Inc.*, No. 2:21-cv-00195 (E.D. Ky.).

[9]   *Beckerich v. St. Elizabeth Med. Ctr., Inc.*, No. 1:21-cv-00576 (S.D. Ohio).

Finally, on September 14, 2021, Plaintiffs filed the complaint in this this case. Plaintiffs originally sued in Hamilton County, but Defendants removed on September 17, 2021. (Doc. 1). Though Plaintiffs challenged removal in a motion for remand (Doc. 21), they abandoned that motion on the day their reply brief was due. (Doc. 42). Now, after keeping Defendants and this Court in limbo for nearly a month, Plaintiffs and their counsel are back

Harsman v. Cincinnati Children's Hospital Medical Center, Slip Copy (2021)

2021 WL 4504245

where they started.

Just as before, Plaintiffs ask the Court to issue a temporary restraining order or a preliminary injunction. (Doc. 14). Plaintiffs foresee that they will face adverse employment action if they refuse to comply with Defendants' mandates. (*Id.*) They ask the Court to enjoin Defendants from requiring Plaintiffs to be vaccinated by Defendants' deadline, and from taking any adverse employment actions against Plaintiffs for their non-compliance. (*Id.*). For the reasons below, and those well-stated in Judge Bunning's Order, the Court **DENIES** Plaintiffs' request.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 empowers district courts to issue temporary restraining orders or preliminary injunctions "to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). The standards for obtaining a temporary restraining order or a preliminary injunction are the same. *Workman v. Bredesen*, 486 F.3d 896 (6th Cir. 2007). Courts consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc). In the Sixth Circuit, "[t]hese factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Commonwealth v. Beshear*, 981 F.3d 505, 508 (6th Cir. 2020).

A temporary restraining order or a preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Accordingly, a party seeking an "injunction must establish its case by clear and convincing evidence." *Honeywell, Inc. v. Brewer–Garrett Co.*, 145 F.3d 1331 (6th Cir.1998).

## III. ANALYSIS

### 1. Likelihood of Success on the Merits

The first factor asks if "the movant has a strong likelihood of success on the merits." *City of Pontiac Retired Emps. Ass'n*, 751 F.3d at 430. This factor is often determinative. *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020). In the Sixth Circuit, this factor is so important that "a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed." *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997). To establish a likelihood of success, a movant "need not prove his case in full," but he "must show more than a mere possibility of success." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012). The "proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion, for example." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

**\*3** Here, Plaintiffs have not established that any of their claims are likely to succeed. They haven't even tried. In their motion, Plaintiffs correctly cite the legal standard for injunctive relief, but they never connect the standard to any specific factual allegations from their complaint. Instead, Plaintiffs invite the Court to see for itself "[t]he reasons for this Motion [as] detailed in the attached Verified Complaint and Exhibits." (Doc. 13 at 2). However, even if the Court were inclined to accept that invitation, the complaint does not establish that success on any of its claims would be likely. For example, the complaint alleges violations of Ohio law based on disability and religious beliefs. (Doc. 13 at 56, ¶¶ 431–36; 57, ¶¶ 437–44). But, in assessing Plaintiffs' likelihood of success on these claims, the Court is left to wonder what disability Plaintiffs allegedly have, or how Plaintiffs account for the *hundreds* of religious and medical exemptions Defendants have granted, including those of some of the named Plaintiffs and affiants.[10] The Court has waded through the entire complaint, probing the seemingly insurmountable obstacles to Plaintiffs' likelihood of success of *any* of their claims, but the Court need not have done so. As the law provides, "[t]he district court and defendants should not have to fish a gold coin from a bucket of mud to identify the allegations really at issue." *Kensu v. Corizon, Inc.*, 5 F.4th 646, 651 (6th Cir. 2021). Instead, "the substantial subsidy of litigation … should be targeted on those litigants who take the preliminary steps to assemble a comprehensible claim." *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003).

[10]     *E.g.*, Hanlon-Bremer Decl. (Doc. 37-1 at 3, ¶ 12)

Harsman v. Cincinnati Children's Hospital Medical Center, Slip Copy (2021)

2021 WL 4504245

(TriHealth has granted 88 medical and 481 religious exemptions), Hutchins Decl. (Doc. 39-1 at 2, ¶ 10) (TCHHN has granted 104 medical and 348 religious exemptions); Crandell Decl. (Doc. 33-1 at 2, ¶ 6) (UC has granted 750 undifferentiated exemptions).

The only basis for injunctive relief that appears on the face of the motion is "[c]onstitutional violations." (Doc. 14 at 2). Plaintiffs do not disclose what constitutional provision, or even which constitution, is allegedly violated, but, in this case, it does not matter. As Judge Bunning capably explained deciding a substantially identical motion:

[A] well settled principle of constitutional law is that there exists "a line between state action subject to Fourteenth Amendment scrutiny and private conduct (however exceptionable) that is not." ... Because of that principle, generally known as the state action doctrine, the Court sees Plaintiffs' constitutional assertions as bearing more on their likelihood of success than on the irreparable harm factor. Put simply, without establishing that Defendants are state actors, Plaintiffs' constitutional claims cannot stand, and thus have *zero* likelihood of success on the merits.

*Beckerich v. St. Elizabeth Med. Ctr.*, No. CIV 21-105-DLB-EBA, 2021 WL 4398027, at *3 (E.D. Ky. Sept. 24, 2021) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 297 (2001)) (emphasis supplied); *accord Haddox v. Moreland*, No. 95CA20, 1996 WL 451361, at *1 (Ohio Ct. App. Aug. 5, 1996) ("Generally, individual rights and liberties protected by the United States and Ohio Constitutions, such as the right to due process, apply only to actions of governmental entities.") (citing *State ex rel. Howard v. Ferreri*, 70 Ohio St. 3d 587, 1994-Ohio-130, 639 N.E.2d 1189).

Because Plaintiffs cannot establish that Defendants are state actors, Plaintiffs' likelihood of successfully proving "constitutional violations" is zero. But even if Defendants were state actors, the overwhelming majority of courts to consider vaccine mandates have found them constitutionally sound. In 1905, the Supreme Court of the United States upheld a municipal vaccine mandate authorized by Massachusetts law. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). The Court unequivocally held that the mandate did not offend the Constitution:

[T]he liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others. This court has more than once recognized it as a fundamental principle that persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state; of the perfect right of the legislature to do which no question ever was, or upon acknowledged general principles ever can be, made, so far as natural persons are concerned.

*4 *Id.* at 12; *see also Zucht v. King*, 260 U.S. 174, 176 (1922) (it is "settled that it is within the police power of a state to provide for compulsory vaccination"); *Klaassen v. Trs. of Indiana*, 7 F.4th 592, 594 (7th Cir. 2021) (affirming that the Fourteenth Amendment permits Indiana University to require its students to be vaccinated to protect the public health of its students, faculty, and staff); *Norris v. Stanley*, No. 1:21-CV-756, 2021 WL 3891615, at *1 (W.D. Mich. Aug. 31, 2021) (denying TRO to block university employer's vaccine requirement because plaintiff could not establish likelihood of success on her constitutional claims).

## 2. Irreparable Harm

Harsman v. Cincinnati Children's Hospital Medical Center, Slip Copy (2021)

2021 WL 4504245

The Court is obligated to deny injunctive relief based on Plaintiffs' unlikelihood of success alone. *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997). For the sake of completeness, however, the Court will analyze the remaining factors.

The next factor a court considers when deciding whether to grant injunctive relief is irreparable harm. The Sixth Circuit considers irreparable harm "indispensable" such that "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief now as opposed to at the end of the lawsuit." *Id.* A harm is "irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensation or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). For that reason, loss of employment is not an irreparable injury. *Overstreet*, 305 F.3d at 578–79; *Aluminum Workers Int'l Union, AFL-CIO, Loc. Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 443 (6th Cir. 1982). Finally, the irreparable injury must be "certain and immediate, not speculative or theoretical." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020).

In this case, Plaintiffs assert they will "suffer immediate and irreparable injury, loss, and damage" as a result of "loss to their careers, reputations, privacy, health, and face bankruptcy, foreclosure, and other losses." (Doc. 14 at 2). Threats to Plaintiffs' "careers," "reputations," and the risk of "bankruptcy" or "foreclosure" are quintessentially compensable injuries. They are not irreparable. As for the threat to Plaintiffs' "privacy" or "health," Plaintiffs avoid these issues by refusing to comply with the mandate and accepting the resulting employment action. Again, Judge Bunning frames the issue concisely:

> Here, no Plaintiff is being imprisoned and vaccinated against his or her will....Rather, these Plaintiffs are choosing whether to comply with a condition of employment, or to deal with the potential consequences of that choice. Even if they believe the condition or the consequences are wrong, the law affords them an avenue of recourse—and that avenue is not injunctive relief on this record.

*Beckerich v. St. Elizabeth Med. Ctr.*, No. CIV 21-105-DLB-EBA, 2021 WL 4398027, at *7 (E.D. Ky. Sept. 24, 2021). Injuries that Plaintiffs elected to sustain cannot be irreparable. Accordingly, Plaintiffs have failed to show that they face irreparable injury.

### 3. Harm to Others and the Public Interest

**\*5** Whether an injunction would cause substantial harm to others and whether an injunction would serve the public interest may be discussed together because, in this case, harm to non-parties is the same as harm to the public. Weighing these factors against (1) a movant's likelihood of success on the merits, and (2) the threat of irreparable harm, is known as "balancing equities." *Entm't Prods., Inc. v. Shelby Cnty.*, 588 F.3d 372, 395 (6th Cir. 2009). Here, once again, Plaintiffs' motion offers no argument. Regardless, there is no question that balancing the equities requires the Court to deny Plaintiffs' motion. Denying injunctive relief serves the public's interest in combating COVID-19, at an infinitesimally small risk to Plaintiffs' health or liberty. The Court once again adopts Judge Bunning's view:

> Actual liberty for all of us cannot exist where individual liberties override potential injury done to others. For that reason, the state of Massachusetts was permitted to impose a vaccine mandate without exception, and with a penalty of imprisonment, during the smallpox pandemic. [*Jacobson*, 197 U.S. at 26.] The case before this Court deals with a private actor, and with no actual coercion. Being substantially less restrictive than the *Jacobson* mandate, and being enacted by a private actor, Defendants' policy is well within the confines of the law, and it appropriately balances the public

Harsman v. Cincinnati Children's Hospital Medical Center, Slip Copy (2021)

2021 WL 4504245

interests with individual liberties.

*Beckerich v. St. Elizabeth Med. Ctr.*, No. CIV 21-105-DLB-EBA, 2021 WL 4398027, at *8 (E.D. Ky. Sept. 24, 2021); *see also Maryville Baptist Church, Inc. v. Beshear*, 455 F. Supp. 3d 342, 346 (W.D. Ky.), *appeal dismissed*, 977 F.3d 561 (6th Cir. 2020) ("a temporary restraining order allowing large in-person gatherings would substantially harm third parties by facilitating the spread of COVID-19, and the public interest thus does not favor a temporary restraining order").

The Court will not, however, adopt Judge Bunning's charitable treatment of Plaintiffs' views on vaccination. Balancing the equities requires the Court to make judgments about relative risk to Plaintiffs versus the risk to the community as a whole. In our community, COVID continues to devastate. Since the start of August, our region has seen 448,599 new hospital admissions of patients with confirmed COVID-19.[11] The case rate this month is roughly double what it was during the first six months of the pandemic.[12] In Hamilton County alone this week, there were 2,304 new confirmed cases of COVID-19, with 172 new hospital admissions, and 10 deaths.[13] Those deaths may well have been preventable. Next month's deaths still are.

[11]   *COVID Data Tracker: New Hospital Admissions*, Centers for Disease Control (last visited Sep. 29, 2021), https://covid.cdc.gov/covid-data-tracker/#new-hospital-admissions.

[12]   *COVID Data Tracker: COVID-19 Integrated County View*, Centers for Disease Control (last visited Sep. 29, 2021), https://covid.cdc.gov/covid-data-tracker/#county-view|Ohio|39061|Risk|community_transmission_level.

[13]   *Id.*

Against this objective data, Plaintiffs allege unsupported conspiracy theories. Rather than "suspicions" about the vaccine, (*Beckerich*, 2021 WL 4398027, at *8), Plaintiffs' allegations are falsehoods. The complaint contains too many for this Court to review given the time constraints on this Order, but a few examples illustrate the flimflam

this Court is asked to weigh against the very real threat of COVID.

More than a dozen times, Plaintiffs allege the Pfizer vaccine has not been fully approved by the FDA. (Doc. 13, ¶¶ 19, 27, 237, 321, 339, 434, 454, 459, 480, 509–16, 519, 548). This is false. The letter fully approving the vaccine is available from FDA.[14] Plaintiffs claim it is a "lie" that "Covid is still contagious when you're asymptomatic." (Doc 13, ¶ 310). This is false too.[15]

[14]   Approval Letter from Mary Malarkey, Dir. Office of Compliance and Biologics Quality, and Marion Gruber, Dir. Office of Vaccine Research and Review, to Amit Patel, Pfizer Inc. (Aug. 23, 2021), available at https://www.fda.gov/media/151710/download.

[15]   Andrew Sayampanathan, Cheryl Heng, et al., *Infectivity of Asymptomatic versus Symptomatic COVID-19*, 397 Lancet 10269 (2021), available at https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)32651-9/fulltext (concluding that asymptomatic cases of COVID-19 are "a potential source of substantial spread within the community setting.").

*6 Plaintiffs assert that the statement, "Masks, social distancing and lockdowns have helped 'flatten the curve,' " is a "lie." (Doc. 13, ¶319). This is not only false,[16] it flatly contradicts Plaintiffs' own allegations 58 paragraphs prior. (Doc. 13, ¶ 261) ("Scientific evidence for the protective effect of face masks and respiratory virus infection in healthcare and community settings is overwhelming."); (*see also id.* ¶ 262) ("The wearing of masks, along with the other safety protocols recommended by the CDC such as the social distancing and frequent hand washing contributed to the significant reduction of the spread of Covid-19 disease before vaccines were made available.").

[16]   *Use of Cloth Masks to Control the Spread of SARS-CoV-2*, Centers for Disease Control (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html.

Finally, though it is hardly necessary to the Court's disposition in this order, the Court finds that the behavior of Plaintiffs' counsel disfavors injunctive relief. "There is

a fundamental public interest in ending [ ] abuse of the judicial system, in conserving judicial resources, and in preventing further confusion and disruption in this litigation." *McGirr v. Rehme*, 891 F.3d 603, 614 (6th Cir. 2018). Plaintiffs' counsel set their Ohio clients back nearly a month in time. In that month, counsel likely would have received a decision, and, perhaps, appealed that decision to the Sixth Circuit. At the very least, Plaintiffs might have proofread their complaint. Granting Plaintiffs injunctive relief, after weeks of delays, diversions, *confessed* judge shopping,[17] and a flood of barely relevant affidavits, would improperly countenance Plaintiffs' gamesmanship to the detriment of the public's interest in a well-functioning judicial system.

[17]   *See* Eric Deters, The Bulldog Show, *Bulldog Show 1 | September 13, 2021*, YouTube (Sep.13, 2021), https://youtu.be/Orxmwq2b5mk?t=570.

### IV. CONCLUSION

The Court finds that Plaintiffs have not met their burden of establishing entitlement to a temporary restraining order. Accordingly, Plaintiffs' motion for a restraining order (Doc. 14) is **DENIED**.

A district court's denial of a motion for a temporary restraining order generally is not appealable. *Office of Pers. Mgmt. v. Am. Fed'n of Gov't Employees, AFL–CIO*, 473 U.S. 1301, 1304–06 (1985). Such a ruling is appealable, however, if it is tantamount to a ruling on a preliminary injunction. *Wilson v. Wilkinson*, 28 Fed. App'x. 465, 466 (6th Cir.2002) (citing *Manbourne, Inc. v. Conrad*, 796 F.2d 884, 887 n.3 (7th Cir.1986)); *see also Wong-Opasi v. Haynes*, 8 F. App'x 340, 342 (6th Cir. 2001). This Court finds that its instant Order denying Plaintiff's motion for a temporary restraining order is tantamount to an Order denying a motion for a preliminary injunction and, therefore, certifies a finding that the Court's Order denying Plaintiff's motion for a temporary restraining order is a final appealable order as there is no just reason for delay.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 4504245

---

**End of Document**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

CIVIL ACTION NO. 13-151-DLB

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF KENTUCKY NORTHERN DIVISION AT COVINGTON

# Harris v. Sara Lee & Hillshire Brands Corp.

Decided Apr 22, 2014

CIVIL ACTION NO. 13-151-DLB

04-22-2014

LUNNIE WESLEY HARRIS, JR. PLAINTIFF v. SARA LEE/HILLSHIRE BRANDS CORP. DEFENDANT

David L. Bunning

## MEMORANDUM OPINION AND ORDER

### I. Introduction

Plaintiff Lunnie Wesley Harris, Jr. Brings this *pro se* employment discrimination action against his former employer, Defendant Sara Lee/Hillshire Brands Corporation, alleging that he was fired for calling his former supervisor a racist. Plaintiff asserts that Defendant violated his Fourteenth Amendment rights, as well as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq,* the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq* ("the ADEA"), and the Genetic Information Nondisclosure Act of 2008, 42 U.S.C. § 2000ff ("GINA"). Defendant has moved to dismiss Plaintiff's complaint on a number of grounds (Doc. # 9). Defendant's motion has been fully briefed (Docs. # 11, 12) and is now ripe for review. For the following reasons, the Court agrees that Plaintiff's Complaint shall be dismissed.

### II. Factual and Procedural Background

According to Plaintiff's complaint, he was employed by Defendant as a floor runner and was responsible for the quality of meats produced by Defendant. Plaintiff became *2 embroiled in a dispute with his new supervisor, Jim Brooks, regarding the proper procedures for maintaining the quality of the meats. During a meeting with Defendant's Human Resources department on August 2, 2012, Plaintiff accused Brooks of being a racist, and complained about an employee's vehicle that had a Confederate flag engraved in its windshield. On August 10, 2012, Defendant terminated Plaintiff's employment despite the fact that Defendant was still investigating Plaintiff's complaint of "racial issues." (Doc. # 1 at 8).

As a result of the foregoing, Plaintiff filed a suit in this Court on December 4, 2012, alleging violations of the Fourteenth Amendment, Title VII, the ADEA, and GINA. (See 2:12-cv-240-DLB). Upon an initial screening, the undersigned dismissed that suit without prejudice. (Doc. # 6 in 2:12-cv-240-DLB). The Court held that Plaintiff could not proceed on his statutory claims because he failed to attach a right-to-sue letter from the Equal Employment Opportunities Commission ("EEOC") to his Complaint, or otherwise allege that he had received such a letter. Additionally, the Court held that Plaintiff could not pursue a claim against his employer for violations of the Fourteenth Amendment because that Amendment does not apply to private employers. (*Id.* at 6).

This is Plaintiff's second suit against his employer based on his allegedly unlawful termination. He has attempted to cure the defects of his first suit by attaching various documents to his Complaint, most notably an EEOC intake questionnaire (Doc. # 1-3) and an EEOC dismissal and right-to-sue letter dated August 31, 2012 (Doc. # 1-4). The EEOC intake questionnaire indicates that Plaintiff

complained that he was subject to discrimination based on his race and national origin; he did not check the boxes for discrimination based on sex, age, disability, genetic testing, or family medical history. (Doc. # 1-3 at 2). *3 Moreover, the factual allegations in Plaintiff's intake questionnaire suggest that he was discriminated against based solely on race and national origin; they make no mention of age or genetic information.

## III. Analysis

Defendant has moved to dismiss Plaintiff's Complaint on four grounds. (Doc. # 9). First, Defendant argues that Plaintiff's Fourteenth Amendment claim fails as a matter of law because the Fourteenth Amendment does not apply to private employers. Second, Defendant contends that Plaintiff's Title VII, ADEA, and GINA claims are untimely because they were filed outside of the ninety-day statute of limitations. Third, Defendant asserts that Plaintiff failed to exhaust his administrative remedies on his ADEA and GINA claims because he did not first bring these claims before the EEOC. Finally, Defendant believes that Defendant has failed to state a claim for violations of the ADEA or GINA because the Complaint is devoid of any facts that suggest he was terminated based on his age or genetic information.

As explained more fully herein, the Court agrees that Plaintiff filed his Title VII, ADEA, and GINA claims outside the applicable statute of limitations, otherwise failed to exhaust his administrative remedies on his ADEA and GINA claims, and cannot assert a claim against his employer for violating his Fourteenth Amendment rights. Each of these findings compel the Court to dismiss this action. Therefore, the Court need not address whether Plaintiff has pled sufficient facts to support a claim under the ADEA or GINA.

### A. Pro Se Litigants

Plaintiff argues that the Court must construe his pleadings liberally and not hold his procedural failures against him. There is some truth to the

former assertion, not the latter. *4 "A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (internal citations omitted). A *pro se* complaint "can only be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). This standard, though, does not require the Court to conjure up facts that were not pled in the complaint. *McFadden v. Lucas,* 713 F.2d 143, 147, n. 4 (5th Cir. 1983). Furthermore, "federal courts have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel." *Branham v. Micro Computer Analysts,* 350 F. App'x 35, 38 (6th Cir. 2009) (internal citations omitted).

### B. Fourteenth Amendment Claim

In Plaintiff's previous suit against Defendant on the same set of facts, he alleged that Defendant violated his Fourteenth Amendment rights. The undersigned held that the Fourteenth Amendment claim must be dismissed "because the Fourteenth Amendment does not apply to private employers." (Doc. # 6 at 3 in 2:12-cv-240) (citing *Regents of University of California v. Bakke,* 438 U.S. 265, 418 n. 20 (1978) (Stevens, J., concurring in the judgment in part and dissenting in part)). This remains good law and continues to doom Plaintiff's Fourteenth Amendment claim.

### C. Statute of Limitations

Under Title VII, the ADEA, and the GINA, once a plaintiff receives a right-to-sue letter from the EEOC, he has ninety days to file his civil action in district court. 42 U.S.C. § 2000e-5(f)(1); 29 U.S.C. § 626(e); 42 U.S.C. § 2000ff-6(e). "The Sixth Circuit has *5 resolved that notice is *given,* and hence the ninety-day limitations term begins running, on the fifth day following the EEOC's

mailing of an RTS notifications to the claimant's record residential address, by virtue of a presumption of actual delivery and receipt within that five-day duration." *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 557 (6th Cir. 2000). Here, Plaintiff has not attempted to establish when he received the right-to-sue letter. Therefore, the Court will rely on the presumption that it was received five days after it was mailed. The letter was signed and dated, and presumably mailed on August 31, 2012. With the five-day mailing rule, Plaintiff received the right to sue letter on September 5, 2012. However, he did not file this lawsuit until August 15, 2013, approximately 254 days after the ninety-day statute of limitations had run. His claims under Title VII, the ADEA, and the GINA are, therefore, untimely and shall be dismissed.

Plaintiff challenges this conclusion by pointing to the date that he filed his first lawsuit, apparently arguing that he filed his first suit within the applicable statue of limitations which somehow makes this second lawsuit timely. Plaintiff did file his first lawsuit within the applicable statute of limitations; his Complaint was filed on December 4, 2012, the last day of the ninety-day statute of limitations period. However, that Complaint was later dismissed without prejudice. Filing the original Complaint within the applicable statute of limitations did not toll the statutory period of Title VII, the ADEA or the GINA. *See Wilson v. Grunman Ohio Corp.,* 815 F.2d 26, 29 (6th Cir. 1987).

The Sixth Circuit addressed this exact issue in *Wilson.* There, the plaintiff filed her first Title VII law suit eighty-seven days after receiving her right-to-sue letter. *Id.* at 27. That case was dismissed without prejudice for failing to perfect service on the defendant. *Id.* The plaintiff then filed a second lawsuit eighty-five days after the dismissal of her first *6 case and over fifteen months after receiving her right-to-sue letter. *Id.* The district court dismissed the second lawsuit because it was filed outside of the ninety-day

statutory period. *Id.* The Sixth Circuit Court of Appeals affirmed, holding that "the filing of a complaint which is later dismissed without prejudice does not toll the statutory filing period of Title VII. Because [the plaintiff] did not refile within the original ninety day period, the district court correctly dismissed her second complaint." *Id.* at 28. That holding applies with equal force here: because Plaintiff failed to file his second complaint within the original ninety day period, his Title VII, ADEA, and GINA claims are hereby dismissed.

**D. Failure to Exhaust Administrative Remedies**

In addition to the statute of limitations argument, Defendant also argues that Plaintiff failed to exhaust his administrative remedies on his ADEA and GINA claims. As a statutory prerequisite to bringing claims under both Acts, Plaintiff was obligated to explicitly file the claims in his EEOC charge or the claims must be reasonably expected to grow out of the charge. *Allen v. Highlands Hosp. Corp.,* 545 F.3d 387, 401 (6th Cir. 2008). Defendant argues that Plaintiff failed to check the boxes for age or genetic information discrimination on his EEOC charge, and that the charge is otherwise devoid of any facts to support either claim. Plaintiff failed to respond to this argument. In any event, the Court agrees with Defendant; Plaintiff has failed to exhaust his administrative remedies on his ADEA and GINA claims.

Plaintiff did not check the box on his EEOC charge for discrimination based on "age" or "genetic information." Likewise, Plaintiff did not allege any facts in his EEOC charge to put the EEOC on notice of his ADEA or GINA claims. The factual allegations on his charge state in their entirety as follows: *7

I. I am a Black person of African descent. On or about August 2, 2012 I complained of racial issues within the workplace following a heated discussion with a manager. On August 2, 2012 I was suspended. On or about August 10, 2012 I was discharged.

II. Brian Personett, Human Resources, stated I was suspended following the argument. Mr. Personett stated I was discharged due to insubordination.

III. I believe I have been discriminated against due to my race (Black), National Origin (African), Color and in retaliation for my complaints in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Doc. # 1-5). These facts would not have prompted the EEOC to investigate a different, uncharged claim. *See Spengler v. Worthingon Cylinders,* 615 F.3d 481, 490 (6th Cir. 2010) (considering whether factual allegations put the EEOC on notice of the plaintiff's retaliation claim despite the plaintiff's failure to check the "Retaliation" box on the EEOC charge). Plaintiff

is therefore precluded from pursuing his ADEA or GINA claims in district court.

**IV. Conclusion**

Accordingly, for the reasons set forth herein, **IT IS ORDERED** as follows:

(1) Defendant's Motion to Dismiss Plaintiff's Complaint (Doc. # 9) is hereby **granted;**

(2) Plaintiff's Complaint is hereby **dismissed with prejudice;** and

(3) This matter is hereby **stricken** from the Court's active docket.

**Signed By:**

*David L. Bunning*

**United States District Judge**

casetext

Case No. 15-1620
UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

# Deister v. Auto Club Ins. Ass'n

647 F. App'x 652
Decided May 11, 2016

Case No. 15-1620

05-11-2016

TODD DEISTER, Plaintiff-Appellant, v. AUTO CLUB INSURANCE ASSOCIATION, Defendant-Appellee.

---

BERNICE BOUIE DONALD, Circuit Judge.

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0256n.06 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

## OPINION

**BEFORE: SUHRHEINRICH**, **McKEAGUE**, **and DONALD**, **Circuit Judges.**

**BERNICE BOUIE DONALD**, **Circuit Judge.** Todd Deister ("Deister") appeals the district court's order granting Defendant Auto Club Insurance Association's ("Auto Club") motion for summary judgment. Deister filed an employment discrimination suit against Auto Club under the Americans with Disabilities Act ("ADA"). The district court held that he failed to set forth sufficient evidence to survive summary judgment with respect to his disability discrimination and failure to accommodate claims, and that he was barred from bringing his retaliation claim because he failed to exhaust his administrative remedies.

For the reasons articulated below, we **AFFIRM.**

2    *2

## I.

On September 12, 2011, Deister began working for Auto Club as a claims adjuster. Prior to his employment at Auto Club, he worked as a property claims adjuster for more than twenty-five years. When not dispatched to a property claim location, Deister worked from home. His direct supervisor was Christopher Ruby ("Ruby").

On March 8, 2012, while on an assignment to adjust property claims for tornado damage in Kentucky, Deister began experiencing shakiness and poor concentration. After his work computer stopped functioning, he suffered a panic attack. Deister emailed Ruby stating,

> I am leaving for home tonight due to panic/stress attacks and to meet with my doctor tomorrow. I will have my files with Aht. Please advise if you need anything else before I leave.

(Page ID # 435.)

Upon receiving Deister's message, Ruby replied,

> Todd, Sorry to hear that. Rob is going to come by to get the files. What about the losses you inspected did you write the estimates? Please checkout of the hotel you will not deploy back if able. Please let me know how you are. I hold (sic) everything is okay. Drive safe.

(Page ID # 435.)

Beginning March 9, 2012, Deister took an indefinite medical leave from work. On March 12, 2012, he faxed Auto Club Human Resources employee, Rosita Brockington ("Brockington") a

"Disability Certificate" signed by Deister's physician, Dr. Baldwin, indicating that Deister suffered from an "acute stress reaction," and that his prognosis was "good." (Page ID # 748.) The "Disability Certificate" also stated that the first day Deister would be unable to work was March 9, 2012, and that he would be able to return to work on April 9, 2012.

In a letter dated March 23, 2012, Auto Club acknowledged receiving Deister's claim for disability leave of absence. The letter also explained some of Auto Club's policies and *3 procedures with regard to employees who take disability leave, such as an employee's employment status while on leave and how an employee's paid time off is impacted while on leave. Specifically the letter advised, "[y]ou may be replaced after 90 days of absence in a rolling 12 month period (unless otherwise protected by Family and Medical Leave.)" (Page ID # 159.) Moreover, Auto Club's employment policy guide stated that "failure to return to work when released by the disability administrator or as instructed by the company may result in termination." (Page ID # 169.)

The Hartford, which administered Auto Club's disability benefit plan, approved Deister's short-term disability benefits claim, in a letter dated April 16, 2012. According to that letter, Deister was to receive benefits from March 16, 2012 until May 31, 2012. A final extension allowed him to receive benefits through July 31, 2012.

On June 8, 2012, Ruby sent Deister a letter advising, in relevant part, that Auto Club "holds an employee position open for 90 consecutive calendar days of disability" and that in Deister's case, "more than 90 calendar days have elapsed and business conditions require that [Auto Club] fill the vacancy." (Page ID # 510.) On June 26, 2012, Ruby sent Deister another letter requesting "return of company-owned equipment." (Page ID # 174.) The letter concluded, "[p]lease contact me . . . by no later than noon on Friday, June 29, 2012.

If you fail to contact me by this deadline, you will leave me no choice but to pursue recovery through other legal channels." *Id.*

On July 19, 2012, Deister's psychiatrist met with Deister and determined that he would be able to return to work on August 1, 2012. Deister called JoAnn Hines ("Hines"), an Auto Club Human Resources employee, on July 24, 2012, and informed her that he wanted to meet with her before his leave ended to discuss his options. Hines told him that she could not meet *4 until August 1, 2012. After this conversation, on July 31, 2012, Hines left Deister a voicemail advising that she could respond to questions about his leave, but that if he had questions regarding "the option for employment with a 90-day letter" then he would need to meet with Brockington. (Page ID # 504.)

Deister left Brockington a voicemail on July 31, 2012. She returned his call on August 1, 2012. While the contents of that conversation are disputed, there is no dispute that Brockington told Deister that he needed to review his "90 Day Letter," and that he would have to go back to his former position. (Page ID # 697-98.) Nor is there any dispute that Deister said he would not return to his former position under the same manager, Ruby. (Page ID # 697.) Deister states that he also requested Brockington to review his medical records and suggested the possibility of working under a different manager. (Page ID # 697.) Following their phone conversation, Brockington sent Deister a letter dated, August 6, 2012, stating, in relevant part, "[b]ecause you have chosen not to return to your former position, your employment will be terminated effective August 7, 2012." (Page ID # 173.)

On October 10, 2012, Deister filed a charge of disability discrimination against Auto Club with the Equal Employment Opportunity Commission ("EEOC"). The EEOC subsequently issued Deister a right to sue letter on February 27, 2013. Deister filed this suit on September 18, 2013, and on

March 5, 2015, the district court granted Auto Club's motion for summary judgment. Deister's motion for reconsideration was also denied. This timely appeal followed.

## II.

We review a district court's grant of summary judgment *de novo*. *Rd. Sprinkler Fitters Local Union No. 669*, *U.A.*, *AFL-CIO v. Dorn Sprinkler Co.*, 669 F.3d 790, 793 (6th Cir. 2012). Likewise, we also review a district court's denial of a motion for reconsideration *de novo*. *Bank* *5 of Ann Arbor v. Everest Nat. Ins. Co.*, 563 F. App'x 473, 475 (6th Cir. 2014). When reviewing a district court's summary judgment decision, we draw all reasonable inferences in the light most favorable to the party opposing the motion. *Hanover Ins. Co. v. Am. Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994). "Summary judgment is appropriate when there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law." *Smith v. Wal-Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party," and a "factual dispute concerns a 'material' fact only if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).

## III.

On appeal, Deister argues that the district erred in (1) granting summary judgment with respect to his disability discrimination and failure to accommodate claims, and (2) in deciding that he was foreclosed from litigating his disability retaliation claim because he did not exhaust his administrative remedies. For the reasons explained below, we disagree.

### A.

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge or employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). In cases like the one before us, where no direct evidence of discrimination is in the record, we utilize the *McDonnell-Douglass* burden-shifting framework to determine whether a viable discrimination claim exists. *Anderson v. City of Blue* *6 Ash*, 798 F.3d 338, 356 (6th Cir. 2015). Under that framework, a plaintiff must first establish a prima facie case of discrimination, showing that: (1) he is disabled; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse action; (4) the employer knew or had reason to know of his disability; and (5) he was replaced or the job remained open. *Yarberry v. Gregg Appliances*, *Inc.*, 625 F. App'x 729, 735 (6th Cir. 2015). If a prima facie case is established, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for taking the adverse action. *Id.* Once the defendant overcomes that hurdle, the plaintiff must present evidence that would allow a jury to find that the defendant's explanation is a pretext for discrimination. *Id.* In doing so, the plaintiff must show that his disability was a but-for cause of the adverse decision. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc).

The district court found that Deister satisfied his burden of establishing a prima facie case, and also determined that Auto Club proffered a nondiscriminatory reason for terminating Deister—he "refus[ed] to return to his position after the expiration of his short term disability leave." (Page ID # 1283.)[1] In making that determination the district court relied on the following undisputed facts: (1) Deister provided no evidence *7 to extend his leave; *7 (2) Brockington told Deister that upon the expiration of his short term

Deister v. Auto Club Ins. Ass'n    647 F. App'x 652 (6th Cir. 2016)

disability leave he must return to his former position, as it had not been filled; and (3) Deister told Brockington that he would not return to his previous position under his former manager. (Page ID # 20.) However, the district court decided that Deister failed to meet his burden of showing that Auto Club's proffered reason for terminating him was a pretext. We find no error with the district court's reasoning or ultimate conclusion that Deister did not meet his burden of proving that Auto Club's proffered reason for terminating him was a pretext for discrimination.

1   In accepting that Deister made out a prima facie case, the district court held he had adequately established that he had a disability. Yet, at the time of the complained-of adverse employment action, the August 7, 2012 termination, Deister had been cleared for return to work without restriction by his treating physician, T.L. Ittiara, M.D. There is no evidence Deister was then still suffering from the acute stress reaction he experienced on March 8, 2012. The district court nevertheless construed the record most generously in Deister's favor and held that a reasonable finder of fact could find that Deister had an "episodic disability." In support, the district court cited two sources: (1) Dr. Ittiara's May 8, 2012 intake diagnosis of "Major Depression-recurrent, Anxiety Disorder;" and (2) Beair v. Summit Polymers, 2013 WL 4099196 at *3 (E.D. Ky., Aug. 13, 2013) (finding diagnosis of major depression disorder and PTSD sufficient to meet low threshold of qualifying disability).

Suffice it to say we are not persuaded. A disability is hardly made out by the mere fact that Deister's presenting condition was diagnosed in May 2012 as "major depressionrecurrent," without evidence that earlier manifestations of the condition had been disabling, and without evidence that Deister's condition resulted in substantial limitation of his major life activities in August, when he was terminated. Yet, our

reticence regarding the adequacy of Deister's prima facie case showing is of little consequence as we ultimately agree that summary judgment was properly awarded to Auto Club on other grounds.

On appeal, Deister takes issue with the district court's decision that he did not meet his burden of establishing that Auto Club's decision to discharge him was, in fact, a pretext. Deister's arguments, however, are meritless and do nothing to demonstrate that Auto Club's discharge decision was not legitimate. A plaintiff can establish pretext by showing, (1) that the defendant's proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the adverse employment decision, or (3) that the proffered reason was insufficient to motivate the adverse employment decision. *Chattman v. Toho Tenax Am.*, *Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). The first category implicates evidence that the proffered basis never occurred; the second category requires a plaintiff to admit the factual basis underlying the proffered reason and also admit that the reason could motivate the adverse action, but prove in reality it did not; the third category is a direct attack on the credibility on the employer's proffered motivation and may consist of evidence that employees outside the protected class were not disciplined despite the fact that they engaged in substantially identical conduct as the plaintiff. *Id.* (citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds)). Deister's basis for arguing that Auto Club's discharge decision was a pretext must fit into one of the above-defined categories. *8

8

While Deister's appellate brief sets forth arguments that are difficult to discern, the comprehensible argument it does provide fails to sufficiently demonstrate that Auto Club's reason for discharging him was a pretext. It appears that he contends that Brockington and Hines were coconspirators in a ploy to discharge him by intentionally delaying his meeting until August 1,

2012, the same day his leave expired. His argument fails for three reasons. First, it does not fit into one of the previously articulated alternatives to prove a pretext, because, as stated above, Deister told Brockington that he would not return to work at Auto Club if it meant that he had to work in his previous position. *See id*. Second, proof of the conspiracy is not in the record, thus we cannot assume that one existed. *See Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) ("conclusory statements are not sufficient to survive any motion for summary judgment"). Third, assuming, arguendo, that Brockington and Hines conspired to move his meeting to the same day his leave expired, that fact does nothing to prove pretext because, as stated above, Deister made it clear in no uncertain terms that he would not return to work if it entailed working in his previous position. His insistence provided Auto Club with a nondiscriminatory reason to discharge him. Accordingly, we agree with the district court's decision that Deister did not establish that Auto Club's proffered reason for terminating his employment was a pretext.

## B.

Under the ADA, employers must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business." 42 U.S.C. § 12112(b)(5)(A). In order to establish a prima facie case failure to accommodate claim under the ADA, Deister was *9 required to show that: (1) he was disabled within the meaning of the Act; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) Auto Club knew or had reason to know about his disability; (4) he requested an accommodation; and (5) Auto Club failed to provide the necessary accommodation. *Johnson v. Cleveland City Sch. Dist*., 443 F. App'x 974, 982-83 (6th Cir. 2011).

Like Deister's disability discrimination claim, we also analyze failure to accommodate claims based on circumstantial evidence using the *McDonnell-Douglass* burden-shifting framework. *Kleiber v. Honda of Am. Mfg*., *Inc*., 485 F.3d 862, 869 (6th Cir. 2007). Under that framework, first, Deister bears the initial burden of establishing that he is disabled. Second, Deister must prove that he was "otherwise qualified" for the position despite his disability. Third, the burden is transferred to Auto Club to show that the challenged job criterion is essential, or that the proposed accommodation will impose an undue hardship upon Auto Club. *Id*.

The district court determined that Deister failed to satisfy his burden to make a prima facie case because there was no evidence to prove that he requested an accommodation. Deister contends that he has provided evidence that he did make a satisfactory request for an accommodation. Specifically, Deister points to his sworn declaration, in which he alleged that, during a telephone conversation with Brockington on August 1, 2012, he requested an accommodation for his disability. In his declaration, Deister alleges that he told Brockington, "[y]ou need to review my medical records," and that he "wanted a meeting to discuss [his] options regarding [his] condition and employment." (Page ID. # 430.) He also alleged that after Brockington did not respond he "began offering suggestions hoping she would respond in some *10 way" and that he also requested "another adjusting position with a different manager . . . possibly even a different position. . ." (Page ID # 431.)

We disagree, and hold that Deister's sworn averments in his declaration fall short of satisfying his burden to show he requested an accommodation under the ADA. As we have previously observed "[o]ur case law establishes no bright-line test for when the form of an employee's request is sufficiently clear to constitute a request for an accommodation." *Judge v. Landscape Forms*, *Inc*., 592 F. App'x 403, 407 (6th Cir. 2014). Although a plaintiff need not use the word

"accommodate" or "disability," at a minimum he must "make it clear from the context that [the request] is being made in order to conform with existing medical restrictions." *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007) (citing *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir.2004) (holding that a plaintiff stating that a job was "kicking his ass" is not sufficient to request an accommodation)); *see also Stanciel v. Donahoe*, 570 F. App'x 578, 583 (6th Cir. 2014) (reasoning that requesting a "revised work schedule" without letting the employer know he needed the accommodation because of his disability provides the employer with no reason to know that the employee is requesting an accommodation for his disability).

Deister's blanket requests for Brockington to review his medical records, for a meeting to discuss employment conditions, or to be placed in a new position all are insufficient to amount to an accommodation request under the ADA. As explained above, in requesting an accommodation, we require plaintiffs not only to request to be accommodated, but to also provide their employers with a sufficient basis to understand that the request is being made because of their disability. *See Stanciel*, 570 F. App'x at 583. Deister's request for Brockington to review his medical records and his request for a meeting to discuss his employment conditions are not requests to be accommodated. Moreover, with

11   respect to his request to be placed in a *11 new position, Deister failed to let Brockington know that he was requesting a new position because of his disability.[2] Accordingly, we agree with the district court and hold that insufficient evidence exists in the record to show that Deister requested an accommodation under the ADA.

> [2] Even if the record were generously construed as evidencing Deister's communication of a request to be assigned to a manager other than Ruby, the result would be the same. As the district court recognized, citing *Burdett-Foster v. Blue*

*Cross & Blue Shield of Michigan*, 574 F. App'x 672, 680 (6th Cir. 2014), an employer is not obliged to honor, as a "reasonable accommodation," an employee's request for assignment to a different supervisor. --------

## C.

"As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010) (finding that a plaintiff's EEOC form fails to bring a retaliation charge when the box entitled "retaliation" is not checked and the narrative does not allege facts from which one could conclude that he or she intends to bring a retaliation claim;) *see also Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) (reasoning that the determinative inquiry is whether a plaintiff alleged specific facts in his EEOC complaint to put the EEOC on notice of his retaliation claim). "This rule serves the dual purpose of giving the employer information concerning the conduct about which the employee complains, as well as affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion." *Younis*, 610 F.3d at 361.

In this case, Deister failed to check the box in his EEOC form entitled "retaliation." Nor does the narrative section include facts that would suggest that he intended to bring an ADA retaliation claim. (*See* Page ID # 176.) Therefore, we agree with the district court's decision that Deister failed to exhaust his administrative remedies as to his retaliation claim because his EEOC form did not include a retaliation charge.

In his appellate brief, Deister appears to contend that the district court erred because *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2519

12   (2013), overruled our court's *12 precedent and announced a new rule in which a plaintiff preserves a retaliation claim by simply checking the box entitled "disability" on the EEOC form.

However, not only does *Nassar* fail to promulgate such a rule, it does not even discuss the exhaustion of administrative remedies issue presented by this case. Therefore, we need not address it further.

## IV.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

casetext

No. 12-2875-STA-tmp
UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE WESTERN DIVISION

# Simpson v. G4S Secure Solution (Usa), Inc.

Decided May 13, 2013

No. 12-2875-STA-tmp

05-13-2013

SAMMIE C. SIMPSON, III, Plaintiff, v. G4S SECURE SOLUTION (USA), INC., Defendant.

S. THOMAS ANDERSON

# ORDER GRANTING DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

Before the Court is Defendant G4S Secure Solution (USA), Inc.'s Motion to Dismiss the Amended Complaint (D.E. # 15) filed on January 10, 2013. Plaintiff Sammie C. Simpson has filed *pro se* a response in opposition (D.E. # 19) to Defendant's Motion, and Defendant has filed a reply. (D.E. # 21).[1] For the reasons set forth below, Defendant's Motion is **GRANTED.**

> [1] On March 22, 2013, Plaintiff filed a Motion to Strike Defendant's Reply (D.E. # 22), arguing that Defendant had not first sought leave from the Court to file its reply brief. Pursuant to Local Rule 12.1(c), "[l]eave of court is not required to file a reply to a response to a motion to dismiss." Therefore, Plaintiff's Motion to Strike is **DENIED.**

# BACKGROUND

On October 3, 2012, Plaintiff filed a *Pro Se* Complaint, alleging a claim of discrimination under the Americans with Disabilities Act ("ADA"). On December 10, 2012, Defendant filed a motion to dismiss (D.E. # 8) the initial complaint

for failure to state a claim. On January 2, 2013, Plaintiff filed his Amended Complaint (D.E. # 11) and a response in opposition to Defendant's *2 motion to dismiss the initial complaint, arguing that the filing of his Amended Complaint rendered the motion to dismiss the initial complaint moot. On April 8, 2013, the Court denied Defendant's motion to dismiss the initial complaint as moot as well as Plaintiff's motion for entry of default.

Plaintiff's Amended Complaint alleges that Defendant discriminated against him on the basis of race, sex, and disability and retaliated against him. Notably, the Amended Complaint alleges that "Plaintiff has fully exhausted all the administrative prerequisites to an action" by making an oral charge of discrimination on all of Plaintiff's claims. (Am. Compl. ¶ 4.) In its Motion to Dismiss the Amended Complaint, Defendant argues that Plaintiff has failed to exhaust his administrative remedies as to his claims for race and disability discrimination and retaliation. According to Defendant, Plaintiff never filed a charge of discrimination asserting any of these theories with the EEOC. Defendant contends that these claims are subject to dismissal for failure to exhaust administrative remedies. Next Defendant seeks dismissal of Plaintiff's sex discrimination claim. Defendant admits that Plaintiff filed a charge of discrimination with the EEOC in April 2012, alleging sex discrimination in violation of Title VII and that Plaintiff received his right-to-sue letter as to this claim on July 17, 2012. Plaintiff had 90 days from the receipt of his right-to-sue letter in which to file his judicial complaint. However, Plaintiff did not allege sex discrimination in a judicial complaint until

Case 1:22-cv-00076-GNS-HBB Document 19-1 Filed 09/14/22 Page 85 of 133 PageID #: 537

Simpson v. G4S Secure Solution (Usa), Inc. No. 12-2875-STA-tmp (W.D. Tenn. May. 13, 2013)

January 2, 2013, when Plaintiff filed his Amended Complaint. Defendant adds that Plaintiff's claim for sex discrimination should not relate back to the date of filing his initial complaint. Defendant argues that Plaintiff's sex discrimination claim is therefore time-barred. Defendant concedes that Plaintiff did file a charge with the Tennessee Human Rights Commission ("THRC") in March 2012, alleging sex discrimination and retaliation. However, Plaintiff's charge remains pending before the THRC. Therefore, Defendant argues that the Court should dismiss all *3 claims in Plaintiff's Amended Complaint.

3

Plaintiff has filed *pro se* a response in opposition as well as a declaration.[2] Plaintiff states that he went to the EEOC on April 6, 2012, to file his charge of discrimination. Plaintiff asserts that he requested that EEOC investigator Margie Toson ("Toson") fill out his charge of discrimination for him. Plaintiff claims that he informed Toson he was dismissed from his job because of his disability. Specifically, Plaintiff told Toson that he was dismissed for failing to complete paperwork properly but that a female security guard had also failed to complete paperwork properly. Based on these facts, Plaintiff argues that he exhausted his administrative remedies for his disability discrimination claim.

> [2] The Court notes that counsel filed a notice of appearance on behalf of Plaintiff on April 1, 2013. To date Plaintiff's attorney has not filed any other papers with the Court.

Defendant has filed a reply brief. Defendant reiterates its position that Plaintiff failed to exhaust his administrative remedies for his claim of disability discrimination. Defendant contends that Plaintiff's disability claim could not have reasonably been expected to grow out of his charge of sex discrimination. Defendant points out that Plaintiff did not check the box on his charge form for a disability claim and did not refer to disability discrimination in the narrative section of his charge form. Defendant also argues that there

is no evidence Plaintiff mentioned disability discrimination during an interview with the EEOC investigator. Defendant has obtained a partial copy of the EEOC investigative file and attached it as an exhibit to its reply. According to the file, Plaintiff checked "no" on the portion of the intake form asking whether he was disabled. Therefore, Plaintiff's Amended Complaint should be dismissed for failure to exhaust administrative remedies. *4

4

## STANDARD OF REVIEW

A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pleaded allegations of the complaint as true and construe all of the allegations in the light most favorable to the non-moving party.[3] However, legal conclusions or unwarranted factual inferences need not be accepted as true.[4] "To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of the claim."[5]

> [3] *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 (6th Cir. 1992).

> [4] *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

> [5] *Wittstock v. Mark a Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[6] Although this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."[7] In order to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to

5 "state a claim to relief that is plausible on its face."[8] *5 "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[9]

6   Fed. R. Civ. P. 8(a)(2).

7   *Ashcroft v. Iqbal, 556 U.S. 662, 681* (2009); *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555* (2007). *See also Reilly v. Vadlamudi, 680 F.3d 617, 622* (6th Cir. 2012) (quoting *Twombly, 550 U.S. at 555*).

8   *Twombly, 550 U.S. at 555, 570.*

9   *Iqbal, 556 U.S. at 678.*

## ANALYSIS

The Court holds that Plaintiff's Amended Complaint fails to state a claim. As an initial matter, both parties have presented materials outside of the pleadings. Plaintiff has attached a declaration to his response, explaining what he told the EEOC investigator who assisted him in preparing his EEOC charge form. Defendant has produced a redacted copy of the EEOC investigative file for Plaintiff's administrative charge. Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.[10] The Court retains the discretion to consider or exclude such extrinsic evidence presented with a Rule 12(b)(6) to dismiss.[11] The Court finds that it is need not take up these exhibits to resolve the issues presented in Defendant's Rule 12(b)(6) Motion. Therefore, the Court declines to consider them.

10   Fed. R. Civ. P. 12(d); *Heinrich v. Waiting Angels Adoption Serv., Inc., 668 F.3d 393, 405* (6th Cir. 2012) (citing *Jones v. City of Cincinnati, 521 F.3d 555, 561-62* (6th Cir. 2008)).

11   *Jones, 521 F. 3d at 561.*

The Court will consider Plaintiff's charge of discrimination as part of its Rule 12(b)(6) analysis. In assessing the sufficiency of the pleadings, it is proper for the Court to take into account any exhibits attached to the pleadings, exhibits included with the motion to dismiss (as long as the pleadings refer to the exhibits and the exhibits are central to the plaintiff's claims), and public *6 records of which the Court can take judicial notice.[12] EEOC charges and related documents like right-to-sue letters qualify as public records.[13] Therefore, the Court will consider Plaintiff's charge of discrimination without converting Defendant's Motion to a motion for summary judgment.

12   *Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 430* (6th Cir. 2008).

13   *Rhea v. Dollar Tree Stores, Inc., 395 F. Supp. 2d 696, 703* (W.D. Tenn. 2005) (McCalla, C.J.).

## I. Waiver

Before reaching the merits of Plaintiff's pleadings, the Court holds that Plaintiff has waived some of the issues presented in Defendant's Motion to Dismiss. The Sixth Circuit has held that a party's failure to respond to or oppose an issue raised in a Rule 12(b)(6) motion may result in waiver of the issue.[14] Plaintiff's response brief addresses only Defendant's argument that Plaintiff failed to exhaust his administrative remedies as to his claim for disability discrimination. Plaintiff has not responded to Defendant's argument that Plaintiff did not exhaust his claim for race discrimination or that Plaintiff brought his claim for sex discrimination more than 90 days after he received his right-to-sue letter from the EEOC. Plaintiff's failure to address these issues in his response constitutes a waiver of the claims. Therefore, Defendant's Motion to Dismiss Plaintiff's claims for race and sex discrimination will be **GRANTED** for this reason alone.

14  *E.g. Allstate Ins. Co. v. Global Med. Billing, Inc.,* No.12-1263, 2013 WL 1405142, *3 (6th Cir. Apr. 8, 2013); *Humphrey v. U.S. Attorney Gen.'s Office,* 279 F. App'x 328, 331 (6th Cir. 2008).

Likewise, Plaintiff has not addressed Defendant's argument that he failed to exhaust his claim for retaliation. However, Defendant has conceded that Plaintiff filed a charge with the THRC asserting this claim and that the charge remains pending before the THRC. Under the circumstances, *7 the proper remedy is dismissal of the claim without prejudice.[15] Therefore, Plaintiff's claim for retaliation is dismissed without prejudice.

15  *Mitchell v. Chapman,* 343 F.3d 811, 821 (6th Cir. 2003) ("Where the plaintiff files suit prior to receiving the right to sue letter, the district court is compelled to dismiss the premature action for failure to exhaust administrative remedies.").

## II. Failure to Exhaust Administrative Remedies

With respect to Plaintiff's claim for discrimination under the ADA, the Court holds that Plaintiff has failed to exhaust his administrative remedies. Generally a Title VII plaintiff cannot allege claims in a lawsuit that were not first raised in an EEOC charge.[16] It is well-settled that a failure to timely exhaust administrative remedies is an appropriate basis for dismissal of a discrimination claim .[17] Plaintiff does not dispute that his written charge includes no allegation of disability discrimination. Plaintiff simply argues that his statements to the EEOC investigator are sufficient to satisfy the exhaustion requirement, whether the investigator reduced Plaintiff's claim to writing in the formal charge or not. Plaintiff cites no authority for this proposition. Title VII specifically requires that EEOC charges must be in writing.[18] The Sixth Circuit has never addressed this precise issue. The Seventh Circuit has concluded that oral communications with the EEOC are no substitute for a written charge of discrimination.[19] In *Vela,*

8  the plaintiff orally reported the facts *8 of her sexual harassment claim to an EEOC intake officer.[20] According to the plaintiff, the EEOC officer failed to record the information when he typed up the charge form.[21] The Seventh Circuit held that an oral charge did not satisfy the statutory requirement for a charge to be in writing and under oath and would also fail to give the employer notice of the claim during the administrative process.[22] Although the *Vela* decision is not binding authority, the Court finds the Seventh Circuit's reasoning persuasive. Plaintiff's disability claim is subject to dismissal for this reason alone. Therefore, Defendant's Motion is **GRANTED** as to this issue.

16  *Kuhn v. Washtenaw Cnty.,* 709 F.3d 612, 627 (6th Cir. 2013) *(Younis v. Pinnacle Airlines, Inc.,* 610 F.3d 359, 361 (6th Cir. 2010)).

17  *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96 (1990).

18  42 U.S.C. § 2000e-5(b).

19  *Vela v. Vill. of Sauk Vill.,* 218 F.3d 661, 664-65 (7th Cir. 2000) (holding that oral communications with an EEOC intake officer were insufficient to preserve a claim not contained in the EEOC charge); *see also Brown v. Montgomery Surgical Ctr.,* 2:12-CV-553-WKW, 2013 WL 1163427, at *12 (M.D. Ala. Mar. 20, 2013); *Mazur v. City of Chicago,* No. 11 C 5546, 2012 WL 138604, at *3 (N.D. Ill. Jan. 18, 2012).

20  *Vela,* 218 F.3d at 665.

21  *Id.*

22  *Id.* (citing 42 U.S.C. § 2000e-5(b)).

## III. Expected Scope of the Investigation

Defendant offers the additional argument that Plaintiff's disability and race discrimination claims could not reasonably be expected to grow out of the written charge Plaintiff actually made.

Case 1:22-cv-00076-GNS-HBB   Document 19-1   Filed 09/14/22   Page 88 of 133 PageID #: 540

Simpson v. G4S Secure Solution (Usa), Inc.   No. 12-2875-STA-tmp (W.D. Tenn. May. 13, 2013)

According to Defendant, Plaintiff did not check the box for disability or race discrimination on the EEOC charge form. Plaintiff's narrative refers only to his alleged failure to follow procedures as the reason for his termination and blames this on his gender. The Court has already dismissed Plaintiff's disability and race discrimination claims on other independent grounds. Even so, the Court holds that Plaintiff has failed to state his disability and race discrimination claims for this alternative reason as well.

Under the "expected scope of investigation test," a plaintiff may bring suit alleging a discrimination claim which was not disclosed in an EEOC charge but only if the charge sets forth *9 facts which should have prompted the EEOC to investigate the different, uncharged claim.[23] Based on the facts included in the written charge, the Court holds that an investigation of Plaintiff's claims for disability and race discrimination could not reasonably be expected to grow out of his charge. The whole of Plaintiff's charge narrative reads as follows:

> [23] *Spengler v. Worthington Cylinders,* 615 F.3d 481, 490 (6th Cir. 2010) (citing *Weigel v. Baptist Hosp. of E. Tenn.,* 302 F.3d 367, 380 (6th Cir. 2002)).

> In November 2011 I was hired with the above named employer. I held the position of Security Guard. On March 1, 2012, I was discharged. The reason given for my discharge was violation of the guidelines set forth in the G4S Security Officer Handbook (obey all orders promptly and inform your relief of all new orders issued). A female Security Officer (Vanessa Ray) has violated several rules and she is still employed.

> I believe I have been discriminated against because of my sex, male, in violation of Title VII of the Civil Rights Act of 1964, as amended.[24]

Based on this brief factual summary, Plaintiff clearly stated the basis for his sex discrimination

9

claim. However, none of the facts recited relate in any way to Plaintiff's alleged disability or discrimination on the basis of his race.[25] The Court holds then that Plaintiff's charge would not prompt the EEOC to investigate a possible disability or race claim in this case. Therefore, for this independent reason, Defendant's Motion to Dismiss is **GRANTED** as to Plaintiff's disability and race claims.

> [24] Charge of Discrimination (D.E. # 15-2).

> [25] Even though Plaintiff's THRC charge is still before the THRC, the Court notes that his type-written narrative attached to that charge describes his conversation with a supervisor leading up to his termination and then concludes with his belief that Defendant engaged in "gender abuse, sex based discrimination, work place retaliation, and wrongful termination." THRC Charge (D.E. # 15-3).

## IV. Timeliness

10   *10

Finally, Defendant argues that Plaintiff's sex discrimination claim is now time-barred because Plaintiff first alleged the claim in a judicial complaint more than 90 days after he received his right-to-sue letter from the EEOC. The Court has already held that Plaintiff has waived this claim due to his failure to address it in response to the Motion to Dismiss. In the alternative, the Court holds that the claim is untimely. "A Title VII plaintiff ordinarily must file a civil action within ninety days of receiving a notice of dismissal and right to sue from the [EEOC]."[26] The 90-day filing period applies to all plaintiffs, including those who act *pro se,* and "so much as one day's delay is fatal to a claim."[27] In this case Plaintiff's right-to-sue letter (D.E. # 15-4) on his sex discrimination claim was dated July 17, 2012, and Plaintiff filed his initial complaint alleging disability discrimination on October 3, 2012. It is undisputed that Plaintiff's initial pleading was filed within 90 days of his receipt of the right-to-sue

letter. However, Plaintiff did not raise his claim for sex discrimination until he filed his Amended Complaint on January 2, 2013, almost five months after the EEOC issued a right-to-sue letter. Other members of this Court have dismissed discrimination claims as untimely under nearly identical circumstances.[28] Therefore, Defendant's Motion is **GRANTED** as to Plaintiff's claim for

11  sex discrimination for this additional reason. *11

> 26  *Seay v. Tenn. Valley Auth.,* 339 F.3d 454, 469 (6th Cir. 2003) (citing *See* 42 U.S.C. § 2000e-5(f)(1)).

> 27  *Williams v. Sears, Roebuck & Co.,* 143 F. Supp. 2d 941, 944-45 (W.D. Tenn. 2001) (Donald, J.).

> 28  *Simns v. Maxim Healthcare Servs., Inc.,* No. 11-1052, 2013 WL 435293, at * 4 (W.D. Tenn. Feb. 4, 2013) (Breen, J.); *Reynolds v. Solectron Global Servs.,* 358 F. Supp. 2d 688, 693 (W.D. Tenn. 2005) (McCalla, C.J.).

--------

## **CONCLUSION**

Defendant's Motion to Dismiss is **GRANTED.** Plaintiff's claims for discrimination on the basis of disability, race, and sex are dismissed with prejudice. Plaintiff's claim for retaliation is dismissed without prejudice.

**IT IS SO ORDERED.**

S. THOMAS ANDERSON

UNITED STATES DISTRICT JUDGE

 casetext

No. 13-2257-STA-tmp

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE WESTERN DIVISION

# Jordan v. E&A Protective Servs.-Bravo, LLC

Decided Oct 4, 2013

No. 13-2257-STA-tmp

2013-10-04

ANNETTE JORDAN, Plaintiff, v. E & A PROTECTIVE SERVICES-BRAVO, LLC, Defendant.

S. THOMAS ANDERSON

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is the United States Magistrate Judge's Report and Recommendation issued September 12, 2013, that Defendant's Motion to Dismiss (D.E. # 9) be granted. Defendant filed its Rule 12(b)(6) Motion on July 3, 2013. Plaintiff had 28 days in which to respond to the Motion but failed to do so. On August 8, 2013, the Magistrate Judge entered a show cause order, directing Plaintiff to respond and warning her that should she fail to respond, the Magistrate Judge would proceed to the merits of the Motion without the benefit of hearing her position. Plaintiff did not respond to the Magistrate Judge's order or Defendant's Motion to Dismiss within the time allowed. In his Report and Recommendation, the Magistrate Judge reasoned that Plaintiff's sex discrimination claim was time-barred and that her claim for religious discrimination was not properly exhausted. Therefore, the Magistrate Judge recommended that Defendant's Motion to Dismiss be granted.

*2 Objections to the Report and Recommendation were due within fourteen (14) days of the *2 entry of the Report, making the objections due on or before September 30, 2013.[1] Neither party has filed objections within the time permitted. Having reviewed the Magistrate Judge's Report and Recommendation *de novo,* Defendant's brief, and the entire record of the proceeding, the Court hereby **ADOPTS** the Magistrate Judge's Report. Defendant's Motion to Dismiss is **GRANTED.**

[1] The parties received the benefit of three additional days to file objections under Federal Rule of Civil Procedure 6(d).

The next issue to be addressed is whether Plaintiff should be allowed to appeal this decision *in forma pauperis.* Twenty-eight U.S.C. § 1915(a)(3) provides that an appeal may not be taken *in forma pauperis* if the trial court certifies in writing that it is not taken in good faith. The good faith standard is an objective one.[2] An appeal is not taken in good faith if the issue presented is frivolous.[3] It would be inconsistent for a district court to determine that a complaint should be dismissed prior to service on the defendant but has sufficient merit to support an appeal *in forma pauperis.* [4] The same considerations that lead the Court to dismiss this case for failure to state a claim also compel the conclusion that an appeal would not be taken in good faith. It is therefore **CERTIFIED,** pursuant to 28 U.S.C. § 1915(a)(3), that any appeal in this matter by Plaintiff would not be taken in good faith and Plaintiff may not proceed on appeal *in forma pauperis.*

[2] *Coppedge v. United States,* 369 U.S. 438, 445 (1962).

Case 1:22-cv-00076-GNS-HBB   Document 19-1   Filed 09/14/22   Page 91 of 133 PageID #: 543

Jordan v. E&A Protective Servs.-Bravo, LLC      No. 13-2257-STA-tmp (W.D. Tenn. Oct. 4, 2013)

3   *Id.*

4   *See Williams v. Kullman,* 722 F.2d 1048, 1050 n.1 (2d Cir. 1983).

The Sixth Circuit Court of Appeals decisions in *McGore v. Wrigglesworth,* 114 F.3d 601, 612-13 (6th Cir. 1997) and *Floyd v. United States Postal Serv.,* 105 F.3d 274, 276 (6th Cir. 1997) apply to any appeal filed by Plaintiff in this case. If Plaintiff files a notice of appeal, he must pay the *3 entire $455 filing fee required by 28 U.S.C. §§ 1913 and 1917.[5] The entire filing fee must be paid within thirty (30) days of the filing of the notice of appeal. By filing a notice of appeal Plaintiff becomes liable for the full amount of the filing fee, regardless of the subsequent progress of the appeal. If Plaintiff fails to comply with the above assessment of the appellate filing fee within thirty (30) days[6] of the filing of the notice of appeal or the entry of this order, whichever occurred later, the Court will notify the Sixth Circuit, which will dismiss the appeal. If the appeal is dismissed, it will not be reinstated once the fee is paid.[7]

5   The fee for docketing an appeal is $450. *See* Judicial Conference Schedule of Fees, ¶ 1, Note following 28 U.S.C. § 1913. Under 28 U.S.C. § 1917, a district court also charges a $5 fee:

> Upon the filing of any separate or joint notice of appeal or application for appeal or upon the receipt of any order allowing, or notice of the allowance of, an appeal or of a writ of certiorari $5 shall be paid to the clerk of the district court, by the appellant or petitioner.

6   The district court may extend this deadline one time by thirty (30) days if the motion to extend is filed before the expiration of the original deadline. *McGore,* 114 F.3d at 610.

7   *McGore,* 114 F.3d at 610.

--------

**IT IS SO ORDERED.**

S. THOMAS ANDERSON

UNITED STATES DISTRICT JUDGE

Civil Action 5:22-CV-00077-KDB-DCK

United States District Court, W.D. North Carolina, Statesville Division

# Speaks v. Health Sys. Mgmt.

Decided Aug 17, 2022

Civil Action 5:22-CV-00077-KDB-DCK

08-17-2022

STEPHANIE SPEAKS, Plaintiff, v. HEALTH SYSTEMS MANAGEMENT, INC., Defendant.

KENNETH D. BELL, UNITED STATES DISTRICT JUDGE

**ORDER**

KENNETH D. BELL, UNITED STATES DISTRICT JUDGE

**THIS MATTER** is before the Court on Defendant Health Systems Management, Inc.'s ("Heath Systems" or the "Company") Motion to Dismiss the employment discrimination claims of its former employee Stephanie Speaks. Ms. Speaks claims that she was unlawfully terminated in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq* ("ADA"), when she refused to comply with the Company's COVID-19 vaccination policy. (Doc. No. 8). For the reasons discussed below, the Court will **GRANT** the motion.

At the outset, however, it is important to note the narrowness of the issue before the Court. Since early 2020, the world has battled COVID-19, the disease caused by the infectious SARS-CoV-2 coronavirus. According to the Johns Hopkins University of Medicine, there have been over 580 million cases of COVID-19 worldwide, with more than 92 million cases in the United States. The death toll from the disease is equally staggering - COVID-19 has killed over 6 million people worldwide, including over a million people in the

United States. *See* Johns Hopkins University COVID-19 Dashboard, https://coronavirus.jhu.edu/map.html, accessed August 10, 2022. *1 The disease continues to be a public health challenge, albeit with fewer serious illnesses and deaths than when it first spread.

Among the reasons for the amelioration of the worst effects of this global pandemic is the creation and broad administration of more than 12 billion doses of vaccines that, while certainly not a panacea nor a complete shield against the disease, "work well to help prevent severe coronavirus disease, hospitalization or death." *Id.*; Lisa Maragakis, M.D. and Gabor Kelen, M.D., *Full FDA Approval of a COVID-19 Vaccine: What You Should Know*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/full-fda-approval-of-a-covid-19-vaccine-what-you-should-know. The advent of these life-saving vaccines has led some schools, government agencies and private businesses to require that their employees, students and customers become vaccinated. These "vaccine mandates" raise a host of important and complex legal issues that force courts to balance the competing constitutional, statutory and common law rights of public and private employers, employees, students, parents and others, often with each group containing those who both support and oppose the vaccination requirement.

The full scope of these challenging issues is not before the Court. Instead, the Court need only address the narrow issue of whether Ms. Speaks, who is appearing *pro se*, may maintain her ADA

casetext

claims against the Company. As explained below, because the Court finds that she has not sufficiently alleged that she has a disability within the meaning of the ADA simply because her employer implemented a COVID-19 policy requiring vaccination and she chose not to become vaccinated or seek an exemption, the Court concludes her claims must be dismissed.

## I. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted" tests whether the complaint is legally and factually *2 sufficient. *See* Fed.R.Civ.P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012). A complaint must only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. In evaluating whether a claim is sufficiently stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, ... bare assertions devoid of further factual enhancement[,] ... unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

Further, a court is not bound to "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002); *see also Miller v. Pacific Shore Funding*, 224 F.Supp.2d 977, 984 n.1 (D. Md. 2002) ("When the bare allegations of the complaint conflict with any exhibits or documents, whether attached or adopted by reference, the exhibits or documents prevail") (citing *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)); *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir.

2007). Thus, a motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

Finally, in applying these Rule 12 standards the Court must also consider that Plaintiff is proceeding *pro se*, which requires the Court to liberally construe the pleadings. *See Erickson v. Pardus*, 551 U.S. 89 (2007). Pro se pleadings are held to a less stringent standard than those drafted by attorneys, and if the Court can reasonably read the pleadings to state a valid claim on which the *3 plaintiff could prevail, it should do so. *Estelle v. Gamble*, 429 U.S. 97 (1976), *Hughes v. Rowe*, 449 U.S. 5 (1980). However, a district court may not rewrite a *pro se* complaint to include claims that were never presented, *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999), or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). Still, the requirement of liberal construction of *pro se* pleadings does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim cognizable in a federal district court. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990); *see also Iqbal*, 556 U.S. at 678.

## II. FACTS AND PROCEDURAL HISTORY

Health Systems is in the business of providing management and administrative services for dialysis facilities in Georgia and North Carolina. Speaks is a resident of Statesville, North Carolina and a former employee of Health Systems Management North Carolina, one of the Company's subsidiaries. She worked with patients as a financial counselor in a Statesville outpatient dialysis facility, which operated under what was at the time the Wake Forest Baptist Health System.

In July 2021, Health Systems instituted a mandatory COVID-19 vaccination policy. In enacting the policy, the Company told its

Case 1:22-cv-00076-GNS-HBB   Document 19-1   Filed 09/14/22   Page 94 of 133 PageID #: 546

Speaks v. Health Sys. Mgmt.   Civil Action 5:22-CV-00077-KDB-DCK (W.D.N.C. Aug. 17, 2022)

employees that it did so because (1) it was required by the Wake Forest Baptist Health System (Doc. No. 1 at pp. 44-45; Ex. A-14), and (2) "[a]s healthcare workers, we know that it is our sacred duty to keep those in our care safe and protected." (Doc. No. 1 at p. 27; Ex. A-1.) The policy, which contained an opportunity for employees to seek a medical or religious exemption, required vaccination by October 31, 2021. *Id.* On July 29, 2021, Ms. Speaks signed an acknowledgment that she had received and understood the vaccination policy, (Doc. 1 p. 31; Ex. A-4), although she claims that she soon thereafter expressed her disagreement with the vaccination requirement. *4

Prior to the vaccination deadline date, the Company held educational seminars, informed its employees that the Pfizer vaccine had been fully approved by the FDA, and offered a financial incentive of $500.00 to vaccinated employees. (Doc. No. 1; Speaks Aff. ¶¶ 16; 19-21.) Plaintiff admits that she did not seek a medical or religious exemption but rather asserted a "right of informed consent and the right to refuse to take part in clinical trials," even though by the vaccination deadline the Pfizer vaccine had moved beyond emergency use approval. (Compl. ¶ 46.) On October 29, 2021, the Company sent Speaks a letter reminding her of the vaccination policy and exemption request/approval deadline of October 31, 2021, and told her that if she remained unvaccinated that she would be placed on a two-week unpaid leave of absence starting on Monday, November 1, 2021. (Doc. No. 1, Speaks Aff. ¶ 37.) She was also informed that her employment would be terminated on November 14, 2021, if she remained unvaccinated. *Id.* Speaks chose to remain unvaccinated and not seek an exemption and she was terminated on or about November 14, 2021.

Before filing this lawsuit, Speaks filed charges of disability discrimination and retaliation with the Civil Rights Division of the North Carolina Office of Administrative Hearings ("NCOAH") in

September 2021, (Doc. 1 pp. 41-42; Ex. A-12), and with the U.S. Equal Employment Opportunity Commission ("EEOC") in February 2022. (Doc. 1 pp. 63-66; Ex. A-28.) On March 10, 2022, the EEOC provided Speaks a "Dismissal and Notice of Right to Sue" letter, (Compl. ¶ 6), which was issued at her request prior to the EEOC conducting an investigation into her charges.[1] *5

> [1] There are numerous additional facts related to Speaks' administrative filings, and the Company has asserted as a second ground for dismissal that Speaks allegedly failed to exhaust her administrative remedies because she failed to properly notarize or verify her charges. As noted below, the Court need not and does not reach this technical procedural argument for dismissal so a full statement of the facts relevant to that defense has been omitted.

On June 10, 2022, Speaks filed this action, alleging that the Company violated the ADA by its alleged discrimination and retaliation. Setting aside her most outrageous allegations and invective, including that neither the COVID-19 global pandemic nor a legal vaccine exists,[2] Speaks in effect contends that Health Systems violated the ADA simply by enforcing its COVID-19 policy requiring its employees to be vaccinated. (Doc. No. 1 at ¶¶ 67, 70; Doc. No. 11 at 3). As discussed below, after fully considering the parties' arguments,[3] the Court finds otherwise.

> [2] The Court has some sympathy for Ms. Speaks having to choose between keeping her job and being vaccinated, and Ms. Speaks was certainly entitled to remain unvaccinated if she chose to do so. However, Ms. Speaks is not entitled to pursue her claims based on a clearly false alternate reality that denies the very existence of the COVID-19 pandemic which has left millions dead or the numerous vaccines which have been approved as safe and effective and administered billions of times. *See E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship,*

213 F.3d 175, 180 (4th Cir. 2000) ("[the Court] need not accept as true unwarranted inferences, unreasonable conclusions, or arguments"); *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979) (concluding that, at the motion to dismiss stage, a court need not accept all factual allegations devoid of any reference to actual events). Indeed, the Supreme Court has recognized that "[s]temming the spread of COVID-19 is unquestionably a compelling state interest[.]" *Roman Catholic Diocese of Brooklyn v. Cuomo*, __U.S.__, 141 S.Ct. 63, 67, 208 L.Ed.2d 206 (U.S. 2020).

3   In its reply brief, the Company asks the Court not to consider Speaks' responsive memorandum because it was allegedly *four days* late (and mailed only *one day* after the initial deadline). First, the Company is wrong. Speaks' memorandum filed August 8, 2022, was not late because the Court entered an order giving her until August 23, 2022, to file her response. *See* Doc. No. 10. Further, and especially considering her *pro se* appearance, the Court would have readily granted a extension of time of just a few days (even if it had been opposed by the Company as the reply suggests). Therefore, the Court rejects the Company's effort to disallow Ms. Speaks' memorandum in support of her claims, which the Court has fully considered in reaching its ruling.

### III. DISCUSSION

The Company asks the Court to dismiss Speaks claims on two grounds. First, it argues that

Speaks has failed to sufficiently allege a viable ADA claim for either discrimination or retaliation. Second, it asserts a procedural defense based on its allegation that Speaks failed to exhaust her administrative remedies by failing to properly

6   verify her EEOC charge, which was otherwise *6 timely and sufficient. Because the Court finds in

favor of the Company on its merits arguments, it need not and will not rule on Health System's technical procedural defense.

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a); *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370 (4th Cir. 2022). To establish a prima facia case of disability discrimination, a plaintiff must show (i) she was disabled, (ii) she was discharged, (iii) she was fulfilling her employer's legitimate expectations when she was discharged, and (iv) the circumstances of her discharge raise a reasonable inference of unlawful discrimination. *Id.*, citing *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272 n.9 (4th Cir. 2004). If the employee makes this showing, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007). If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation was "actually a pretext for discrimination." *Id.* (citation and internal quotation marks omitted).

Only the first element of Speaks' prima facie case, whether she was disabled within the meaning of the ADA, is contested here. According to the Company, the fact that Speaks - like all their other employees - was required to be vaccinated or that she refused to become vaccinated are insufficient to show that she was disabled under the meaning of the ADA. The Court agrees.

The ADA defines "disability" as either (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1). While the ADA directs courts to construe "disability" in "favor of broad coverage of individuals" to the "maximum extent permitted by the terms" of the statute, 42 U.S.C. § 12102(4)(A), to have an actual

disability under the ADA, an individual must have "a physical or mental impairment that *7 substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Speaks does not contend that she has an actual disability (although she does contend that she was prevented from working for Health Systems because of its COVID-19 policy).[4] Indeed, she does not allege that she ever contracted COVID-19, which itself may or may not be a disability under the ADA.[5]Rather, she claims that Health Systems made a "record of" her alleged disability by "misclassifying her as having an impairment" and she was "regarded as" having a disability. Doc. No. 11 at 2.

[4] The application of an employer's COVID-19 policy to a particular employee is not a disability. *See e.g., Roman v. Hertz Loc. Edition Corp.,* No. 20 CV 2462-BEN, 2022 WL 1541865, at * 8 (S.D. Cal. May 16, 2022) (rejecting argument that employer's "COVID-19 policy prevented [plaintiff] from working and therefore transformed her COVID-19 infection into disability," because "an employer's legal treatment of an individual cannot form the basis of [a] finding [of] a disability.").

[5] The Court need not and does not decide under what circumstances COVID-19 may be considered a disability under the ADA, an issue on which Federal courts have reached different conclusions. *Compare Brown v. Roanoke Rehab. & Healthcare Ctr.,* No. 3:21-CV-00590-RAH, 2022 WL 532936, at *5-6 (M.D. Ala. Feb. 22, 2022) (finding that a plaintiff alleging serious COVID-19 related symptoms could maintain an ADA claim) and *Matias v. Terrapin House, Inc.,* 21-cv-02288, 2021

WL 4206759, at *4 (E.D. Pa. Sept. 16, 2021) (citing agency guidance to conclude that COVID-19 may be an ADA disability as it is not always transitory and is not minor) *with Champion v. Mannington Mills, Inc.,* 538 F.Supp.3d 1344, 1349 (M.D. Ga. 2021) (explaining that to find millions of Americans "disabled" under the ADA would lead to absurd results) and *Baum v. Dunmire Prop. Mgmt., Inc.,* No. 21-CV-00964-CMA-NYW, 2022 WL 889097, at *4 (D. Colo. Mar. 25, 2022) (acute short term 15 day COVID-19 illness resulting in death does not constitute a disability under the ADA); *see also Booth v. GTE Fed. Credit Union,* 21-cv-1509-KKM-JSS, 2021 WL 5416690, at *6 (M.D. Fla. Nov. 20, 2021) (analyzing the lack of consensus regarding whether COVID-19 is a disability under the ADA).

Speaks has not plausibly alleged that she is disabled based on a "record of" a disability. To state a claim for disability discrimination based on a record of a disability, a plaintiff must *8 plausibly allege that she has "a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment." 29 C.F.R. § 1630.2(k)(2); *Reynolds v. Am. Nat. Red Cross,* 701 F.3d 143, 153 (4th Cir. 2012); *see Shklyar v. Carboline Co.,* No. 4:22 CV 591 RWS, 2022 WL 2867073, at *2-3 (E.D. Mo. July 21, 2022). To survive a motion to dismiss, a plaintiff using this prong must "allege facts or indicate that defendant or any of its employees knew, had records, or had misclassified Plaintiff as having a physical impairment that substantially limits one or more major life activities." *Okyere v. John Bean Tech. Corp.,* No. 5:20-CV-190-FL, 2020 WL 7625237, at * 7 (E.D. N.C. Dec. 22, 2020). The Company did not classify Speaks as having any "impairment" that limited one of her "major life activities." Instead, she was simply required to become vaccinated under the Company's COVID-19 policy applicable to all employees, which,

while it ultimately led to Speaks' termination from Health Systems, plainly did not impair her ability to work (for example, for another company).

Simply put, inferring that the Company classified Speaks as impaired by requiring her to become vaccinated or seek an exemption would mean that Health Systems considered all its employees to have an "impairment," which is of course not a plausible inference, particularly in light of the possibility of an exemption. *See Shklyar*, No. 4:22 CV 391 RWS, 2022 WL 2867073, at *4-5 ("[Plaintiff's amended complaint shows that [her employer] classified [plaintiff] in the same way that it classified all of its RD&I employees. Inferring that [the employer] misclassified [plaintiff] as having a disability would therefore require inferring that [the employer] misclassified all of its RD&I employees as having a disability. Such an inference is not reasonable."). Accordingly, Speaks has failed to state a claim for disability discrimination based on a "record of" a disability. *9

9

Similarly, Speaks has failed to state a claim for disability discrimination based on having been regarded as having a disability, which requires that a plaintiff plausibly allege that she "'has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Miller v. Maryland Dep't of Nat. Res.*, 813 Fed.Appx. 869, 876 (4th Cir. 2020) (quoting 42 U.S.C. § 12102(3)). Again, there is no plausible basis to conclude that Health Systems regarded Speaks as having a "physical or mental impairment." The Company only regarded Speaks as being required - like all of its employees - to obtain a COVID-19 vaccine or be approved for an exemption and then "regarded" her as having failed to do so by the deadline to become vaccinated.[6] Refusing to get a vaccine required by an employer is not itself an "impairment" of any sort. Rather, it reflects a personal *choice* by Speaks that, while hers to make in this context,

cannot be considered an impairment under the ADA.[7],[8] *See Egelkrout v. Aspirus, Inc.*, No. 22-CV-118-BBC, 2022 WL 2833961, at *3 (W.D. Wis. July 20, 2022) *10 (noting that a similar anti-discrimination statute Title VII does not require an employer to accommodate a "purely personal preference."). Accordingly, Speaks has also not plausibly alleged that the Company regarded her as having a disability.

10

> 6   *See Hice v. Mazzella Lifting Techs., Inc.*, No. 2:21CV281, 2022 WL 636640, at *7-8 (E.D. Va. Mar. 4, 2022) (possible future exposure to COVID-19 does not constitute an impairment under the ADA, citing *Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1315 (11th Cir. 2019) in which the Eleventh Circuit concluded that "the disability definition in the ADA does not cover [restrictions on foreign travel because of the risk of the Ebola virus] where an employer perceives a person to be presently healthy with only a potential to become ill and disabled in the future.").

> 7   Speaks specifically disclaims making any allegation that the Company "regarded" her as being especially vulnerable to COVID-19 or likely to develop COVID-19 in the future. Doc. No. 11 at 9. Instead, Speaks claims that she meets the "regarded as" prong because she allegedly gave "notice" to the Company that she was disabled when she informed them that she objected to the vaccination requirement and thus would lose her job if the policy was enforced. Of course, whether or not an employer "regards" an employee as disabled is determined by the view of the employer not the employee. *Wilson v. Phoenix Specialty Mfg. Co.*, 513 F.3d 378, 385 (4th Cir. 2008) (where an employee relies on a "regarded as" disabled theory, the focus is "on the reactions and perceptions of the employer's decisionmakers....").

Case 1:22-cv-00076-GNS-HBB   Document 19-1   Filed 09/14/22   Page 98 of 133 PageID #: 550

Speaks v. Health Sys. Mgmt.   Civil Action 5:22-CV-00077-KDB-DCK (W.D.N.C. Aug. 17, 2022)

8 Indeed, "[v]accination requirements are a common feature of the provision of healthcare in America: Healthcare workers around the country are ordinarily required to be vaccinated for diseases such as hepatitis B, influenza, and measles, mumps, and rubella." *Biden v. Missouri*, 142 S.Ct. 647, 653; 211 L.Ed.2d 433 (2022) (preliminarily upholding a vaccine mandate for health care workers who are employed by organizations receiving federal funding).

In sum, because Speaks has not plausibly alleged an actual disability, that Health Systems misclassified her as having a disability nor plausibly alleged that the Company regarded her as having a disability, she has failed to plausibly allege the existence of an essential element of her discrimination claim: that she is disabled within the meaning of the ADA. For this reason, Speaks' discrimination claim fails and will therefore be dismissed.

Speaks' second claim alleging retaliation will similarly be dismissed. The ADA's retaliation provision specifies that "[n]o person shall discriminate against any individual because such individual... made a charge ... under this chapter." 42 U.S.C. §12203(a). "To establish a prima facie retaliation claim under the ADA, a plaintiff must prove (1) she engaged in protected conduct (2) she suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds*, 701 F.3d at 154. Speaks' retaliation claim fails because, even assuming that Speaks has plausibly alleged that her opposition to the Company's COVID-19 policy was protected ADA activity,[9] she has not plausibly alleged that there was a causal connection between her alleged protected activity and her termination. *11

11

9 Protected activity is generally defined as an action that requests an ADA remedy or that challenges a violation of the ADA. *See* 42 U.S.C. 12203(a); *see also Thompson v. City*

of Charlotte, 3:17-cv-00600, 2018 WL 5085766, at *3 (W.D. N.C. Oct. 18, 2018) *aff'd* 827 Fed.Appx. 277 (4th Cir. 2020) ("Since the communication did not challenge an infraction of the ADA, it was not considered a protected activity."). While Speaks' memorandum suggests that her "prohibited activity" was not being allowed to "perform[] [her] essential job actions," Doc. No. 11 at 10, and that is not "protected activity" in the context of a retaliation claim, the Court will construe Speaks' *pro se* Complaint liberally to sufficiently allege that she raised ADA concerns about the Company's COVID-19 policy, which would arguably constitute "protected activity."

The core of Speaks retaliation claim against Health Systems is that her termination under the Company's COVID-19 policy's vaccination requirement violates the ADA because she repeatedly opposed the policy. However, it is clear that the policy - which was undisputedly the grounds for Speaks' termination when she chose to remain unvaccinated - was enacted *before* Speaks spoke up in opposition to the vaccination requirement. Therefore, it is not reasonable to infer that there was a causal connection between her criticism of the policy and her termination. *See O'Halpin v. Hawaiian Airlines, Inc.*, No. 22-00007 JAO-KJM, 2022 WL 314155, at *11 (D. Haw. Feb. 2, 2022) ("Plaintiffs are unlikely to establish a prima facie case of retaliation ... because the adverse employment actions ... appear to be unconnected to their RA requests. Indeed, the vaccine policy was established, as well as the consequences for failing to comply[,] ... before Plaintiffs submitted their RA requests."); *Together Emps. v. Mass. Gen. Brigham Inc.*, No. 21-11686-FDS, 2021 WL 5234394, at *20 (D. Mass. Nov. 10, 2021) (finding plaintiffs likely could not show a causal connection between protected activity and adverse employment action where defendant asserted that "plaintiffs [were] subject to unpaid leave and potential termination not because they requested exemption, but because they were not

Case 1:22-cv-00076-GNS-HBB   Document 19-1   Filed 09/14/22   Page 99 of 133 PageID #: 551

Speaks v. Health Sys. Mgmt.    Civil Action 5:22-CV-00077-KDB-DCK (W.D.N.C. Aug. 17, 2022)

approved and remain[ed] noncompliant with the Vaccination Policy"). Accordingly, because Speaks has not plausibly alleged that there was a causal connection between her alleged protected activity and the adverse action taken against her, her retaliation claim fails and must be dismissed. *See Shklyar*, No. 4:22 CV 391 RWS, 2022 WL 2867073, at *5-6.

As noted above, the Court recognizes the harshness of Speaks' choice between a decision not to be vaccinated against COVID-19 and keeping a job that she had held for many years. And the Court is mindful of the difficult choices that had to be made by the Company in balancing the different interests of their corporate partners, 12 patients, and employees (who no doubt both *12 supported and opposed the vaccine requirement). However, regardless of the wisdom of the Company's COVID-19 policy, which is of course not before the Court, it is clear that Ms. Speaks has failed to state a claim that she was disabled under the ADA. Therefore, this action will be dismissed.

## IV. ORDER

**IT IS ORDERED THAT:**

1. Defendant's Motion to Dismiss (Doc. No. 8) is **GRANTED;** and

2. The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.
13  *13



casetext

8

CIVIL 2:21cv281

United States District Court, Eastern District of Virginia

# Hice v. Mazzella Lifting Techs.

Decided Mar 4, 2022

CIVIL 2:21cv281

03-04-2022

RAYMOND HICE, Plaintiff, v. MAZZELLA LIFTING TECHNOLOGIES, INC., & MAZZELLA JHH COMPANY, INC., Defendants.

---

REBECCA BEACH SMITH SENIOR UNITED STATES DISTRICT JUDGE

### MEMORANDUM ORDER

REBECCA BEACH SMITH SENIOR UNITED STATES DISTRICT JUDGE

This matter comes before the court on Defendants' "Motion to Dismiss for Failure to State a Claim" (``Motion to Dismiss"), filed on August 16, 2021, ECF No. 19.

### I. Procedural Background

Plaintiff filed the Complaint on May 19, 2021. ECF No. 1. Defendants filed their first motion to dismiss on July 20, 2021. ECF No. 12. Plaintiff then filed an Amended Complaint on August 2, 2021.[1] ECF No. 17. The Amended Complaint names as Defendants Mazzella Lifting Technologies, Inc. (``Mazzella Lifting") and Mazzella JHH Company, Inc. (``Mazzella JHH"), and asserts claims for age discrimination under the Age Discrimination in Employment Act (``ADEA")[2] (Count One), disability discrimination

1    *1 under the Americans with Disabilities Act (``ADA")[3] (Count Two), perceived disability discrimination under the ADA[4] (Count Three),

and wrongful termination against a stated Virginia public policy in the Virginia Human Rights Act (``VHRA")[5] (Count Four).

1    "A party may amend its pleading once as a matter of course within" twenty-one (21) days after service of a motion to dismiss. Fed.R.Civ.P. 15(a) (1) (B) .

2    29 U.S.C. § 623.

3    42 U.S.C. § 12101.

4    Id.

5    Plaintiff cites Va. Code Ann. §§ 2.2-3900 and 2.2-3905 (2020) as establishing a Virginia public policy against age discrimination in employment. See ECF No. 21 at 9.

On August 16, 2021, Defendants filed the Motion to Dismiss and Memorandum in Support, asserting that Mazzella Lifting is improperly named in the suit and that Counts Two, Three, and Four of the Amended Complaint fail to state plausible claims against either Defendant under Fed.R.Civ.P. 12(b) (6). ECF Nos. 19-20. On August 30, 2021, Plaintiff filed a Response in opposition. ECF No. 21. On September 7, 2021, Defendants filed a Reply. ECF No. 22.[6]

6    Due to an internal oversight, this matter was not brought to the court's attention until January 13, 2022.

### II. Motion to Dismiss

A complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). ``To survive

Hice v. Mazzella Lifting Techs.   CIVIL 2:21cv281 (E.D. Va. Mar. 4, 2022)

a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to `state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, *2 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility means that a ``plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id* (citing *Twombly*, 550 U.S. at 556). The court does not, however, accept as true conclusory statements that are not supported by factual allegations. *See id.*

### A. Factual Background

For purposes of ruling on the Motion to Dismiss, the court accepts as true the following facts alleged in the Amended Complaint and views these facts in the light most favorable to the Plaintiff. *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) .

Plaintiff was directly employed by Mazzella JHH starting in 2018. *See* Am. Compl. ¶¶ 9, 17. Mazzella JHH is a subsidiary of Mazzella Lifting. *Id* at ¶ 9. Plaintiff held the position of socket pourer, with Larry Lusk (``Lusk") as Plaintiff's supervisor. *Id.* at ¶ 18. Socket pourer is a specialized skill even among those qualified as "riggers" and is critical to many of the contracts performed by Mazzella JHH. *Id* at ¶¶ 19, 22. The "job was essential to the continued operation of [Defendants'] profits." *Id* at ¶ 69.

Plaintiff was qualified to hold the position of socket pourer. *Id.* at ¶¶ 20-21. Throughout his employment, Plaintiff had been an effective employee who received scheduled raises without issue. *3 *Id.* at ¶¶ 29-30, 35-36. Plaintiff ``had no outstanding personal issues, was diligent and efficient as a worker, and conformed to all of [Defendants'] requirements." *Id* at ¶ 67.

Plaintiff has degenerative arthritis "that impacts his ability to use his back and legs without excessive and debilitating pain." *Id* at ¶ 39.

Mazzella JHH knew about the degenerative arthritis diagnosis when hiring Plaintiff. *See id.* at ¶¶ 40, 42. When Lusk hired Plaintiff, Lusk granted Plaintiff accommodations that allowed Plaintiff to work without doing parts of the job that caused him excessive pain. *Id* at ¶¶ 43, 45. Mr. Lusk allowed Plaintiff to work without handling any duties related to the ``three-inch cable." *Id.* With the accommodations, Plaintiff has been able to "perform all of the necessary functions of his position at a high level." *Id.* at ¶ 41.

In April 2020, Plaintiff was furloughed. *Id* at ¶ 56. Plaintiff was ``only one of two riggers furloughed, despite his work `socket pouring' having no decrease in demand." *Id.* at ¶ 57. Plaintiff was furloughed for about a month prior to his termination. *Id.* at ¶ 59. On July 31, 2020, Plaintiff was notified that he was being ``laid off" with ``no plans to return you to work." *Id.* at ¶ 62 and Exhibit B.[7] Even though he met or exceeded all *4 expectations of employment prior to his termination, Plaintiff "was the only rigger who was ultimately terminated." *Id.* at ¶¶ 55, 60. Plaintiff's employers explained the termination as resulting from COVID-19's financial impact. *See id* at ¶ 83. However, neither Plaintiff nor Defendants experienced a decline in work or profitability during the COVID-19 pandemic. *Id* at ¶ 64. Defendants' business did not slow, and Mazzella JHH continued to hire new employees at the time it terminated Plaintiff. *Id* at ¶ 84.

> [7] The letter notification bears the heading of ``Mazzella Companies." *See* Am. Compl. at Exhibit B. Interestingly, the letter does not bear the specific name of either defendant named in this suit. However, the letter contains language throughout referring to ``the Company," as if it and any subsidiaries are one entity. *See id.*

When Mazzella JHH terminated Plaintiff, Plaintiff was the highest paid and oldest rigger in the rigger division. *Id* at ¶ 34 . At sixty-seven (67) years old, Plaintiff was about ten (10) years older than the next oldest similarly situated employee and about

Hice v. Mazzella Lifting Techs.    CIVIL 2:21cv281 (E.D. Va. Mar. 4, 2022)

twenty-five (25) years older than most of the other riggers. *Id* at ¶¶ 37-38. At that time, Plaintiff "was the only employee with the skills and qualifications to perform the socket pourer job." *Id.* at ¶ 65. Mazzella JHH replaced Plaintiff shortly after his termination with a significantly younger and non-disabled socket pourer. *See id* at ¶¶ 70, 73, 76. Mazzella JHH did not eliminate any positions when Plaintiff was terminated. *Id.* at ¶ 81. *5

On November 24, 2020, one hundred sixteen (116) days after his termination, [8] Plaintiff timely filed a discrimination claim with the Equal Employment Opportunity Commission (``EEOC'') regarding age discrimination based on his termination. *Id.* at ¶ 86; *see* Am. Compl. at Exhibit C. On December 11, 2020, one hundred thirty-three (133) days after his termination, [9] Plaintiff timely supplemented the claim with claims for disability and perceived disability discrimination based on his termination.[10] Am. Compl. ¶ 87; *see* Am. Compl. at Exhibit D. The EEOC issued its decision of dismissal and notice of rights as to Plaintiff's claims on February 24, 2021. *See* Am. Compl. at Exhibit A.[11] Plaintiff timely filed suit on May 19, 2021, within the ninety (90) day *6 deadline from the receipt of the EEOC notice of dismissal. See ECF No. 1; Am. Compl. at Exhibit A. Finally, Plaintiff alleges that he has been unable to find comparable work "and has suffered humiliation, loss of income, and general suffering as a result." Am. Compl. ¶ 88.

8 Charges of unlawful employment discrimination must be first filed with the EEOC within one hundred eighty (180) days after the alleged discrimination occurred. *See* U.S. Equal Employment Opportunity Commission, *Time Limits for Filing a Charge*, *https://www.eeoc.gov/time-limits-filing-charge* (last visited on March 3, 2022).

9 *See supra* note 8.

10 The court notes that Plaintiff's EEOC claim, and supplement, refer to ``Mazzella Lifting Technologies, Inc.,'' ``Mazzella Company,'' and ``Mazzella,'' using the terms interchangeably without distinguishing between the entities. *See* Am. Compl. at Exhibits C and D.

11 The EEOC ended its investigation, making ``no determination about whether further investigation would establish violations of the statute.'' Am. Compl. at Exhibit A. The EEOC noted that closing the investigation does not mean the claims have no merit and does not certify that the respondent complied with the statutes. *See id.* The EEOC made no findings as to the merits of any issues that ``might be construed as having been raised by this charge.'' *Id.*

**B. Merits of Defendants' Motion**

Defendants' Motion to Dismiss asserts that Mazzella Lifting is not a proper party to this suit and challenges the sufficiency of Counts Two through Four of the Amended Complaint. ECF No. 19 at 1.

**1. Mazzella Lifting as a Party to the Litigation**

For Mazzella Lifting to remain a defendant, Plaintiff must allege a sufficient basis for the claim that Mazzella Lifting was his employer. *See Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 979-80 (4th Cir. 1987); *see also* 29 U.S.C. § 630(f) (defining the term "employee" under the ADEA as "an individual employed by any employer"); 42 U.S.C. § 12111(4) (same for the ADA); Va. Code Ann. § 2.2-3905(A) (2020) (same for the VHRA). Plaintiff alleges that Mazzella Lifting "through Mazzella JHH employs workers in Virginia" like the Plaintiff. *See* ECF No. 21 at 2. However, Mazzella Lifting "cannot be [an] employer simply because it is the parent company of" Mazzella JHH. *Johnson*, 814 F.2d at 980. Because Mazzella JHH is a subsidiary of Mazzella Lifting, Mazzella Lifting "receives the benefits of the doctrine of limited liability." *Id.*;

Hice v. Mazzella Lifting Techs.    CIVIL 2:21cv281 (E.D. Va. Mar. 4, 2022)

7    *see* *7 Am. Compl. ¶ 9. "[W]hen a subsidiary hires employees, there is a strong presumption that the subsidiary, not the parent company, is the employer." *Johnson*, 814 F.2d at 980.

Under the integrated employer doctrine, this presumption can be rebutted, but only if the parent "controls the subsidiary's employment decisions or so completely dominates the subsidiary that the two corporations are the same entity." *Id.*; *see Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442 (4th Cir. 1999), *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006). In determining whether to treat the parent and subsidiary as an integrated employer, courts look at factors including: ```(1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control.''' *Meyer v. Qualex, Inc.*, 388 F.Supp.2d 630, 635 (E.D. N.C. 2005) (quoting *Hukill*, 192 F.3d at 442).

Plaintiff has not alleged that Mazzella Lifting and Mazzella JHH had ``anything more than a normal parent-subsidiary relationship.'' *Johnson*, 814 F.2d at 981; *see* Am. Compl. ¶¶ 8, 9. Plaintiff tries to tie the Defendants together, arguing that Mazzella Lifting has a "specific financial interest in the employment decisions" of Mazzella JHH. ECF No. 21 at 3. No further detail is alleged. However, all parent companies have a financial interest in the employment decisions of subsidiaries. To

9    sustain *8 a claim under the integrated employer doctrine at this stage, Plaintiff has to allege some indicia of control of the parent company over the subsidiary and its employment decisions. *See Johnson*, 814 F.2d at 982. Plaintiff has not alleged that Mazzella Lifting excessively interfered with the business operations or controlled the employment of Mazzella JHH. *See id.* at 981-82. *But see supra* notes 7 and 10.

The Fourth Circuit also recognizes the joint employer doctrine, where two parties can be considered joint employers of the same employee

and therefore liable for employment discrimination ``if they ` share or co-determine those matters governing the essential terms and conditions of employment.''' *Butler v. Drive Auto. Indus, of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015) (quoting *Bristol v. Bd. of Cnty. Comm'rs*, 312 F.3d 1213, 1218 (10th Cir. 2002)). To determine if a party constitutes an "employer" under the joint employment doctrine, a district court must follow a ``hybrid test,'' which includes nine factors:

(1) authority to hire and fire the individual;

(2) day-to-day supervision of the individual, including employee discipline;

(3) whether the putative employer furnishes the equipment used in the place of work;

(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

(5) the length of time during which the individual has worked for the putative employer;

(6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a

*9

regular employee's duties;

(8) whether the individual is assigned solely to the putative employer; and

(9) whether the individual and putative employer intended to enter an employment relationship.

*Butler*, 793 F.3d at 414 (footnote omitted). Of these factors, none are dispositive, though the degree of control of the alleged employer over the employee remains the key factor in the analysis.

Hice v. Mazzella Lifting Techs.   CIVIL 2:21cv281 (E.D. Va. Mar. 4, 2022)

*See id.* Therefore, the first three factors, which speak to control, "are the most important." *Id.*

Plaintiff's Amended Complaint contains no allegations that Mazzella Lifting could hire or fire Plaintiff; supervised Plaintiff on a day-to-day level; or furnished the required equipment for his job. Plaintiff also alleged few, if any, facts addressing the other six factors in the hybrid test. *But see supra* notes 7 and 10.

The court finds that Plaintiff has failed to allege sufficient facts to allow the court to infer that Mazzella Lifting was an employer of Plaintiff under either the integrated employer doctrine or the joint employer doctrine. However, the court **GRANTS** Plaintiff leave to amend the Amended Complaint to allege further indicia of control. Plaintiff will have twenty-one (21) days from the entry of this Memorandum Order to file a second amended complaint in this regard. Accordingly, the court **GRANTS** Defendants' Motion to Dismiss as to Mazzella Lifting and **DISMISSES** Mazzella Lifting from this action without prejudice to Plaintiff's *10 ability to amend its pleading within the above-specified time period. Moreover, should discovery support a later amendment in this regard as to the proper defendant(s), Plaintiff may move to so file at that time.

### 2. Count Two: Actual Disability and Record of a Disability

The ADA prohibits covered employers from discharging qualified employees because they are disabled. 42 U.S.C. § 12112(a). The elements of a discrimination claim include: (1) a plaintiff was disabled; (2) he was a qualified individual; and (3) he suffered an adverse employment action based on his disability. *See Jacobs v. N.C. Admin. Off, of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015). Defendants specifically contest whether, under the first element, Plaintiff has sufficiently alleged that he was disabled ``within the meaning of the ADA.'' *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 (4th Cir. 2001); *see* ECF No. 20 at 5.

Under the ADA, a "disability" may take any of the following forms: `` (A) a physical or mental impairment that substantially limits one or more major life activities [the "actual disability" prong]; (B) a record of such an impairment [the "record of" prong]; or (C) being regarded as having such an impairment [the "regarded as" prong]. . . .'' 42 U.S.C. § 12102(1) (emphasis added). Plaintiff may claim in the alternative under all three definitions of disability. *See, e.g., Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 236-38 (4th Cir. 2016). *11

At this stage in the litigation, Plaintiff does not have to provide extensive detail as to his medical condition. He must merely plead a disability claim ``above a speculative level.'' Bing *v. Brivo Sys., LLC*, 959 F.3d 605, 617 (4th Cir. 2020) (quoting *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).

Plaintiff has alleged an impairment: degenerative arthritis. Am. Compl. ¶ 39. Plaintiff has also alleged the impairment limits the use of his legs and back. *Id.* In regard to alleging facts sufficient to sustain a claim that his arthritis substantially limits one or more major life activities, or that Defendants had a record of such a disability, the court notes that the ADA's implementing regulations provide clarification.[12] These regulations provide that ``[t]he primary object of attention in *12 cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of a disability.'' 29 C.F.R. § 1630.1(c)(4) (2020) . ``[T]he question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'' Pub. L. No. 110-325, 122 Stat. 3553, § 2(b)(5) (2008) (quoted in *Jacobs*, 780 F.3d at 572).[13]

---

[12] Congress also instructed that the term "substantially limits" be interpreted consistently with the liberalized purposes of the ADAAA. Id; § 12102 (4) (B); *see Summers*, 740 F.3d at 329. In response to

Hice v. Mazzella Lifting Techs.   CIVIL 2:21cv281 (E.D. Va. Mar. 4, 2022)

Congress, later regulations stated that ``[t]he term substantially limits' shall be construed broadly in favor of expansive coverage" and that the term is ``not meant to be a demanding standard." 29 C.F.R. § 1630.2 (j) (1) (i) (2020). As recognized in *Summers*, 740 F.3d at 331, Congress abrogated earlier inconsistent caselaw when it enacted the ADAAA. In September 2008, Congress broadened the definition of "disability" by enacting the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (`` ADAAA") . *See Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014). The legislation reinstates ``a broad scope of protection to be available under the ADA." Pub. L. No. 110-325, 122 Stat. 3553, § 2(b)(1). The ADAAA provides that the definition of disability ``shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by [its] terms." 42 U.S.C. § 12102(4) (A) .

13  *See supra* note 12.

For the reasons set forth in more detail below, the court finds that under Count Two, Plaintiff sufficiently alleges that his arthritis qualifies him as disabled under the ADA's actual disability and record of disability prongs. *See* Am. Compl. ¶¶ 39-48; ECF No. 21 at 3.

### i. Actual Disability Discrimination

Under the ``actual disability" prong, the key question before the court is whether the Amended Complaint presents a viable claim that the arthritis substantially limited a major life activity. Ultimately, the court finds that this impairment and the pain it causes plausibly qualifies as a disability under the ADA.

Plaintiff alleges that his degenerative arthritis "impacts his ability to use his back and legs without excessive and debilitating pain." Am. Compl. ¶ 39. Plaintiff further alleges that he was granted a reasonable accommodation. *Id.* at ¶¶ 43,

13  44. *13  Specifically, with regard to his limitations with work, Plaintiff also points to how excessive pain prevented him from completing a "normal part of the rigger position" known as working the ``three-inch cable" and how he required and was given special accommodation to avoid this task. *Id.*; *see* ECF No. 21 at 5. The court can reasonably infer at this juncture that this type of pain could substantially limit lifting, performing certain manual tasks, bending, and working, all categories of major life activities recognized under the ADA.[14] *See* 42 U.S.C. § 12102(2) (A) .

14  Under the ADA, ``major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2) (A).

Defendant contends that Plaintiff's ability to work has not been substantially limited because he can complete his job without any problems. ECF No. 22 at 8. However, Plaintiff's ability to complete his job may be a result of the accommodation Defendants granted Plaintiff. Without that accommodation, Plaintiff may well have failed to meet the requirements of the position. His job success after accommodations does not preclude a finding of disability. Under the ADA, the determination of whether an impairment is substantially limiting ``shall be made without regard to the ameliorative effects of . . . reasonable accommodations." 42 U.S.C. § 12102 (4) (E) (i) (III); *see Summers v. Altarum, Corp.*, *14 740 F.3d 325, 331 (4th Cir. 2014) (rejecting the district court's reasoning that, because the plaintiff could have worked with a wheelchair, he must not have been disabled).

Lastly, Defendants cite to *Miller v. Maryland Department of Natural Resources*, 813 Fed.Appx. 869, 875-76 (4th Cir. 2020), for the proposition that Plaintiff has not adequately alleged a disability. *See* ECF No. 20 at 5-6. However, that

case is distinguishable. In *Miller*, the Fourth Circuit, in an unpublished opinion, found that the plaintiff's allegations did not satisfy the pleading standard for an unlawful termination claim under the ADA. *See* 813 Fed.Appx. at 876. However, in *Miller*, the plaintiff only alleged that he had a neck injury that resulted in herniated discs and which "caused him difficulties with lifting, running, sleeping, driving, and pulling and turning his neck." *Id.* at 875. The plaintiff ``pled no more facts relating to his difficulties" and left the court to guess how the injury limited such activities. *Id.* Simply put, the plaintiff in *Miller* failed to allege specifically how he was "substantially limited" as a result of his injury. *Id.* at 875-76.

In contrast, Plaintiff in this case has alleged facts that support his claim that his arthritis substantially limited one or more major life activities. Plaintiff has specified that the arthritis caused him debilitating pain, limited the use of his back and legs, and required accommodations at work. The court has *15 a clearer picture of the disability and its consequences for Plaintiff than the district court did in *Miller*.

At this early juncture, drawing all reasonable inferences in Plaintiff's favor, his arthritis falls within the ADA'S definition of disability. Plaintiff has sufficiently alleged he suffered an actual disability that substantially limited one or more major life activities.

**ii. Record of a Disability**

``An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2 (k) (2020). Plaintiff argues that his employer's past record of reasonable accommodations granted to Plaintiff for his disability allows the court to infer Plaintiff had a ``record of having a disability." ECF No. 21 at 6-7. As the basis for his claim, Plaintiff alleges that he had a pre-existing arthritis diagnosis that Defendants knew about when

Plaintiff was hired. *See* Am. Compl. ¶¶ 40, 42. Plaintiff alleges that his supervisor gave him a reasonable accommodation when he started the job because his arthritis limited what tasks he could accomplish. *See id.* at ¶¶ 44, 45. Finally, Plaintiff alleges that, through his supervisor, Defendants were aware of his arthritis. *See id.* at ¶ 48. Drawing all reasonable inferences in Plaintiff's favor, the court finds that Plaintiff has sufficiently alleged *16 that he had a record of a physical impairment that substantially limited one or more major life activities.[15]

> [15] Discovery may be required to determine exactly what records Defendants had or could have discovered upon the disclosure of Plaintiff's arthritis when he began his employment.

For the reasons set forth in Sections B.2. (i)- (ii), the court **DENIES** Defendants' Motion to Dismiss as to the two disability claims, "actual" and "record of," under Count Two of the Amended Complaint.

**3. Count Three: Perceived Disability**

Under the ADA, a "regarded as" disability claim requires the individual to establish that he "has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102 (3) (A); *see also Donaldson v. Trae-Fuels, LLC*, 399 F.Supp.3d 555, 559 (W.D. Va. 2019) (citing *Mercado v. Puerto Rico*, 814 F.3d 581, 588 (1st Cir. 2016)) (stating that for a "regarded as" claim a plaintiff does not need to plead whether the impairment substantially limited a major life activity). Whether a plaintiff is regarded as disabled "turns on the employer's perception of the employee." *Id.* (quoting *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997)). *17

In Count Three of the Amended Complaint, Plaintiff claims that Defendants perceived him as having a disability because of his age-related

Hice v. Mazzella Lifting Techs.     CIVIL 2:21cv281 (E.D. Va. Mar. 4, 2022)

susceptibility to COVID-19.[16] Am. Compl. ¶¶ 149-50. However, Plaintiff has not sufficiently pled facts supporting this claim. Plaintiff states in conclusory terms that ``Mazzella considered [Plaintiff] disabled and overly susceptible to the COVID-19 virus,'' without any factual basis for this claim other than that Defendants replaced Plaintiff with a younger employee. Am. Compl. ¶ 153.

> [16] Plaintiff appears to state in his Response that Defendants also perceived his arthritis to be a disability or that it would make him more susceptible to COVID-19. *See* ECF No. 21 at 7-8. The court finds that Count Three of the Amended Complaint did not specifically include such allegations, with the exception of ¶ 145, which simply "reasserts and affirms the statements made in paragraphs 1-144." Am. Compl. at ¶ 145. Count Three focused on Plaintiff's age as a perceived disability. Therefore, the court holds that Plaintiff failed to allege sufficiently that Defendants perceived his arthritis as a disability and **DISMISSES** Plaintiff's "regarded as" disability claim as to his arthritis, absent specific allegations to this effect.

Moreover, Plaintiff does not cite to precedent for the proposition that an employer's concern that an employee might get sick in the future could count as a perceived disability. *See* ECF No. 21 at 8. A perceived disability requires that an employer believes that an employee has a "physical or mental impairment." 42 U.S.C. § 12102 (3) (A). Plaintiff fails to explain how a risk factor for COVID-19 like age counts as a physical impairment. While the Fourth Circuit has not ruled on whether the perception *18 of a risk of C0VID-19 qualifies as a "perceived" disability, the Eleventh Circuit addressed a similar question in the context of a potential risk of the Ebola virus during future foreign travel. *See Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1315 (11th Cir. 2019) . The Eleventh Circuit concluded that ``the disability definition in the

ADA does not cover this case where an employer perceives a person to be presently healthy with only a potential to become ill and disabled in the future." Io\ Similarly, possible future exposure to C0VID-19 does not constitute an impairment under the ADA.

Plaintiff s conclusory allegations that Defendants perceived his age as a disability because it is a C0VID-19 risk factor are insufficient to state a claim under the ADA. Therefore, the court **GRANTS** Defendants' Motion to Dismiss as to Count Three of the Amended Complaint and **DISMISSES** Plaintiff's claim for a "regarded as" disability as to his age and susceptibility to C0VID-19.[17]

> [17] To the extent Plaintiff has specific allegations that his arthritis constitutes a "regarded as" disability, he must file them in any second amended complaint. *See supra* note 16; *infra* Part III.

### 4. Count Four: Termination in Violation of Public Policy

In Count Four of the Amended Complaint, Plaintiff asserts that when Defendants fired Plaintiff because of his age, Defendants violated a public policy articulated by the Commonwealth of Virginia in the Virginia Human Rights Act (``VHRA'' or ``the Act") . *19 *See* Am. Compl. ¶¶ 173-74 (citing Va. Code Ann. § 2.2-3905); ECF No. 21 at 8-9 (citing Va. Code Ann. § 2.2-3900 (2020)).

In Virginia, employment is generally terminable at any time, for any reason, or for no reason at all. *Lockhart v. Commonwealth Educ. Sys. Corp.*, 247 Va. 98, 102, 439 S.E.2d 328, 330 (1994). However, a "*Bowman* claim" allows an at-will employee[18] to bring a tortious wrongful discharge claim if the termination violates Virginia public policy as expressed in a Virginia statute. *See Bowman v. State Bank of Keysville*, 229 Va. 534, 540, 331 S.E.2d 797, 801 (1985).

Hice v. Mazzella Lifting Techs.   CIVIL 2:21cv281 (E.D. Va. Mar. 4, 2022)

18 Defendants state that Plaintiff was an at-will employee while working for Mazzella JHH. See ECF No. 20 at 10; ECF No. 22 at 14. Plaintiff does not contest this assertion. For the purposes of this Motion to Dismiss, the court will assume Plaintiff's at-will employment status, although it remains unclear what entity was, or entities were, Plaintiff's employer. *See supra* notes 7 and 10; *infra* note 24 and accompanying text.

In Virginia, a common law claim for wrongful discharge may be brought only under one of three circumstances: (1) ``an employer violated a policy enabling the exercise of an employee's statutorily created right;'' (2) ``the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy;'' or (3) ``the employee's refusal to engage in a criminal act.'' *Rowan v. Tractor Supply Co.*, 263 Va. 209, 213-14, 559 S.E.2d 709, 710-11 (2002). *20

The VHRA prohibits age discrimination in employment. *See* Va. Code Ann. § 2.2-3905. Plaintiff, instead of making a claim under the VHRA, relies on the public policy against age discrimination stated in the VHRA as a basis for a common law *Bowman* claim.[19] *See* Am. Compl. ¶¶ 181-85; ECF No. 21 at 10; Va. Code Ann. § 2.2-3900 (B) (2) (stating Virginia's policy to safeguard all individuals from unlawful discrimination because of age or disability) .[20]

19 Plaintiff's Response claims that he has an actionable *Bowman* claim for discrimination based on both age *and disability*. *See* ECF No. 21 at 9. However, the specific allegations in Count Four of the Amended Complaint, other than those generally incorporated in ¶ 170, allege only that Defendants violated the VHRA by terminating Plaintiff because of his age and does not mention his alleged disability. *See* Am. Compl. ¶¶ 171-185. In any event,

given the court's analysis herein, a *Bowman* claim for age or disability would fail. *See infra* Part II(B) (4) (ii) .

20 *See supra* note 19 and accompanying text.

### i. History of VHRA *Bowman* Claims

The use of the VHRA as a basis for a common law unlawful termination claim has a complicated history. In 1994, the Virginia Supreme Court found that the VHRA articulated a policy against employment discrimination based upon race and gender, which did fall under the exception recognized in *Bowman*. *See Lockhart*, 247 Va. at 104, 106, 439 S.E.2d at 331-32. The court found that the Act could form the basis for a *Bowman* claim even though the Act stated: "Nothing in this chapter creates, nor shall it be construed *21 to create, an independent or private cause of action to enforce its provisions." Va. Code Ann. § 2.1-725 (1994); *see Lockhart*, 247 Va. at 106, 439 S.E.2d at 332 (Compton, J., dissenting) (arguing that the majority holding was contrary to the explicit language of the Act).

In 1995, the Virginia General Assembly amended the Act to state that nothing in the Act creates private causes of action to enforce its provisions ``except as specifically provided.'' Va. Code Ann. § 2.1-725(A) (1995) (VHRA with the 1995 amendments); *see Doss v. Jamco, Inc.*, 254 Va. 362, 368, 492 S.E.2d 441, 444 (1997). The amended Act also included new language stating: "Causes of action based upon the public policies reflected in this chapter shall be exclusively limited to those actions, procedures and remedies, if any, afforded by applicable federal or state civil rights statutes or local ordinances." Va. Code Ann. § 2.1-725(D) (1995). In 1997 in *Doss*, the Virginia Supreme Court found that in enacting the 1995 amendments to the VHRA, ``the General Assembly plainly manifested an intent to abrogate the common law with respect to causes of action for unlawful termination of employment based upon the public policies reflected in the Act."

Hice v. Mazzella Lifting Techs.   CIVIL 2:21cv281 (E.D. Va. Mar. 4, 2022)

*Doss* 254 Va. at 372, 4 92 S.E.2d. at 447 (finding that the amended Act prohibited *Bowman* claims relying on its stated public policies).

After *Doss*, courts consistently rejected the use of the VHRA as a basis for *Bowman* claims. *See, e.g.*, *Wright v. Hilldrup Moving & Storage,* \*22 No. 1:16-CV-1349, 2017 WL 2262842, at \*5 (E.D. Va. May 23, 2017) (Trenga, J.) (finding that there is ``no recognized Virginia common law claim for wrongful termination on the basis of age, race, sex or other protected categories covered by the Virginia Human Rights Act") These courts based such decisions in part on the language in Va. Code Ann. § 2.2-3903 (A) and (D) (2014) that explicitly limited the causes of action based on the Act or its public policies to those articulated in the Act. *See, e.g.*, *Branscome v. Virginia Dep't of Env't Quality*, No. 7:17-CV-359, 2017 WL 4897774, at \*5 (W.D. Va. Oct. 30, 2017) (dismissing a *Bowman* claim because the claim was based on public policies that were also reflected in the VHRA and, therefore, precluded by Va. Code Ann. § 2.2-3903(D)).

### ii. Continued Preclusion of *Bowman* Claims under the VHRA

Plaintiff cites to amendments to the VHRA in 2020 as abrogating the decades of caselaw that have limited *Bowman* claims based on the VHRA. *See* ECF No. 21 at 8-9. Plaintiff claims that the reformatted § 2.2-3900 of the VHRA states ``a clear policy against employment discrimination" and thus meets the second *Bowman* exception as articulated in Rowan. ECF No. 21 at 8-9. That second exception applies when an employer discharges an employee in violation of a public policy ``explicitly expressed" in statute and the "employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public \*23 policy." *Rowan*, 263 Va. at 214, 559 S.E.2d at 711. Specifically, Plaintiff points to the reformatted provisions of § 2.2-3900 which, after the 2020 amendments, stated: ``It is *the policy of the Commonwealth* to:

Safeguard all individuals within the Commonwealth from *unlawful discrimination in employment* because of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, *age*, marital status, sexual orientation, gender identify, *disability*, or status as a veteran." Va. Code Ann. § 2.2-3900(B) (2) (2020) (emphasis added).

However, Plaintiff overstates the changes to the stated policy. The VHRA, before the amendments stated: ``It is the policy of the Commonwealth to: Safeguard all individuals within the Commonwealth from unlawful discrimination because of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, or disability ... in employment." Va. Code Ann. § 2.2-3900(B) (1) (2001). The General Assembly did not strengthen the wording of the policy in the 2020 amendments, rather the 2020 amendments simply reformatted aspects of the Commonwealth's previous policy into discrete paragraphs and added updated categories of ``sexual orientation, gender identity, [and] status as a veteran" to the anti-discrimination policy. *Compare* Va. Code Ann. § 2.2-3900(B)(2) (2020), *with* Va. Code Ann. § 2.2-3900(B) (1) (2001) . \*24

Moreover, courts have consistently rejected *Bowman* claims based on the VHRA, not for lack of a stated policy, but because the Act, itself, limited common law claims based on its policies. Any changes to the policies articulated in the Act would have little effect on the holding of the Virginia Supreme Court in *Doss*, barring common law claims for unlawful termination of employment based upon the public policies reflected in the VHRA. *See* 254 Va. at 372, 492 S.E.2d at 447. This court concludes that any 2020 policy changes do not affect this case at bar or the Motion to Dismiss. If anything, the addition of three (3) updated categories of discrimination further limit *Bowman* claims based on the VHRA.

Hice v. Mazzella Lifting Techs.   CIVIL 2:21cv281 (E.D. Va. Mar. 4, 2022)

In the 2020 amendments, the General Assembly did repeal § 2.2-3903, and importantly subsections (A) and (D). *See* Va. Code Ann. § 2.2-3903 (2020) (`` Repealed by Acts 2020, c. 1140, cl. 2.")• As stated above, courts have relied on the language in § 2.2-3903(A) and (D) when limiting private actions based on the Act to those actions articulated in the Act. *See* Va. Code Ann. § 2.2-3903(A) and (D) (2014). The General Assembly did not appear to add comparable language elsewhere in the Act.

Without this language, the holding of *Doss*, barring VHRA *Bowman* claims, arguably does not
25 apply to the amended Act, [21] but *25 this will need to be a pronouncement from the Virginia Supreme Court, because despite the changes to the Act, this court finds that Plaintiff does not have a viable *Bowman* claim. Plaintiff cannot proceed with a *Bowman* claim because the VHRA provides its own remedial scheme and contemplates employees bringing a cause of action based on age and/or disability discrimination under the statute. *See* Va. Code Ann. § 2.2-3905 (B) (1) (a) . Virginia courts have regularly held that ``when a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise." *Concerned Taxpayers of Brunswick Cty. v. Cty. of Brunswick*, 24 9 Va. 320, 330, 455 S.E.2d 712, 717 (1995); *see Carmack v. Virginia*, No. 1:18-CV-31, 2019 WL 1510333, at *13 (W.D. Va. Apr. 5, 2019) (Urbanski, C.J.) (collecting cases). These collected cases involve *Bowman* claims under other statutory schemes rather than the VHRA because Virginia precedent for decades clearly barred VHRA based *Bowman* claims. This is persuasive precedent, however, as it supports that the existence of an extensive statutory scheme disqualifies the underlying policy from also supporting a *Bowman* claim. *See Carmack*, 2019 WL 1510333, at *13-14 (finding that Va. Code Ann. § 2.2-3000, Virginia's State Grievance Procedure, contained a "formal process for
26 resolving employment-related *26 disputes" and

could not give rise to a *Bowman* claim because that would "enable a plaintiff to circumvent extensive remedial schemes crafted by the Virginia General Assembly, thereby rendering them a nullity").

> [21] The court notes that Plaintiff did not raise or address this argument, or any aspect of the repeal of § 2.2-3903, nor did Defendants. To the extent that the repeal of § 2.2-3903 affects the holding of *Doss*, and its progeny of caselaw, the Virginia Supreme Court will have to overrule or modify this precedent, and it has not done so.

Plaintiff cannot work around the structure, limitations, and remedies of the VHRA by bringing a related *Bowman* claim. The VHRA prescribes an extensive remedial scheme that employees must follow when relying on the rights and policies articulated in the Act. At the time of Plaintiff's termination in 2020, to bring an employment discrimination claim under the Act, a person had to file a complaint with the Division of Human Rights of the Department of Law (``the Division") detailing the allegations.[22] *See* Va. Code Ann. § 2.2-3907 (A) (2020). "Once a charge has been issued, the Division shall conduct an investigation sufficient to determine whether there is reasonable cause to believe the alleged discrimination occurred." *Id* § 2.2-3907(D) (2020). The review will lead to a report that details the Division's findings. *See id.* Only after receiving the report does the claimant have the right to seek damages in a civil suit under the statute, unless the investigation takes more than one hundred eighty (180) days. *See Id.* § 2.2-3907 (E), (F), (H) (2020). ``An aggrieved person who
27 has been *27 provided a notice of his right to file a civil action pursuant to § 2.2-3907 may commence a timely civil action . . . ." *Id.* § 2.2-3908(A) (2020) .

> [22] While there were some minor changes to the VHRA in 2021, they are not applicable here, except the Division of Human Rights

Case 1:22-cv-00076-GNS-HBB   Document 19-1   Filed 09/14/22   Page 111 of 133 PageID #: 563

Hice v. Mazzella Lifting Techs.   CIVIL 2:21cv281 (E.D. Va. Mar. 4, 2022)

of the Department of Law is now known as the Office of Civil Rights of the Department of Law. *See* Va. Code Ann. § 2.2-3907 (2021).

The VHRA statutory scheme has been expanded and formalized since the holding in *Doss*. For example, the 2020 amendments enacted the remedial scheme discussed above. *Compare* Va. Code Ann. § 2.2-3907 (2020) (laying out a mandatory remedial scheme for employment discrimination complaints), *with* Va. Code Ann. §2.2-3903 (2014) (containing a less substantial remedial scheme without an administrative exhaustion requirement). When a Virginia statute already contains a remedial scheme for violations of the statute, a plaintiff does not have a *Bowman* claim to vindicate the statute's underlying public policy. *See Williams v. TMS Int'l, LLC*, No. 3:21-CV-260, 2021 WL 4071868, at *5-7 (E.D. Va. Sept. 7, 2021) (Novak, J.). This reasoning applies with equal force to claims under the VHRA itself. In fact, the expansion of the VHRA's remedial scheme since *Doss* strengthens the application of the persuasive precedent from non-VHRA *Bowman* cases that found statutory remedies to be preclusive of *Bowman* claims. This court concludes that removing the § 2.2-3903 language does not automatically allow *Bowman* claims, when the VHRA articulates its own cause of action and remedy.[23] *28

28

---

[23] *See supra* note 21 and accompanying text.

---

Finally, the VHRA still precludes *Bowman* claims based on the statute's policies, even if a plaintiff cannot then prove employment discrimination under the remedial text of the statute. In other words, courts should not allow plaintiffs to use a *Bowman* claim to create ``a broader remedy than the statute specifically provides.'' *Carmack*, 2019 WL 1510333, at *13 (quoting *Jenkins v. Heilig-Meyers Co.*, 57 Va. Cir. 448, 450 (1998)). Doing so would abandon the principle of strict construction and undermine ``the legislative scheme as contemplated and created by the General Assembly.'' *Id.* (quoting *Jenkins*, 57 Va.

Cir. at 450) . Courts would also unnecessarily deplete judicial resources, if they treated a plaintiff's remedial disqualification under the VHRA as a prerequisite to making a *Bowman* claim. Such would require a court to, in essence, adjudicate a plaintiff's VHRA claim before addressing the merits of any *Bowman* claim.

Therefore, Defendants' Motion to Dismiss as to Count Four of the Amended Complaint is **GRANTED.** Accordingly, the court **DISMISSES** Plaintiff's claim for an unlawful termination against Virginia public policy under Count Four.

### III. Conclusion

For the reasons stated above, Defendants' Motion to Dismiss, ECF No. 19, is **GRANTED in part** and **DENIED in part.** The court **GRANTS** Defendants' Motion to Dismiss as to Mazzella Lifting. Mazzella Lifting is **DISMISSED** from this case without prejudice, with *29 Plaintiff being **GRANTED** leave to amend regarding the relationship between Mazzella Lifting and Mazzella JHH.[24] The court **DENIES** Defendants' Motion to Dismiss as to the two disability claims, "actual" and "record of," under Count Two of the Amended Complaint. The court **GRANTS** Defendants' Motion to Dismiss as to Count Three of the Amended Complaint and **DISMISSES** Plaintiff's claim for a "regarded as" disability as to his age. To the extent Plaintiff has specific allegations that his arthritis constitutes a "regarded as" disability under Count Three, he must file them in any second amended complaint.[25] Finally, the court **GRANTS** Defendants' Motion to Dismiss as to Count Four of the Amended Complaint and **DISMISSES** Plaintiff's claim for an unlawful termination against Virginia public policy. The Clerk is **DIRECTED** to forward a copy of this Memorandum Order to counsel for the parties.

29

---

[24] Any second amended complaint must reallege all other counts, as it would then be the operative pleading.

Hice v. Mazzella Lifting Techs.    CIVIL 2:21cv281 (E.D. Va. Mar. 4, 2022)

**IT IS SO ORDERED.** *30                         30

casetext

No. 2021-CA-0985-MR

Court of Appeals of Kentucky

# Tipton v. St. Joseph Health Sys.

Decided Jul 8, 2022

2021-CA-0985-MR

07-08-2022

WILLIAM N. TIPTON AND JOANN K. TIPTON APPELLANTS v. ST. JOSEPH HEALTH SYSTEM, INC.; CHI NATIONAL HOME CARE, INC.; SCOTT LESLIE; TONJA LITTLE; AND COMMONWEALTH OF KENTUCKY EX REL. DANIEL CAMERON, ATTORNEY GENERAL APPELLEES

BRIEFS FOR APPELLANTS: ANDRE F. REGARD LEXINGTON, KENTUCKY BRIEF FOR APPELLEES: B. Todd Thompson Chad O. Propst Abbie C. O'Brien Louisville, Kentucky DANIEL CAMERON ATTORNEY GENERAL OF KENTUCKY MATTHEW F. KUHN SOLICITOR GENERAL BRETT R. NOLAN PRINCIPAL DEPUTY SOLICITOR GENERAL DANIEL J. GRABOWSKI ASSISTANT SOLICITOR GENERAL FRANKFORT, KENTUCKY

GOODWINE, JUDGE

APPEAL FROM FAYETTE CIRCUIT COURT HONORABLE JULIE M. GOODMAN, JUDGE ACTION NO. 20-CI-02904

BRIEFS FOR APPELLANTS: ANDRE F. REGARD LEXINGTON, KENTUCKY

BRIEF FOR APPELLEES: B. Todd Thompson Chad O. Propst Abbie C. O'Brien Louisville, Kentucky

DANIEL CAMERON ATTORNEY GENERAL OF KENTUCKY

MATTHEW F. KUHN SOLICITOR GENERAL BRETT R. NOLAN PRINCIPAL DEPUTY SOLICITOR GENERAL DANIEL J. GRABOWSKI ASSISTANT SOLICITOR GENERAL FRANKFORT, KENTUCKY

BEFORE: CLAYTON, CHIEF JUDGE; COMBS AND GOODWINE, JUDGES.

**OPINION**

GOODWINE, JUDGE

William and Joann Tipton appeal an August 5, 2021 order of the Fayette Circuit Court summarily dismissing various civil claims they *1 asserted against the St. Joseph Health System, Inc., CHI National Home Care, Scott Leslie, and Tonja Little (collectively the appellees). Upon review, we affirm.

The relevant background of this appeal is as follows. On September 29, 2020, the Tiptons filed suit in Fayette Circuit Court against St. Joseph Health System, Inc.; and by March 9, 2021, they had amended their complaint to add, as defendants, home-health service provider CHI National Home Care, Inc.; and two of its employees, physical therapist Scott Leslie and licensed practical nurse Tonja Little. The claims the Tiptons asserted against these individuals were "breach of warranty," "breach of contract," "negligence," "negligent supervision and entrustment," "estoppel," "strict liability," and an alleged violation of Kentucky's Consumer Protection Act, Kentucky Revised Statutes (KRS) 367.170 *et seq.* Despite the different labels given to their claims, however, each of their claims were of the same *type.*

*Tipton v. St. Joseph Health Sys.*   No. 2021-CA-0985-MR (Ky. Ct. App. Jul. 8, 2022)

To explain, each of the Tiptons' claims sought to hold Leslie and Little directly liable for damages - and St. Joseph and CHI National (Leslie's and Little's ostensible employers or principals) indirectly liable - based upon the same set of operative facts: as their complaint alleged, (1) Leslie provided "physical therapy care in the Tiptons' home" on July 15, 2020, and Little "provided nursing care in the Tiptons' home" on July 20, 2020 - dates that occurred after the *2 COVID-19 emergency was declared in the Commonwealth,[1] but before the declaration expired; (2) when they cared for the Tiptons, Leslie and Little were positive for and therefore exposed the Tiptons to the COVID-19 virus; and (3) due to the exposure, the Tiptons contracted the virus. Because each of their asserted claims sought to hold the appellees liable for their resulting harm, what the Tiptons asserted against the appellees was, undisputedly, an array of what KRS 39A.275 deems "COVID-19 claims." *See* KRS 39A.275(1)(a), (b), and (c).

> [1] The declaration of emergency in Kentucky relating to the COVID-19 pandemic occurred on March 6, 2020.

That said, the appellees were each, undisputedly, "businesses and service providers" engaged at all relevant times in the provision of "home-based care and services" and "health care." *See* KRS 39A.275(9)(a)6. and (b). Accordingly, the appellees were what KRS 39A.275 deems "essential service providers," and each was *4 entitled to be "considered an agent of the Commonwealth of Kentucky for the limited purpose of providing essential services arising from COVID-19[,]" per KRS 39A.275(9). The operative effect of KRS 39A.275 therefore rendered the appellees immune to any "COVID-19 claim[s]" not stemming from "gross negligence, or wanton, willful, malicious, or intentional misconduct." *See* KRS 39A.275(8)(a) and (b); [3] KRS 39A.275(9). *3

As such, pursuant to KRS 39A.275, the appellees ultimately moved for summary dismissal of the Tiptons' claims. Responding, the Tiptons offered several arguments in opposition that are addressed more fully below. Notwithstanding, the circuit court granted the appellees' motions. This appeal followed.

We now proceed to our analysis. In its dispositive order of August 5, 2021, the circuit court determined that the health care services provided by the appellees - the focus of the Tiptons' claims - were discretionary functions, *i.e.*, carried out "in the face of a pandemic" and thus "in a legally uncertain environment." It also determined KRS 39A.275 provided at least a form of qualified official immunity to each of the appellees with respect to the Tiptons' COVID-19 claims. And indeed, by exempting "essential service providers" from liability for any such claims that do *not* involve "gross negligence, or wanton, willful, malicious, or intentional misconduct[,]"[2] that is precisely the thrust of the statute. To explain,

> [2] *See* KRS 39A.275(8)(b).

> [W]hen an officer or employee of the state or county (or one of its agencies) is sued in his or her individual capacity, that officer or employee enjoys qualified official immunity, which affords protection from damages liability for good faith judgment calls *made in a legally uncertain environment.*

*4 *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010) (internal quotation marks and citations omitted). However, the defense of qualified official immunity has no application to torts such as gross negligence, which involve malice or willful misconduct,[3] because:

Acting with malice and acting in good faith are mutually exclusive. . . . it is also a fact that defeats the defendant's assertion of qualified official immunity. Official immunity is unavailable to public officers who acted *with the malicious intention* to cause a deprivation of constitutional rights or other injury[.]

*Martin v. O'Daniel*, 507 S.W.3d 1, 5 (Ky. 2016) (internal quotation marks and citations omitted).

> 3 "Gross negligence" is defined "as being something more than the failure to exercise slight care. We have stated that there must be an element either of malice or willfulness or such an utter and wanton disregard of the rights of others as from which it may be assumed the act was malicious of wilful." *Cooper v. Barth*, 464 S.W.2d 233, 234 (Ky. 1971) (citations omitted).

To be clear, the Tiptons do not take issue with any of these points. Rather, their contentions on appeal are limited to the following: (1) KRS 39A.275 is unconstitutional because it is "special legislation;" (2) KRS 39A.275 is unconstitutional because it violates the "jural rights doctrine;" and (3) summary judgment was improper because, as they assert in their brief, "discovery is still necessary to determine whether CHI, St. Joseph, and their employees, including Defendants/Appellees Scott Leslie, and Tonja Little were grossly negligent."

5   \*5

With respect to their first argument, we disagree. The Tiptons argue, in sum, that KRS 39A.275 qualifies as "special legislation" because section (9) of the statute, which delineates the "essential services" to which immunity is extended, applies to some types of businesses, but not others. Their argument misunderstands the law. The appropriate test for determining whether a statute qualifies as "special legislation" within the meaning of Sections 59 and 60 of the Kentucky Constitution "is whether the statute applies to a particular individual, object or locale." *Calloway Cty.*

*Sheriff's Dep't v. Woodall*, 607 S.W.3d 557, 573 (Ky. 2020). Simply put, KRS 39A.275 is not "special legislation" because it does not relate to a *particular* individual, object, or locale. Rather, it applies statewide to industries and types of businesses identified as essential-service providers, and it applies equally to each business or individual within those industries and types of businesses.[4]

> 4 The Tiptons' assertion that KRS 39A.275 impermissibly differentiates between *types* of businesses takes issue with *classification*, which could have been the subject of an equal protection argument under Sections 1, 2, and 3 of the Kentucky Constitution. *See Woodall*, 607 S.W.3d at 573. However, the Tiptons never raised any such argument below or in their brief before this Court, and it is not our prerogative to address that issue, as our review is limited to issues specifically raised before the circuit court. *Regional Jail Authority v. Tackett*, 770 S.W.2d 225, 228 (Ky. 1989).

With respect to their second argument, we likewise disagree that KRS 39A.275 violates the jural rights doctrine. We quote the circuit court and adopt its analysis as follows: \*6

6

The basic premise of the jural rights doctrine is that Sections 14, 54, and 241 of the Kentucky Constitution, when read together, preclude any legislation that impairs a right of action that was recognized at common law prior to the adoption of the 1891 Kentucky Constitution. *E.g.*, *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 800 (Ky. 2009). However, sovereign immunity, under Section 231 of Kentucky's Constitution, prohibits suits against the Commonwealth and its agents, absent its explicit consent. Ky. Const. § 231.[FN]

[FN] The doctrine was first recognized in Kentucky's courts in 1828 "without question or citation to authority" in *Divine v. Harvie* [,] 23 Ky. (7 T.B. Mon.) 439 (Ky. 1828), *Reyes v. Hardin County*, 55 S.W.3d 337, 338 (Ky. 2001).

The doctrine "is a bedrock component of the American governmental ideal[,] is a holdover from the earliest days of the Commonwealth," and "has been included in all four of the Commonwealth's constitutions *and predates each.*" *Id.* at 799 (emphasis added; citing *Ky. Ctr. for the Arts Corp. v. Berns*, 801 S.W.2d 327, 329 (Ky. 1990)). "[S]overeign immunity is older than this Commonwealth's Constitution," and the jural rights doctrine "does not trump" sovereign immunity because the Commonwealth had the power to immunize its agents from suit prior to ratification of the 1891 Kentucky Constitution. *Garrison v. Leahy-Auer*, 220 S.W.3d 693, 698 (Ky. App. 2006).

The legislature can enact law that extends sovereign immunity to the private sector without running afoul of the jural rights doctrine, when an essential governmental function is at issue and especially to protect the public health and safety of the Commonwealth's people under a police power. *E.g.*, *Caneyville*, 286 S.W.3d at 799-806. The jural rights

*7

issue objection raised by the Tiptons has already been addressed and resolved by the Kentucky Supreme Court in 2009 in *Caneyville*. There, the court upheld the extension of state sovereign - governmental, in that case - immunity under KRS 75.070 to a local volunteer fire department. *Id*[.] The statute read, in part, that when answering a call for a fire, all "volunteer fire department [sic] and the personnel of each . . . shall be considered an agent of the Commonwealth of Kentucky and acting solely in a governmental capacity [and] shall not be liable in damages for any omission or act of commission or negligence while answering an alarm . . . ." *Id*. at 795-96 (quoting Ky. Rev. Stat. Ann. § 75.070).

The plaintiff, an owner of a motorcycle business, argued that KRS 75.070 was unconstitutional because it violated the jural rights doctrine and wrongly barred his lawsuit for common-law negligence against the volunteer fire department and its personnel. *Id*. at 794-97. The court framed the issue as whether the legislature "has the right, through the enactment of legislation, to confer immunity on . . . volunteer fire departments, or whether jural rights preclude this grant of immunity as constitutional." *Id*. at 797. The court reasoned that "fire departments perform a paradigmatic function of the government in keeping the public safe from fire[.]" *Id*. at 799.

As to the motorcycle shop owner's jural rights argument, the court reasoned,

The reigning authority on the matter holds that sovereign immunity (as embodied in Ky. Const. § 231) *will trump jural rights* (Ky. Const. §§ 14, 54[,] 241) *because it is a specific provision of the Constitution*, rather than a general provision. . . . Thus, the crucial determination in sovereign immunity analysis boils down to: whether the entity being sued is the sovereign, its agency, or

8    *8

one who goes about the business of conducting the sovereign's work. Therefore, if [the volunteer fire department here] was an agent of the Commonwealth, engaged in the Commonwealth's work, KRS 75.070 is constitutional.

9

*Id*. at 801-02 (emphasis added). The court then reasoned that governmental immunity would extend to an agency of the Commonwealth when the agent performs "an essential government function." *Id*. at 804. Fire departments were then determined to "engage in an essential governmental function in providing for the safety and well-being" of the Commonwealth's citizens. *Id*. at 805. "Significantly," the Kentucky Supreme Court further reasoned that KRS 75.070 expressly characterized "volunteer fire departments as 'an agent of the Commonwealth'" that acts "in a governmental capacity." *Id*. (quoting statute). The court held that KRS 75.070 was constitutional, did not offend the jural rights doctrine, conferred immunity to the volunteer fire department and its personnel, and thus, precluded a suit for damages. *Id*. at 807.[FN]

[FN] Other Kentucky opinions have held that statutes conferring a form of sovereign immunity - governmental or qualified official - upon universities and physicians from reporting suspected child abuse were constitutional, satisfied an integral government function pertaining to public welfare, did not violate the jural rights doctrine, and precluded lawsuits for negligence. *E.g.*, *Garrison*, 220 S.W.3d at 697-700 (construing KRS 620.050); *Hazlett v. Evans*, 943 F.Supp. 785, 787-89 (E.D. Ky. 1996) (same). Also, statutes originally enacted in 1998 that were already within the Statewide Emergency Management Programs Act at KRS chapter 39A - and

*9

Tipton v. St. Joseph Health Sys.    No. 2021-CA-0985-MR (Ky. Ct. App. Jul. 8, 2022)

never challenged as violative of Section 59 or jural rights - grant power to the governor to authorize the use of "the private sector" to act as agents of the Commonwealth during "any part of the response phase or emergency[,]" Ky. Rev. Stat. Ann. § 39A.270(2), and also immunize private-sector "agents or representatives of the state" from claims of "personal injury or property damage[,]" Ky. Rev. Stat. Ann. § 39A.280(2).

Here, the Defendants are immune from suit because at the time of treating the Tiptons they were agents of the Commonwealth assisting same as essential service providers and providing an essential government function requiring discretionary action in order to protect the public's health. See Caneyville, 286 S.W.3d at 804, 808; [KRS 39A.275; internal footnote omitted]. Health care providers, health facilities, and home-based care and services are all deemed essential service providers carrying out the important governmental police power of public health under the statute. [KRS 39A.275(9)(a)6. and (b).] The Tiptons' claims all arise from COVID-19. The Defendants are "deemed essential service providers and shall be considered an agent of the Commonwealth of Kentucky for the limited purpose of providing essential services arising from COVID-19." [KRS 39A.275(9)]. As an agent of the Commonwealth, the Defendants "shall not be liable for any COVID-19 claim," absent ["gross negligence, or wanton, willful, malicious, or intentional misconduct." See KRS 39A.275(8)(b).]

Lastly, the Tiptons argue summary judgment was improper because "discovery is still necessary to determine whether CHI, St. Joseph, and their employees, including Defendants/Appellees Scott Leslie, and Tonja Little were *10 grossly

10

negligent."[5] As this tends to indicate, the Tiptons are not asserting that they presented any evidence of gross negligence capable of withstanding summary judgment. See Kentucky Rule of Civil Procedure (CR) 56. Indeed, they cite no such evidence. Instead, the crux of their argument is that they would like more time to gather more evidence in support of their claims.

---

[5] As an aside, the circuit court disposed of the Tiptons' "gross negligence" claims in two separate ways. First, it concluded its order by stating, "The Tiptons have not alleged gross negligence in their Second Amended Complaint." Second, in disposing of the Tiptons' claims based upon the qualified immunity granted by KRS 39A.275, the circuit court effectively determined the record only sustained that the appellees acted in good faith - which would run contrary to any assertion of malice or gross negligence. See Martin, 507 S.W.3d at 5; see also Yanero v. Davis, 65 S.W.3d 510, 523 (Ky. 2001) (explaining it is the plaintiff's burden, for purposes of defeating a claim of qualified immunity, to adduce evidence that good faith was lacking); see also Furlow v. Sturgeon, 436 S.W.2d 485, 486 (Ky. 1968) (citation omitted) (explaining "effect must be given to that which is unavoidably and necessarily implied in a judgment, as well as that which is expressed in the most appropriate language," and that where claims in an action are mutually exclusive, "adjudicating in favor of one is negating the other"). On appeal, the Tiptons argue the circuit court misconstrued their complaint as not asserting a "gross negligence" claim and assert error in this regard. However, it is unnecessary to address this point; as discussed, the circuit court properly utilized CR 56 to dismiss any "gross negligence" claims the Tiptons may have raised.

However, "[t]he trial court's determination that a sufficient amount of time has passed and that it can properly take up the summary judgment motion for a ruling is reviewed for an abuse of discretion." *Blankenship v. Collier*, 302 S.W.3d 665, 668 (Ky. 2010). Here, absent from the Tiptons' argument is any contention that the circuit court abused its discretion in this regard. Furthermore, no such abuse is apparent from the record. Questions of immunity should be addressed promptly at the outset of a suit, considering that immunity is not just *11 immunity from an eventual adverse judgment but from the ordeal of being a party to a suit at all. As the appellees note, the Tiptons initiated their suit on September 29, 2020, and summary judgment was entered on August 5, 2021 - nearly a year later. "There is no requirement that discovery be completed, only that the non-moving party have 'had an opportunity to do so.'" *Carberry v. Golden Hawk Transp. Co.*, 402 S.W.3d 556, 564 (Ky. App. 2013) (citation omitted). Moreover, a period of six months for discovery has been deemed an appropriate opportunity to do so. *See Hartford Ins. Group v. Citizens Fidelity Bank & Trust Co.*, 579 S.W.2d 628 (Ky. App. 1979).

In conclusion, we have addressed the breadth of the Tiptons' arguments and have found no reversible error. We therefore AFFIRM.

ALL CONCUR.

BRIEF FOR THE COMMONWEALTH OF KENTUCKY: [6] *12

> [6] Because the validity of KRS 39A.275 was at issue in this matter, the Kentucky Attorney General was served and filed a brief in support of the statute's constitutionality. *See* KRS 418.075(1).


casetext

2002 WL 31780191

Only the Westlaw citation is currently available.

This case was not selected for
publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed.
Rule of Appellate Procedure 32.1 generally governing
citation of judicial decisions issued on or after Jan. 1,
2007. See also Sixth Circuit Rule 28. (Find CTA6 Rule 28)

United States Court of Appeals, Sixth Circuit.

Fred L. DAILEY, Director of the Ohio
Department of Agriculture, Plaintiff–Appellant,
OHIO DEPARTMENT OF
AGRICULTURE, et. al., Plaintiff,
v.
Ann M. VENEMAN, Secretary, U.S. Department
of Agriculture; United States Department
of Agriculture, Defendants–Appellees.

No. 01–3146.
|
Dec. 3, 2002.

**Synopsis**

Ohio Department of Agriculture and its Director sued United
States Department of Agriculture (USDA) and its Secretary,
challenging constitutionality of Federal Meat Inspection Act
(FMIA) and Poultry Products Inspection Act (PPIA), and
alleging that Secretary exceeded scope of her authority in
issuing certain implementing regulations. The United States
District Court for the Southern District of Ohio, Smith,
J., dismissed action. Ohio Department of Agriculture and
Director appealed. The Court of Appeals, Batchelder, Circuit
Judge, held that: (1) restrictions on interstate transport of
state-inspected meat did not violate Ohio's equal protection
rights; (2) Congress did not act beyond its Commerce Clause
power in restricting interstate transport of state-inspected
meat and poultry; (3) FMIA and PPIA did not violate Tenth
Amendment in forcing Ohio to choose either to conduct
its own inspection program or allow federal government to
take over; and (4) Secretary did not exceed her regulatory
authority in promulgating regulations restricting entry of
state-inspected meat and poultry into federally inspected
plants.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

On Appeal from the United States District Court for the
Southern District of Ohio.

Before GUY and BATCHELDER, Circuit Judges; and
QUIST, District Judge. [*]

**Opinion**

BATCHELDER, Circuit Judge.

**\*1** The Ohio Department of Agriculture ("Ohio
Department") and its Director, Fred L. Dailey, appeal the
district court's order granting the motion of the United States
Department of Agriculture ("USDA") and its Secretary,
Ann M. Veneman ("Secretary") to dismiss the plaintiffs'
complaint under Fed.R.Civ.P. 12(b)(6). The plaintiffs brought
this action seeking declaratory and injunctive relief, arguing
that the Federal Meat Inspection Act ("FMIA"), 21 U.S.C.
§§ 601–80, the Poultry Products Inspection Act ("PPIA"), 21
U.S.C. §§ 451–70 (collectively, the "Meat and Poultry Acts"),
and their implementing regulations. 9 C.F.R. 301, *et seq.,*
and 9 C.F.R. 381, *et seq.,* respectively, are unconstitutional
because they violate the plaintiff's rights under the equal
protection component of the Fifth Amendment's Due Process
Clause; because they exceed Congress's power under the
Commerce Clause; and because they unconstitutionally
commandeer Ohio's legislative process, in violation of
the Tenth Amendment. The plaintiffs also argue that
specific regulations that implement the Meat and Poultry
Acts, namely 9 C.F.R. §§ 318.1 and 381.145, exceed the
defendants' regulatory authority. Because we conclude that
the plaintiffs, while raising concerns of federalism to which
we are sympathetic, nonetheless cannot demonstrate that
the federal statutes and regulations they challenge here are
unconstitutional, we will affirm the judgment of the district
court.

Statement of Facts

The FMIA governs the slaughtering of livestock and the
processing and distribution of meat products in the United
States; the PPIA governs the slaughtering, processing, and
distribution of poultry products. In accordance with §§ 603
and 621 of the FMIA and § 463 of the PPIA, among other
provisions, the Secretary is authorized to make rules and
regulations setting national standards for meat and poultry
inspection. To that end, the Secretary has promulgated 9
C.F .R. Subchapter A. Part 301. *et seq.,* which regulates meat

2002 WL 31780191

inspection, and 9 C.F.R. Subchapter C, Part 381, *et seq.,* which regulates poultry inspection. Under the FMIA and PPIA and their corresponding regulations there are three different types of meat and poultry establishments or plants: (1) federally inspected plants; (2) foreign-inspected plants, whose meat and poultry is federally inspected when it enters the United States; and (3) state-inspected plants.

For federally inspected plants, the Meat and Poultry Acts charge the Secretary with a number of responsibilities, including ante- and post-mortem inspection of the livestock and carcasses, sanitation inspection in the establishments, enforcement of record-keeping requirements, and the training and supplying of inspectors to carry out these responsibilities. *See* 21 U.S.C. §§ 602–06; *id.* §§ 455–57, 463. The Secretary in turn has established standards, including facilities requirements, inspection requirements, sanitation requirements, and record-keeping requirements. 9 C.F.R. §§ 301–35, 381. Meat produced in a federally inspected plant may be sold in any state.

 **\*2** Foreign-inspected plants operate their own inspection systems under the general supervision of the USDA. 21 U.S.C. §§ 620, 466. To be allowed to export to the United States, a foreign country must show that its system of inspection is "equivalent to" the federal inspection system. 9 C.F.R. § 327.2(a)(1). The USDA conducts its own inspection of foreign-inspected meat and poultry, though the level of the USDA's scrutiny depends on the inspection history of the particular country and plant. Under normal inspection, a sample from each lot is taken for inspection and the rest is immediately shipped to the United States. For plants with better compliance histories only one in four lots is inspected, and for the best plants only one in twelve. For plants with poor compliance every lot is inspected, and no product is shipped until the inspection is complete. USDA-approved meat and poultry from foreign plants may be sold in any state.

The Meat and Poultry Acts grant the Secretary authority to authorize each state to develop its own inspection program. 21 U.S.C. §§ 661, 454. To obtain this authorization, a state must have "enacted a State meat inspection law that imposes mandatory ante mortem and post mortem inspection, reinspection and sanitation requirements that are at least equal to those under [the Meat and Poultry Acts]," 21 U.S.C. §§ 661(a)(1), 454(a)(1), and its inspection system must contain "authorities at least equal to those provided in [the Meat and Poultry Acts]." *Id.* §§ 661(a)(2), 454(a)(2). To demonstrate that it meets the "at least equal to" requirement, a state submits

a "State Performance Plan" to the USDA's Food Safety and Inspection Service ("FSIS"). A benefit of the "at least equal to" requirement is that it allows state inspection programs to exceed the federal requirements if they wish–something which Ohio, for example, has done.

Once the Secretary has authorized a state's inspection program, the USDA monitors the state's compliance via annual certification and comprehensive reviews. In annual certification the USDA reviews each participating state's performance plan and determines whether the state has met the "at least equal to" requirements at the end of each fiscal year. In comprehensive reviews the USDA randomly selects state plants, reviews their records, and conducts in-plant inspections. Comprehensive reviews are conducted in a given state every one to five years, depending on which of the four FSIS ratings the state receives: acceptable, acceptable with minor variations, acceptable with significant variations, and unacceptable. In 1996 the FSIS comprehensively reviewed Ohio's meat and poultry inspection program, finding that Ohio met the "at least equal to" requirements, and rating the program "acceptable with minor variations." In 1997 six states received ratings of acceptable, fourteen were rated acceptable with minor variations, six were rated acceptable with significant variations, and no state program was deemed unacceptable. [2]

 **\*3** Meat and poultry produced at state-inspected plants may be sold intrastate only, and may not be sold interstate. Nor may state-inspected meat or poultry be sold to a federally inspected plant for reprocessing. 21 U.S.C. §§ 610(c), 458(a)(2). This restriction is burdensome for state-inspected plants. Though individual state-inspected plants may petition the FSIS to be inspected instead under the federal system, many small plants cannot afford the renovations that would be required to meet federal standards. The consequence, as alleged by the Plaintiffs, is that many small and mid-size plants have gone out of business, unable to compete with the larger plants because they cannot send their meat or poultry out of the state.

## Analysis

We review *de novo* a district court's dismissal of a complaint under Fed. R. Civ. Proc. 12(b)(6). *Bird v. Parsons,* 289 F.3d 865, 871 (6th Cir.2002). Like the district court, we assume that all of the Plaintiffs' factual allegations are true, and we may affirm the dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

2002 WL 31780191

which would entitle him to relief." *Id.* (quoting *Buchanan v. Apfel,* 249 F.3d 485, 488 (6th Cir.2001)).

I. Fifth Amendment Equal Protection

The Fifth Amendment prohibits Congress from depriving persons of life, liberty, or property without due process of law. Federal courts have discerned an equal protection component to this provision, and consequently "the Fifth Amendment's Due Process Clause prohibits the Federal Government from engaging in discrimination that is 'so unjustifiable as to be violative of due process.' " *Schlesinger v. Ballard,* 419 U.S. 498, 500 n. 3, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975) (quoting *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954)). Where, as here, Congress's differential treatment implicates neither a suspect classification nor a fundamental right, federal courts should uphold the legislation if it is rationally related to a legitimate legislative interest–which is to say that the unequal treatment may not be arbitrary, irrational, or capricious. *Hadix v. Johnson,* 230 F.3d 840, 843 (6th Cir.2000); *Hampton v. Hobbs,* 106 F.3d 1281, 1286 (6th Cir.1997). Hence Ohio bears a heavy burden–to negate "every conceivable basis which might support [the legislation], ... whether or not the basis has a foundation in the record," *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quotation marks and citation omitted)–and the Defendants need not produce any evidence to substantiate their replies, nor are they required to reply at all. *Hadix,* 230 F.3d at 843.

Ohio argues that because, for purposes of the Defendants' 12(b)(6) motion, the district court had to accept as true Ohio's allegation that state-inspected meat and poultry is as safe as federally inspected and foreign-inspected meat and poultry, the Meat and Poultry Acts lack a rational basis for treating state-inspected meat and poultry differently from that produced in federally inspected and foreign plants. Nevertheless, assuming that it is true that state-inspected meat and poultry was and presently is as safe as that subject to the other types of inspections, the district court (and the government in enacting and perpetuating the Meat and Poultry Acts and their regulations) was not required to assume that this will always be the case in the future. Though the USDA does keep an eye on state inspection programs, it keeps yet a closer eye on its own plants and on meat and poultry entering the country, and it is possible that a state program could deteriorate for a time without the USDA's knowledge. This possibility provides a rational basis for Congress to restrict the interstate transport of state-inspected meat. Another rational basis for the discrimination

is Congress's interest in uniformity: because state inspection programs can impose additional or different requirements as they comply with the "at least equal to" requirement, and because states can establish their own labeling systems, Congress may have wanted to avoid confusion by establishing a uniform standard for meat and poultry products shipped interstate. For these reasons, we find that the district court did not err in holding that the plaintiffs fail to state a claim under the Fifth Amendment's Due Process Clause.

II. Commerce Clause

**\*4** Under the Commerce Clause, Congress may regulate three broad categories of activity: (1) "the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) activities with a substantial relation to interstate commerce–activities, that is, "that substantially affect interstate commerce." *United States v. Morrison,* 529 U.S. 598, 609, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (quotation marks and citation omitted). We must reject a Commerce Clause challenge if Congress rationally could have concluded that the regulated activity fit into one of these categories, and if Congress acted rationally in adopting that regulatory scheme. *Hodel v. Va. Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 276, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

The plaintiffs' quarrel here is not with whether meat and poultry sold intrastate substantially affects interstate commerce, or whether Congress has a rational basis for regulating meat and poultry that remains within a state. Rather, they argue that Congress, by forbidding state-inspected meat and poultry from crossing state lines, has voluntarily stripped itself of authority to regulate state-inspected plants engaged in what is now a solely intrastate activity. Yet the plaintiffs cite no cases supporting this novel (though not illogical) proposition, nor are we aware of any. Congress's power to regulate things in interstate commerce surely includes the power to ensure that a commodity does not become a thing in interstate commerce; and meat and poultry products that are solely in intrastate commerce, when considered in the aggregate, have a substantial affect on interstate commerce. *See United States v. Lopez,* 514 U.S. 549, 560, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (discussing the Court's finding in *Wickard v. Filburn,* 317 U.S. 111, 128, 63 S.Ct. 82, 87 L.Ed. 122 (1942) that home-grown wheat, even if it is never sold but is simply consumed at home, substantially affects interstate commerce because it competes

2002 WL 31780191

with wheat that is sold in commerce). Federal regulation of those products in intrastate commerce, then, is not beyond Congress's power under the Commerce Clause.

III. Tenth Amendment

Ohio contends that the Meat and Poultry Acts impermissibly commandeer Ohio's legislature and compel it to enforce the federal inspection laws, in violation of a principle derived from the Tenth Amendment and reiterated in *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992): "The Federal Government may not compel the States to enact or administer a federal regulatory program." *Id.* at 188. In *New York,* the states were offered a choice between regulating low-level radioactive waste according to the instructions of Congress or taking title to that waste. Neither of those, standing alone, was within the authority of Congress, the Court held, and "[a] choice between two unconstitutionally coercive regulatory techniques is no choice at all," and therefore " 'the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program,' an outcome that has never been understood to lie within the authority conferred upon Congress by the Constitution." *Id.* at 176 (quoting *Hodel,* 452 U.S. at 288).

**\*5** The plaintiffs argue that the Meat and Poultry Acts present Ohio with similarly unsavory alternatives: the state must either continue to operate its own inspection program or face the prospect of being subjected to federal inspection, and the considerable expenses of converting to the latter would drive many small meat and poultry plants out of business. We disagree. Ohio's choice is either to conduct its own program or allow the federal government to take over, *see* 21 U.S.C. §§ 661(c), 454(c), and the Supreme Court has held that such choices do not amount to compulsion. *See New York,* 505 U.S. at 167 ("[W]here Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress's power to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation."). Nor is the harm threatened here of the kind that the principle reiterated in *New York* is intended to prevent: the prospect of having small businesses fail due to conversion costs, though disagreeable, nevertheless affects Ohio only indirectly. *See, e.g., id.* at 168 ("[W]here the Federal Government compels States to regulate, the accountability of both state and federal officials is diminished."). We conclude that the Plaintiffs' arguments fail.

IV. The Scope of the Secretary's Regulatory Authority

We must uphold the Secretary's regulations unless they are "arbitrary, capricious, an abuse of discretion, [ ] otherwise not in accordance with law," or are "unsupported by substantial evidence." 5 U.S.C. § 706. When reviewing an agency's interpretation of a statute which that agency administers, we look to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc .,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* established that where Congress has spoken to the precise question at issue, the court asks whether the interpretation of an agency that administers the statute is based on a permissible construction of the statute, and if it is then the court must defer to the agency's construction. *Id.* at 842–43. In the present case, the question is whether the Secretary had authority to order that state-inspected meat and poultry can enter federally inspected plants only if it is kept separately for storage and distribution, and that state-inspected poultry cannot be repackaged, relabeled, or processed in a federally inspected plant.

Specifically, Ohio challenges the regulations the Secretary promulgated under Section 605 of the FMIA and Section 465 of the PPIA. *See* 9 C.F.R. §§ 318.1(a), 318.1(h)(2), 381.145(a). Section 605 of the FMIA provides that

> [t]he Secretary may limit the entry of carcasses, parts of carcasses, meat and meat food products, and other materials into any [federally inspected] establishment ..., under such conditions as he may prescribe to assure that allowing the entry of such articles into such inspected establishments will be consistent with the purposes of this [Act].

**\*6** 21 U.S.C. § 605; *see also id.* § 465 ("The Secretary may limit the entry of poultry products and other materials into any [federally inspected] establishment, under such conditions as he may prescribe to assure that allowing the entry of such articles into such inspected establishments will be consistent with the purposes of this [Act].").

We conclude that Congress did not speak to the precise question at issue, leaving it instead to the Secretary to set out "such conditions as he may prescribe ... [that] will be

2002 WL 31780191

consistent with the purposes of this [Act]." 21 U.S.C. §§ 605, 465; *see also* 21 U.S.C. §§ 602, 452 (establishing that the purposes of the Meat and Poultry Acts are to ensure that meat and poultry is safe and healthy). Our inquiry, then, must be whether the Secretary's regulation is a permissible construction of the statute. We find that it is, for the reason noted above: the USDA does not scrutinize state-inspected plants as frequently as it does federally inspected plants or federally inspected foreign meat and poultry, and hence there is the possibility that state-inspected meat and poultry would not be as safe.

### Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court dismissing the Plaintiffs' case.

**All Citations**

Slip Copy, 2002 WL 31780191

## Footnotes

*    The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

2    The meat and poultry plants in all other states were under federal supervision. When a state abandons its inspection program, the state's inspection facilities immediately fall under the supervision of the federal inspection system. Plants under state inspection are also returned to federal control if a previously authorized state fails to meet the Secretary's requirements. 21 U.S.C. §§ 661(c), 454(c).

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4302836

561 F.Supp.3d 717
United States District Court, E.D. Texas.

Michael FIELDS et al., Plaintiffs,
v.
TYSON FOODS, INC., Defendant.

No. 6:20-cv-00475
|
Signed 09/22/2021

**Synopsis**

**Background:** Employees brought action against employer for negligence and gross negligence, alleging that employer failed to satisfy duty of care to keep meat-packing facility where they worked in reasonably safe condition and failed to exercise ordinary care to reduce or eliminate risk of employees being exposed to COVID-19. Employer moved to dismiss for failure to state claim based on pre-emption by federal Poultry Products Inspection Act (PPIA) as well as liability shield of Texas Pandemic Liability Protection Act (PLPA).

**Holdings:** The District Court, J. Campbell Barker, J., held that:

duty of care alleged in employees' claims would impose requirements "in addition to" those authorized and promulgated under PPIA, and thus PPIA expressly pre-empted claims;

employees failed to adequately allege that reliable scientific evidence demonstrated employer was cause-in-fact of their contracting COVID-19; and

they also failed to allege that employer had reasonable opportunity to implement government-promulgated standards or warn employees of dangerous infectious conditions due to COVID-19, and thus PLPA shielded employer from liability.

Motions granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

***718** Kurt B. Arnold, Andrew Robert Gould, Claire Elizabeth Traver, Micajah Daniel Boatright, Roland Thomas Christensen, Arnold & Itkin, LLP, Houston, TX, Christopher C. Hughes, Christopher C. Hughes, Attorney at Law, Nacogdoches, TX, Don Wheeler, Law Office of Don Wheeler, Center, TX, for Plaintiffs.

Zachary Thomas Mayer, Joseph Edward Johnson, II, Mayer LLP, Dallas, TX, Christopher S. Coleman, Jessica Everett-Garcia, Perkins Coie LLP, Phoenix, AZ, for Defendant.

### OPINION AND ORDER

J. Campbell Barker, United States District Judge

**\*\*1** Before the court are defendant's motion to dismiss (Doc. 17) and supplemental motion to dismiss (Doc. 29). For the reasons set forth below, those motions are granted.

### Background

Plaintiffs complain that their employer, Tyson Foods, directed them to come back to work after Texas and other States issued stay-at-home orders in response to COVID-19. Doc. 7 ¶ 14. Plaintiffs allege that Tyson failed to take adequate safety measures—including by not providing personal protective equipment to its employees and not implementing social-distancing guidelines—which caused them to contract COVID-19. *Id.* ¶¶ 15, 16, 21. Plaintiffs bring causes of action for negligence and gross negligence, claiming that Tyson failed to satisfy a duty of care to keep its premises in a reasonably safe condition and failed to exercise ordinary care to reduce or eliminate the risk of its employees being exposed to COVID-19. *Id.* ¶¶ 21, 28, 29, 31.

The meat-packing facility at which plaintiffs worked is subject to federal regulation under the Poultry Products Inspection Act **\*719** of 1957 ("PPIA"). 21 U.S.C. §§ 451 *et seq.*; *see also* FSIS Meat, Poultry and Egg Product Inspection Directory at 517 (Sept. 6, 2021) (identifying Tyson's facility in Carthage, Texas, as establishment number P7044), https://www.fsis.usda.gov/sites/default/files/media_file/2021-09/

Fields v. Tyson Foods, Inc., 561 F.Supp.3d 717 (2021)

2021 WL 4302836

MPI_Directory_by_Establishment_Number.pdf. The United States Department of Agriculture's Food Safety and Inspection Service ("FSIS") promulgates the relevant regulations. 9 C.F.R. § 300.2(a), (b)(2). The PPIA requires the FSIS to inspect domesticated birds when slaughtered and processed into products for human consumption. The PPIA also requires the inspection of plant facilities to ensure sanitary conditions, provide for infectious-disease control, and regulate personal protective equipment. *See id.* §§ 416.5(c), 381.36(c), 381.45, 416.5(c).

On December 14, 2020, Tyson filed a motion to dismiss plaintiffs' first amended complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 17. Plaintiffs timely responded (Doc. 18), and Tyson filed a reply. Doc. 19. On June 28, 2021, Tyson filed a supplemental motion to dismiss, asserting that the recently passed Pandemic Liability Protection Act ("PLPA") was a new ground for dismissal not available to Tyson at the time of its first motion to dismiss. Doc. 29. The PLPA, enacted on June 14, 2021, provided retroactive protections to businesses against damages lawsuits alleging exposure to COVID-19. Plaintiffs timely responded (Doc. 31), and Tyson filed a reply. Doc. 32. Both motions are now ripe for resolution.

## Discussion

Having construed the facts in the light most favorable to plaintiffs, the court holds that their operative complaint fails to state a claim against Tyson for which relief may be granted because the PPIA's express-preemption clause and the PLPA each independently foreclose plaintiffs' claims.

## A. Poultry Products Inspection Act (PPIA)

The PPIA contains an express-preemption clause: "Requirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State." 21 U.S.C. § 467e. Thus, regulations promulgated by the FSIS—the body responsible for administering the PPIA and regulating the processing and distribution of poultry products (including regulations regarding infectious disease) —override state requirements that are different than or in addition to those regulations.

**\*\*2** That express-preemption clause is essentially the same as the nearly identical provision in the Federal Meat Inspection Act ("FMIA"). Both contain "substantially identical preemption language." *See Grocery Mfrs. of Am., Inc. v. Gerace,* 755 F.2d 993, 996 (2d Cir. 1985); 21 U.S.C. § 678 (prohibiting states from imposing "[r]equirements with respect to premises, facilities and operations of any establishment ... which are in addition to, or different than those made under [the FMIA]."). Indeed, the FMIA and PPIA are two sides of the same coin. Where the FMIA is responsible for regulating certain aspects of slaughterhouses for beef and pork, the PPIA covers the same standards for poultry processing. Both statutes are administered by the FSIS.

The Supreme Court held in *National Meat Association v. Harris* that "[t]he FMIA's preemption clause sweeps widely," as it "prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the Act and concern a slaughterhouse's **\*720** facilities and operations." 565 U.S. 452, 459–60, 132 S.Ct. 965, 181 L.Ed.2d 950 (2012). The PPIA's preemption clause has a similarly broad reach.

Contrary to plaintiffs' argument, PPIA preemption extends to state-law tort claims. The Supreme Court has frequently recognized "that a provision pre-empting state 'requirements' pre-empt[s] common-law duties." *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 324, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008); *see Bates v. Dow Agrosciences, LLC,* 544 U.S. 431, 444, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) ("[T]he term 'requirements' ... reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties."). These general common law duties include "negligence, strict-liability, and implied-warranty claims" in the context of personal injuries. *Id.* at 327, 128 S.Ct. 999. So, if the state requirements fall "within the scope" of the PPIA, plaintiffs' common law tort claims (even involving personal injuries) are foreclosed by the PPIA's express-preemption clause.

The state-law tort claims here fall "within the scope of" the PPIA—and are therefore preempted. The crux of plaintiffs' claims is that Tyson failed to impose adequate safety measures to reduce the spread of COVID-19 in its Carthage, Texas, facility. But the FSIS has promulgated, and has authority to promulgate, a number of regulations that directly address the spread of disease.

For example, FSIS has promulgated many federal regulations concerning infectious diseases like the "disease control"

2021 WL 4302836

regulation requiring that "any person who has or appears to have an infectious disease ... must be excluded from any operations which could result in product adulteration and the creation of insanitary conditions until the condition is corrected." 9 C.F.R. § 416.5(c). The FSIS also has regulations requiring facilities to "monitor and document any work-related conditions of establishment workers," to "encourage early reporting of symptoms of injuries and illnesses," to provide "[n]otification to employees of the nature and early symptoms of occupational illnesses ... including by posting in a conspicuous place ... a copy of the FSIS/OSHA poster encouraging reporting and describing reportable signs and symptoms." *Id.* § 381.45. FSIS also promulgates regulations regarding employee clothing hygiene, requiring: "Aprons, frocks, and other outer clothing worn by persons who handle product must be of material that is disposable or readily cleaned. Clean garments must be worn at the start of each working day and garments must be changed during the day as often as necessary to prevent adulteration of product and the creation of insanitary conditions." *Id.* § 416.5(b). The FSIS also promulgates detailed regulations regarding sanitation and hygiene procedures, such as that "hand rinsing facilities must have a continuous flow of water." *Id.* § 381.36(c).

**\*\*3** The duty of care alleged in plaintiffs' state-law tort claims would require Tyson to utilize garments or clothing in addition to those required by § 416.5(b). Plaintiffs' claimed duty would also impose additional or different requirements as those for monitoring for the spread of disease as specified in §§ 416.5(c) and 381.45. Plaintiffs' tort claims would therefore impose requirements "in addition to" those authorized and promulgated under the PPIA and are preempted by that federal law.

### B. Pandemic Liability Protection Act (PLPA)

The PLPA generally shields corporations from liability if an individual suffered "injury or death caused by exposing [the] **\*721** individual to a pandemic disease during a pandemic emergency." Tex. Civ. Prac. & Rem. Code § 148.003. Individuals may seek damages only if they can establish that:

(1) the [corporation] who exposed the individual:

(A) knowingly failed to warn the individual of or remediate a condition that the person knew was likely to result in the exposure of an individual to the disease, provided that the [corporation]:

(i) had control over the condition;

(ii) knew that the individual was more likely than not to come into contact with the condition; and

(iii) had a reasonable opportunity and ability to remediate the condition or warn the individual of the condition before the individual came into contact with the condition; or

(B) knowingly failed to implement or comply with government-promulgated standards, guidance, or protocols intended to lower the likelihood of exposure to the disease that were applicable to the [corporation], provided that:

(i) the person had a reasonable opportunity and ability to implement or comply with the standards, guidance, or protocols;

(ii) the person refused to implement or comply with or acted with flagrant disregard of the standards, guidance, or protocols; and

(iii) the government-promulgated standards, guidance, or protocols that the person failed to implement or comply with did not, on the date that the individual was exposed to the disease, conflict with government-promulgated standards, guidance, or protocols that the person implemented or complied with; and

(2) reliable scientific evidence shows that the failure to warn the individual of the condition, remediate the condition, or implement or comply with the government-promulgated standards, guidance, or protocols was the cause in fact of the individual contracting the disease. *Id.*

Hence, to survive dismissal, plaintiffs must plausibly allege that Tyson either (a) knowingly failed to warn them or remedy some condition at the facility that Tyson knew would expose plaintiffs to COVID-19 or (b) knowingly flouted government-promulgated COVID-19 guidance that was applicable to the corporation. Additionally, the complaint must further allege that "reliable scientific evidence" shows that Tyson's conduct was the cause-in-fact of plaintiffs' contracting COVID-19. The complaint, however, does not meet any of these requirements. Plaintiffs fail to adequately allege all the requirements to show the requisite "knowing failures" by Tyson.

**Fields v. Tyson Foods, Inc., 561 F.Supp.3d 717 (2021)**

2021 WL 4302836

The same issues were discussed in a substantially similar case in the Northern District of Texas, in which the court gave examples of how the plaintiffs' complaint failed to allege facts that meet the PLPA standards. First, the plaintiffs failed to allege that "reliable scientific evidence" showed that the defendant was the cause-in-fact of plaintiffs' contracting COVID-19. Second, the plaintiffs did not allege the dates they contracted COVID-19, so it was impossible for the court to determine if defendants had a "reasonable opportunity" to implement government-promulgated standards or warn the plaintiffs of dangerous infectious conditions. *Wazelle v. Tyson Foods, Inc.*, No. 2:20-CV-203-Z, 2021 WL 4145090 (N.D. Tex. Aug. 20, 2021).

 **\*\*4**  The same deficiencies are present here. Plaintiffs fail the causation prong because they provide no "reliable scientific  **\*722**  evidence" that shows that Tyson was the cause-in-fact of plaintiffs' contracting COVID-19. Plaintiffs make only conclusory statements that they contracted COVID-19 because of unsafe working conditions, without alleging how, when, or why they contracted COVID-19 or accounting for other possible sources of infection.

Plaintiffs also fail to allege the dates on which they allegedly contracted COVID-19. The court agrees that, without such dates, it is impossible to determine if the defendants had a "reasonable opportunity" to implement government-promulgated standards or warn the plaintiffs of dangerous infectious conditions. Plaintiffs have not alleged facts sufficient to satisfy the PLPA.

### C. Any attempt to amend is futile

Plaintiff requests the opportunity to amend their complaint to cure any deficiencies found therein. Although a court "should freely give leave [to amend] ... when justice so requires," Fed. R. Civ. P. 15(a)(2), "[i]t is within the district court's discretion to deny a motion to amend if it is futile," *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 872–73 (5th Cir. 2000). An amendment is futile if "the amended complaint would fail to state a claim upon which relief could be granted." *Id.* Plaintiffs argue that an amendment might allow them to plead facts that satisfy the PLPA, which was enacted after the complaint. Even if that is so, however, PPIA preemption would still independently foreclose the claims. Thus, the envisioned amendment would be futile.

### Conclusion

For the reasons given above, defendant's motions to dismiss are granted. A final judgment will issue forthwith.

*So ordered by the court on September 22, 2021.*

### All Citations

561 F.Supp.3d 717, 2021 WL 4302836

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2637335

2021 WL 2637335
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Amarillo Division.

Jamie WAZELLE, et al., Plaintiffs,

v.

TYSON FOODS, INC., et al., Defendants.

2:20-CV-203-Z
|
Signed 06/25/2021

**Attorneys and Law Firms**

Kurt B. Arnold, Andrew Robert Gould, Caj D. Boatright, Claire Elizabeth Traver, Joseph F. McGowin, Roland Thomas Christensen, Arnold & Itkin LLP, Houston, TX, Timothy D. Newsom, Law Offices of Frank L. Branson, PC, Dallas, TX, Joe L. Lovell, Lovell Lovell Isern & Farabough, Amarillo, TX, for Plaintiffs.

Kelly D. Utsinger, Titiana Dixon Frausto, Christopher Jason Fenton, Underwood Law Firm, Amarillo, TX, Christopher S. Coleman, Pro Hac Vice, Jessica L. Everett-Garcia, Pro Hac Vice, Perkins Coie LLP, Phoenix, AZ, Mary Z. Gaston, Pro Hac Vice, Perkins Coie LLP, Seattle, WA, for Defendants.

**MEMORANDUM OPINION AND ORDER**

MATTHEW J. KACSMARYK, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is Plaintiffs' Motion to Remand ("Motion") (ECF No. 13). For the reasons stated below, Plaintiffs' Motion is **DENIED.**

**BACKGROUND**

Plaintiffs were employees of Defendant Tyson Foods' meat-packing plant located in Amarillo, TX during the first half of 2020. ECF No. 1-14 ("First Amended Petition") at 9. As the COVID-19 pandemic swept across the United States, many states, including Texas, began to implement precautionary measures to slow the spread of the virus. *Id.* Effective April 2, 2020, Texas Governor Greg Abbott issued a stay-at-home order, but Plaintiffs allege they were required to continue to work at Tyson Foods' meatpacking plant. *Id.*

While working at the plant, Plaintiffs allege that they were exposed to and contracted COVID-19 — both before and after Governor Abbott's order. *Id* at 10. Asserting claims for negligence, gross negligence, and wrongful death, Plaintiffs brought suit in Texas state court naming Ernesto Sanchez, Kevin Kinikin, and Farren Fernandez as defendants. ECF No. 1-3 at 9. Plaintiffs alleged these individuals "failed to fulfill their job duties to provide a safe working environment to Plaintiffs." *Id.* Plaintiffs later amended their state petition to include Tyson Foods as a Defendant. First Amended Petition at 8.

On August 28, 2020, Defendants timely removed the case to this Court under 28 U.S.C. § 1442(a)(1). ECF No. 1 at 4. On September 25, 2020, Plaintiffs filed their Motion to remand this case back to the 251st District Court, Potter County. ECF No. 13.

**LEGAL STANDARDS**

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Lavery v. Barr*, 943 F.3d 272, 275 (5th Cir. 2019) (internal quotations omitted). "Any ambiguities are construed against removal because the removal statute should be strictly construed in favor of remand." *Manguno v. Prudential Prop. And Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002) (citing *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000)).

The federal officer removal statute, however, must be liberally interpreted because of its broad language and unique purpose. *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007). The statute provides, in relevant part:

(a) A civil action or criminal prosecution that is commenced in a State court and that is against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity *for or relating to* any act under color of such office...

28 U.S.C. § 1442(a)(1) (emphasis added).

2021 WL 2637335

While courts are to interpret this statute liberally, the removing defendant still bears the burden of establishing a basis for federal jurisdiction. *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 397 (5th Cir. 1998). In light of the 2011 Congressional Amendment to section 1442(a), the Fifth Circuit articulated a four-part test to determine whether federal officer removal is justified: (1) the party has asserted a colorable federal defense; (2) the party is a "person" within the meaning of the statute; (3) the party has acted pursuant to a federal officer's directions; (4) and the charged conduct is connected or associated with an act pursuant to a federal officer's directions. *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020).

**ANALYSIS**

**\*2** The Court finds Defendants have carried their burden to establish jurisdiction under the federal officer removal statute.

**A. Defendants have asserted a colorable federal defense.**

The well-pleaded complaint rule provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. *Caterpillar v. Williams*, 482 U.S. 386, 392 (1987). Consequently, the well-pleaded complaint rule usually bars defendants from removing to federal court when the only jurisdictional hook is a federal defense. *See Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908).

But the federal officer removal statute is an exception. It permits an officer to remove a case even if no federal question is raised so long as the officer asserts a federal defense. *Latiolais*, 951 F.3d at 290. The asserted defense need not even be clearly sustainable. *Id.* at 297. Instead, "an asserted federal defense is colorable unless it is immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous." *Id.* "Certainly, if a defense is plausible, it is colorable." *Id.*

In their notice of removal, Defendants raised two federal defenses. ECF No. 1 at 10–11. First, they argue that the Federal Meat Inspection Act (FMIA) expressly preempts plaintiffs' state-law claims. *Id.* at 10. Second, the Defendants claim that there is conflict preemption between Plaintiffs' claims and President Trump's April 28 Executive Order paired with the Defense Production Act. *Id.* at 10–11.

The Federal Meat Inspection Act "regulates a broad range of activities at slaughterhouses to ensure the safety of meat and the humane handling of animals." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455 (2012). The FMIA contains an express preemption provision which reads:

> "Requirements *within the scope* of this [Act] with respect to *premises, facilities and operations* of any establishment at which inspection is provided under ... this [Act], which are *in addition to, or different* than those made under this [Act] may not be imposed by any State."

21 U.S.C. § 678 (emphasis added).

In the Plaintiffs' view, the FMIA only expressly preempts state laws covering the inspection, handling, and slaughter of livestock for human consumption, so their common-law tort and wrongful death claims are not preempted. ECF No. 13 at 15.

Defendants emphasize the first portion of the provision, which prohibits state-law requirements "with respect to premises, facilities and operations." Defendants also stress the Supreme Court has ruled that the Federal Meat Inspection Act's preemption clause "sweeps widely." *Nat'l Meat Ass'n*, 565 U.S. at 459.

In sum, Plaintiffs frame this case as a workplace safety issue that is not preempted by FMIA. Defendants frame this case as being about "sanitary conditions" and "disease control" which could be pre-empted by the FMIA. *See, e.g.*, 9 C.F.R. §§ 416.5(b)-(c), 416.2(b).

Preliminarily, the Court takes note that the Supreme Court has held "that state laws of general application (workplace safety regulations, building codes, etc.) will *usually* apply to slaughterhouses." *Id.* at 467 n. 10 (emphasis added). The word "usually" implies that *sometimes* the FMIA *does* preempt state workplace safety regulations.

**\*3** This case is not a typical workplace injury case such as a slip and fall that falls outside of the scope of the FMIA's preemption provision. *See, e.g.* ECF No. 15 at 13–14 (collecting workplace-safety cases against Tyson Foods that proceeded in state court). Instead, this case arose in the unique context of a global pandemic. Workplace conditions and procedures related to disease prevention implicate food safety, which could bring Plaintiffs' claims under the ambit of the FMIA.

2021 WL 2637335

At this stage, the Court finds, without expressing any opinion on the merits, that preemption under the Federal Meat Inspection Act is plausible. And, as the Fifth Circuit has held, if the defense is plausible, it is colorable. *Latiolais*, 951 F.3d at 297. Accordingly, Defendants have satisfied the first prong of the *Latiolais* requirements. [1]

### B. Defendants are "persons" within the meaning required in Section 1442.

The parties do not dispute that Defendants satisfy the second prong of the *Latiolais* test. Section 1442(a)(1) applies to "private persons," *Bell v. Thornburg*, 743 F.3d 84, 89 (5th Cir. 2014) (quoting *Watson*, 551 U.S. at 143). And it applies to corporations. *Latiolais*, 951 F.3d at 291.

### C. Defendants acted under a federal officer's directions.

Defendants must establish they were *acting under* the directions of a federal officer to satisfy the third prong under *Latiolais*. 28 U.S.C. § 1442(a)(1); *Latiolais*, 951 F.3d at 296.

Under section 1442(a)(1), a "private person's acting under must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152. "Although the words 'acting under' are undoubtedly broad, the Supreme Court has clarified that they must refer to a relationship that involves acting in a certain capacity, considered in relation to one holding a superior position or office." *Zeringue v. Crane Company*, 846 F.3d 785, 792 (5th Cir. 2017).

Defendants point to two possible sources of direction from a federal officer: Tyson Foods' designation as "critical infrastructure" and President Trump's April 28, 2020 Executive Order. ECF No. 20 at 10–12. [2]

Defendants argue they were acting under a federal officer's directions because Tyson Foods was designated as "critical infrastructure" by the federal government. The Patriot Act empowers the federal government to designate particular industries as "critical infrastructure," meaning that "their incapacitation or destruction would have a debilitating effect on security, national economic security, national public health or safety, or any combination thereof." ECF No. 20 at 5.

On March 13, 2020, Tyson Foods, along with other components of the Food and Agriculture Sector, was designated as critical infrastructure in response to the COVID-19 pandemic. *Id.* at 6; Exec. Office of Pres., *Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 85 Fed. Reg. 15,337, 15,337 (Mar. 13, 2020).

**\*4** After this designation, Tyson Foods interacted with multiple government agencies and was "in close contact with officials at the U.S. Department of Homeland Security and the U.S. Department of Agriculture regarding continued operations." ECF No. 20 at 11. On March 15, just two days after the declaration of a national emergency, Tyson Foods also participated in a meeting between President Trump and other food industry executives "to discuss the stability of the supply chain." *Id.*

In the following days, Tyson Foods began working directly with the United States Food Safety and Inspection Service (FSIS). *Id.* at 7. Tyson Foods communicated informally [3] but regularly with FSIS Administrator Paul Kiecker. *Id.* FSIS had employees staffed onsite at meatpacking plants—including those operated by Tyson Foods — to ensure that they maintained operations. *Id.* Moreover, "Congress allocated additional funding [to FSIS], precisely for the purpose of continued operations under federal oversight." *Id.* at 12. Finally, Tyson Foods worked with both the Department of Agriculture and the Federal Emergency Management Agency to receive personal protective equipment for its employees. *Id* at 7.

Plaintiffs contend that the critical-infrastructure designation is insufficient to conclude that defendants were "acting under" the directions of a federal officer Plaintiffs specifically cite to *Watson v. Phillip Morris*, where the Supreme Court held that private entities that are merely subject to government regulation cannot remove under the federal officer removal statute. 551 U.S. at 152 ("In our view, the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law."). Plaintiffs aver that Defendants' evidence only proves "they communicated with federal regulators and that Tyson Foods was subject to federal regulation." ECF No. 25 at 7.

But unlike *Watson*, Defendants here exhibited "an effort to help assist, or carry out, the duties and tasks of the federal superior." *Watson*, 551 U.S. at 152. Defendants did so by working directly with the Department of Agriculture and the FSIS to guarantee that there was an adequate food supply. ECF No. 20 at 7. ("On March 16, 2020, the

2021 WL 2637335

Department of Agriculture issued a statement that it was committed to the 'timely delivery of services to maintain the movement of America's food supply from farm to fork," and that it was "prepared to *utilize their authority and all administrative means and flexibilities* to address staffing considerations.") (emphasis added). Both the Department of Agriculture and the FSIS closely monitored Tyson Food's meatpacking plants, staffing some employees onsite during the pandemic. Congress even allocated additional funding to FSIS to ensure that they had the resources to adequately supervise meatpacking plants like the one at issue in this case.

**\*5** Accordingly, the Court finds Defendants were "acting under" the directions of federal officials when the federal government announced a national emergency on March 13, 2021 and designated Tyson Foods as "critical infrastructure."

### D. The charged conduct is connected or associated with an act pursuant to a federal officer's directions.

Finally, Defendants must show a connection or association between the federal officer's directions and Plaintiffs' claims. *Latiolais*, 951 F.3d at 296.

Plaintiffs assert that there must be a "causal nexus" between the Plaintiffs' claims and the directions that the Defendants received from a federal officer. *See* ECF No. 13 at 11–12. Plaintiffs rely on *Winters v. Diamond Shamrock Chemical Company*, 149 F.3d 387 (5th Cir. 1998). The *Winters* standard no longer governs.

The Fifth Circuit in *Latiolais* elucidated the correct standard after the 2011 Congressional Amendment to 28 U.S.C. § 1442(a), changing the word "for" to the phrase "for *or relating to*." *Latiolais*, 951 F.3d at 292. The *Latiolais* court held that the 2011 revisions "broadened federal officer removal

to actions, not just causally connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Id.* at 292 (emphasis added). Under this more relaxed standard, the Court finds Defendants have satisfied their burden.

Plaintiffs allege that Defendants failed to create an adequately safe working environment during the COVID-19 pandemic by not providing personal protective equipment or implementing social-distancing measures. First Amended Petition 9–10. According to the Plaintiffs, the lack of personal protective equipment and social distancing measures led to their contraction of COVID-19. *Id.* at 11.

As explained above, Tyson Foods acted under the color of federal authority by maintaining operations during the pandemic to ensure the stability of the national food supply. Logically, the choice of what safety precautions should be taken—such as whether personal protective equipment should be provided or what social-distancing measures should be adopted—is connected to the broader decision to keep the plant operating during the pandemic. Thus, the final prong of the *Latiolais* standard is met. [4]

### CONCLUSION

For the reasons set forth above, Defendants have met the standards of the federal officer removal statute. Plaintiffs' Motion to Remand is **DENIED.**

### SO ORDERED.

### All Citations

Slip Copy, 2021 WL 2637335

### Footnotes

1    Because the Court holds that Defendants have a colorable defense under the FMIA, the Court does not address Defendants' second argument regarding conflict preemption with President Trump's Executive Order. The Court notes, however, that the Executive Order was issued *after* the primary allegations in the First Amended Petition.

2    Because the Court holds that Defendants were acting under the direction of a federal officer because of Defendants' "critical infrastructure" designation, the Court does not address Defendants' second argument

2021 WL 2637335

regarding President Trump's Executive Order. Moreover, the Court notes the Executive Order was issued *after* the primary allegations in the First Amended Petition. *See supra*, fn 1.

3    To the extent some of the federal direction may have been more "informal," including emails, phone calls, and weekly meetings with FSIS and other federal officials regarding how to maintain operations safely, that informality does not change the fact that Defendants were still receiving and following federal direction. "It was recognized that, for reasons of practical necessity, urgently needed government orders had to be obtained ' "by non-mandatory directions based ultimately on the powers of compulsion rather than by the actual exercise of the statutory compulsive powers.' " *E. Air Lines, Inc. v. McDonnel Douglas Corp.*, 532 F.29 957, 993 (5th Cir. 1976) (quoting Dodd, *Impossibility of Performance of Contracts Due to War-Time Regulations,* 32 HARV. L. REV. 789, 798 (1919)). Although the President did not invoke the Defense Production Act until April 28, 2020, the President's authority under the DPA and Tyson Foods' earlier designation as critical infrastructure gave greater weight to the informal communications during the early and rapidly developing days of the COVID-19 pandemic. *Id.* at 998. ("[A] cumbersome and inflexible administrative process is antithetical to the pressing necessities.").

4    Because defendants have established federal jurisdiction under the federal officer removal statute, it is not necessary to determine whether there is federal question jurisdiction as well. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g&Mfg.*, 545 U.S. 308 (2005).

---

**End of Document**                                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.